## EXHIBIT 1

Credit Suisse has a long and exhaustive history of disregard for laws of the United States as well as other countries. Credit Suisse has been fined billions of dollars for its nefarious actions. Their actions are not a one-time mistake by a rogue employee, but rather a multi-year, multi-occurrence, coordinated and premeditated enterprise.

Quotes from a recent analysis entitled Corporate Rap Sheet /Credit Suisse by Philip Mattera reveal much of the past bad acts Credit Suisse is known to have committed.

"Credit Suisse, which used an alliance with First Boston to become a force in U.S. investment banking, has in recent years been caught up in a variety of scandals involving its role in helping wealthy U.S. and German customers evade taxes, its apparent violations of U.S. laws prohibiting dealings with countries such as Iran and Sudan, and its involvement in selling toxic subprime mortgage securities to investors. In 2014 it pleaded guilty to a federal criminal charge related to the tax issue and was forced to pay a penalty of $2.6 billion."

### HISTORY OF CREIDT SUISSE AG

In the late 1970s Credit Suisse faced a scandal when managers of its branch in Chiasso were found to have diverted more than $1 billion of the bank's money into off-the-books investments for their personal benefit. The bank recovered the assets and prosecuted the managers.

In 1988 Credit Suisse, along with the other major Swiss banks, was embroiled in a controversy involving money laundering. The banks were reported to have been used by a Turkish-Lebanese drug ring to launder some $1 billion in cash, which was said to have arrived in suitcases at Zurich airport and taken directly to the banks (see Wall Street Journal, November 7 and 9, 1988). The banks denied doing anything wrong. Credit Suisse also played a role in the Reagan Administration's Iran/Contra scandal.

A decade later, the Swiss banks were also hit with lawsuits filed in the United States by relatives of Holocaust victims who had been unable to access assets held by the banks for decades because of a lack of documentation. There were also charges that the banks profited by receiving deposits of funds that had been looted by the Nazis. In 1998 the banks agreed to pay a total of $1.25 billion in restitution. The judge in the case later accused the banks of stonewalling in paying out the settlement.

### A ROCKY ALLIANCE WITH FIRST BOSTON

After White Weld merged with Merrill Lynch, Credit Suisse found a new Euromarket partner in another U.S. firm, First Boston. Created in the 1930s out of the investment banking subsidiaries of First National Bank of Boston and Chase National Bank (which had to be spun off to comply with the Glass-Steagall Act), First Boston was a defendant in the antitrust suit brought by the Truman Administration against 17 investment banks. Although the case was ultimately dismissed, it kept First Boston and the other firms in a legal morass for six years.

CSFB was a target of U.S. divestment activists in the early 1990s because of Credit Suisse's operations in apartheid-era South Africa. Later that decade, it was one of the investment banks sued for their role in the 1994 bankruptcy of California's Orange County. In 1998 CSFB agreed to pay $870,000 to settle SEC charges of having misled investors in Orange County bonds and then settled a suit brought against it by the county for $52.5 million.

In 1999 Japan's Financial Supervisory Agency revoked the business license of a CSFB unit after investigating the firm for using derivatives transactions to help companies conceal losses—and for impeding that investigation by destroying evidence. The latter also led to a criminal conviction in a Japanese court and a £4 million fine by Britain's Financial Services Authority.

Exhibit 1 – Page 1

## DOT COM AND ANALYST CONFLICT OF INTEREST SCANDALS

In 2000 CSFB sought to bolster its position on Wall Street by arranging to acquire investment house Donaldson, Lufkin & Jenrette, the leading U.S. trader of junk bonds, from French financial services giant AXA Group. Instead, CSFB found itself in the middle of a controversy over the way in which it allocated shares of initial public offerings of tech stocks. In 2002 the SEC announced that the firm would pay $100 million to settle allegations that it charged inflated commissions to customers for shares of "hot" IPOs. Industry regulator NASD (now FINRA) later fined and suspended two CSFB executives for failing to prevent those practices.

Also in 2003, CSFB was one of ten major investment firms that agreed to pay a total of $1.4 billion in penalties, disgorgement and investor education spending to settle federal and state charges involving conflicts of interest between their research and investment banking activities. CSFB's share was $200 million.

In 2004 NASD fined CSFB $170,000 and ordered $600,000 in restitution for failing to provide customers the best price in an initial public offering. In 2005 CSFB agreed to pay $12.5 million to settle a lawsuit brought by investors against it and other investment banks for their role in helping WorldCom sell bonds to the public prior to its collapse amid an accounting scandal.

In 2006 NASD fined Credit Suisse Securities (the new name given to CSFB that year) $225,000 for numerous violations of research analyst conflict of interest rules. In 2007 the Financial Services Authority fined Credit Suisse £1.75 million for failing to provide accurate and timely transaction reports.

In 2008 Credit Suisse agreed to pay 172.5 million euros to settle litigation relating to its dealings with the dairy company Parmalat, which had collapsed five years earlier in Italy's largest bankruptcy case. That same year, its UK operation was fined £5.6 million by the Financial Services Authority for management's failure to recognize that some of the firm's traders had mis-priced asset-backed securities.

In 2009 FINRA fined Credit Suisse Securities $275,000 for failing to fully comply with the 2003 Global Research Analyst Settlement. Later that year, Credit Suisse had to agree to pay $536 million and enter into a deferred prosecution agreement to settle accusations by U.S. government and New York State authorities that it violated laws prohibiting dealings with customers in countries such as Iran and Sudan. The charges alleged that the bank *altered wire transfers to remove names that* appeared on official lists of banned entities. That is the same method Credit Suisse used in hiding the true identities of the approximate 22,000 Americans that Credit Suisse helped evade reporting foreign income.

## TAX EVASION CHARGES

In 2010 Credit Suisse's offices in Germany were searched by police and prosecutors as part of an investigation of the role the bank's employees may have played in helping clients evade taxes. The following year, four employees of Credit Suisse were indicted in U.S. federal court on charges of providing banking services designed to enable tax evasion. (The case is pending.) Credit Suisse later disclosed that it was being investigated by U.S. authorities for such activity. In September 2011 Credit Suisse agreed to pay German authorities 150 million euros to put an end to an investigation of whether it helped clients conceal assets. The investigation of those clients continued, and in July 2012 German authorities conducted a series of raids at the homes and offices of an unspecified number of wealthy Credit Suisse customers.

In 2011, FINRA fined Credit Suisse Securities $4.5 million for abuses, including the misrepresentation of delinquency rates, relating to the sale of subprime mortgage securities, and later added another fine of $1.75 million for failing to properly supervise short sales. That same year, the Federal Housing Finance Agency sued Credit Suisse and other firms for abuses in the sale of mortgage-backed securities to Fannie Mae and Freddie Mac (in 2014 Credit Suisse agreed to pay $885 million to

Exhibit 1 – Page 2

settle the case). And the Financial Services Authority imposed a fine of £5.95 million for failing to exercise proper controls in the sale of complex financial instruments known as structured capital at risk products.

In February 2012 federal prosecutors brought criminal charges against three former Credit Suisse investment bankers and traders for inflating the value of subprime mortgage securities during 2007 and 2008 in a scheme to increase their year-end bonuses. Two of the traders, David Higgs and Salmaan Siddiqui, each pleaded guilty to one count of conspiracy to falsify records and commit wire fraud. U.S. Attorney Preet Bharara called on the third trader, Kareem Serageldin, who was living in London, to return to the United States to face the charges against him. (In early 2013 he was extradited to the U.S.)

In November 2012 the SEC announced that Credit Suisse Securities would pay $120 million to settle charges of misleading investors in the sale of mortgage-backed securities; specifically, it was charged with failing to tell investors of the fees it received from mortgage originators when packing delinquent loans into the securities.

Despite the settlement, Credit Suisse was then sued by New York Attorney General Eric Schneiderman, acting on behalf of a federal working group on mortgage-backed securities, on charges similar to those that had been brought by the SEC.

In February 2014 the SEC announced that Credit Suisse would pay $196 million and admit wrongdoing to settle charges that it had provided cross-border brokerage and investment advisory services to U.S. clients without first registering with the agency.

That same month, Credit Suisse's woes on the tax evasion issue escalated as a lengthy report by a Senate investigative committee provided extensive details of ways in which the bank allegedly helped wealthy U.S. customers evade taxes. At a hearing on the report, Credit Suisse executives faced intensive grilling from both Republican and Democratic senators.

In May 2014 the Justice Department announced that Credit Suisse would plead guilty to one criminal count of conspiring to aid tax evasion and would pay penalties of $2.6 billion."

On May 21, 2014 Employees Retirement System of Texas halted trading with Credit Suisse AG after Switzerland's second-biggest bank pleaded guilty to a U.S. criminal charge.
"We are suspending trading with them at this time," Mary Jane Wardlow, spokeswoman in Austin for the pension fund, which manages $25.4 billion for state workers, said in an e-mail. "We have a policy against hiring firms convicted of felonies."

In virtually every state, if any citizen had a rap sheet this long they would be considered a serial offender. Credit Suisse should not be considered otherwise.

Tim L. Blixseth

Exhibit 1 – Page 3

Sender name - Tim L. Blixseth
　　　　　1605 73 rd Ave.NE
　　　　　Medina, Wa. 98039
　　　　　206-422-7435


Recipient name- Honorable Rebecca Beach Smith, chief judge.
　　　　　United States District Court for the Eastern district of Virginia

　　　　　401 Courthouse Square
　　　　　Albert V. Bryan Courthouse
　　　　　Alexandria , Virginia 22314
　　　　　703-299-2100

Contents- paperwork
Delivered- tomorrow morning first thing
Declared value- 0