IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) CRIMINAL NO. 1:14-CR- 188 | |
| | ) | |
| CREDIT SUISSE AG, | ) | |
| | ) | |
| Defendant. | ) | |

## Notice of Intent to Be Heard at Sentencing Hearing and Other Matters

24 October 2014

The undersigned (Dr Paul Morjanoff) is representing himself pro se and over 450 US and foreign clients by Power of Attorney, collectively known hereafter as the "Victims' Group".

The Victims' Group is a party of interest which respectfully requests permission to present to the court:

1. Information regarding relevant conduct for which Credit Suisse AG is accountable under U.S.S.G. § 1B1.3 and other relevant information.
2. Information showing that Credit Suisse AG has broken the Plea Agreement making it liable to be criminally prosecuted by the United States for expanded charges under conditions where it may not withdraw its current plea of guilty or previously submitted evidence.
3. A Request that the current Plea Agreement be rejected unless the United States exercises its right to be released from all its commitments under the plea agreement, and either prosecutes the defendant or negotiates a new and appropriate Plea Agreement and the Victims' Group is granted its rights according to Point 7 following.
4. A Request to be given the status of victims according to 18 U.S. Code § 3663A the Mandatory Victims Restitution Act ("MVRA") and that this status be extended to include the rights available under the Crime Victims' Rights Act of 2004 ("CVRA") and similar statutes to the extent allowed by law.
5. Claims for Restitution under the Mandatory Victims Restitution Act for $500 million.
6. A Request for permission to be heard at the Sentencing Hearing by the undersigned and an appropriate number of other victims (including their relatives, medical or psychological practitioners or other appropriate representatives e.g. where the victim is deceased, medically or psychologically incapacitated etc.) to be heard in person or by written testimony or by voice or video recording.
7. A Request for permission to confer with United States Attorney/s and other officers as appropriate at Alexandria and elsewhere (or their appropriate delegated representative/s) prior to and after any decision by the United States regarding:
   a. Exercising its right to be released from all commitments under the Plea Agreement
   b. Exercising its right to prosecute the defendant or
   c. Making any changes to the Plea Agreement and/or Statement of Facts
   d. The above be interpreted liberally to facilitate effective communication with and between foreign law enforcement, government authorities and victims where appropriate.
8. A Request that the court impose a sentence of probation on the defendant of 5 years which includes the condition of liberally interpreted full restitution to the Victims' Group if the Victims' Group is granted such full restitution under the MVRA or other statute.

9. A Request for permission to view and copy relevant evidence known to the United States as it relates to criminal activity by the defendant which may affect or relate to members of the Victims' Group or the damage they suffered, subject to such confidentiality conditions which may be required but which do not prejudice the rights of the victims.

10. A Request for permission for further information to be communicated electronically preferably by email and download links for speed and efficiency under agreed conditions.

## Overview:

The Victims' Group consists of former customers of the defendant damaged by the "Credit Suisse-TNST sub-conspiracy". We claim that the defendant, in the course of its decades' long conspiracy, offended against the United States in multiple ways (18 U.S.C. § 1341 mail fraud, 18 U.S.C. § 1343 wire fraud, 18 USC § 3293 financial institution fraud enhancement of mail and wire fraud, false statements, 18 U.S.C. Chapter 96 - Racketeer Influenced and Corrupt Organizations (RICO) offences, 18 U.S.C. 1956 & 1957 money laundering, securities fraud and/or other offences) to loot their accounts, with the conspiracy also causing damage the victims in other ways. For the most part, the Victims' Group consists of ordinary working people, while significant numbers hold educated professional, executive, training or supervisory positions of responsibility. In many cases, the money lost represented most of, all of, or more than all of their disposable life savings. Victims' Group members generally affirm that they were damaged because of the defendant's participation and its status as a supervised and regulated financial institution.

The Credit Suisse-TNST conspiracy with its associated conspiracies relating to other smaller but similar constructs (Paramount Switzerland/Portugal, Price Richardson, Swiss Equity Trust etc) were part of the main over-arching conspiracy.

The defendant was an international bank partly under the authority of both the US Federal Reserve, and its Swiss regulator FINMA or the former SFBC (hereafter FINMA, including the period before the SFBC was consolidated into FINMA). Swiss law guarantees "irreproachable business conduct" by management[1] and this is extensively advertised by FINMA. The US Federal Reserve defers to FINMA as its "home country regulator" giving it the obligation to supervise and regulate the consolidated activities of defendant as a foreign bank operating in the USA. Permission for the defendant to operate in the USA is mandatorily dependent on FINMA doing this. Consequently, Swiss laws, regulations, judicial procedures and criminal investigations pertaining to the defendant are of direct relevance to its US activities and also to the matter at hand. Also, the bank is not compliant with minimum requirements to operate in the USA due to the extremely negative actions and omissions of FINMA.

When many Victim Group members learned of their immense losses, the shock was so unexpected that it was devastating, bringing on physical, psychological and life tragedies (divorce, heart attack, and loss of family home, severe untreatable depression, PTSD etc).

The damage was severely exacerbated by ignorance of the true cause and malicious deceit in blaming the victims. In the absence of the truth, victims tended to blame themselves by default (often with the ignorant agreement of close relatives) which mitigated against victims seeking or being able to receive useful treatment. Depression is difficult to cure when the cause is known. When the victims are defrauded of the knowledge of the true cause, it can be effectively untreatable. Even after Credit Suisse senior and top management were formally notified of the criminal combination within the bank and the damage done to their former customers, there was not the slightest acknowledgement or token effort to relieve the victims.

---

[1] Article 3c of the Swiss Banking Act and Article 10d of the Swiss Federal Act on Stock Exchanges and Securities Trading (guarantee of irreproachable business conduct in both banking and securities businesses).

## Extraordinary Aspects of these Crimes

Action is urgently required to protect honest banks from unfair competition by criminally subsidized banks which utterly distorts the risk/reward profile of the financial industry. Criminal penetration on such a scale obscures the demarcation between criminal and legitimate corporations – and pressures otherwise honest banks to venture into high risk, illegitimate, reckless, illegal or even criminal activity, destabilizing the financial system.

## A.    The Felonies due for Sentencing

Credit Suisse AG has plead guilty to two separate although related felonies:
26 U.S. Code § 7206 (2) Aid or assistance in Fraud and false statements
and
18 U.S. Code § 371 - Conspiracy to commit offense or to defraud United States

In particular, despite the efforts of the United States, it was not possible to determine the true extent or the boundaries of the conspiracy felony. The Defendant had obstructed the investigation by destroying documents, tampering with other documents, discharging involved staff without being interviewed refusing to submit documents in its possession and possibly other actions. Most or all of these obstructive acts took place after the defendant knew that it was being criminally investigated by the DOJ.

The Plea Agreement and the Statement of Facts was only able to provide a limited description of the charged conspiracy to commit offenses against United States, which took place over several decades. Only a very small number of examples were quoted. Credit Suisse destroyed evidence and knowingly obstructed the criminal investigation making it impossible for the United States to reliably determine or report the actual extent of the conspiracy.

Since the true extent of the conspiracy is relevant for sentencing, restitution, and deciding whether the court should accept the plea agreement, we are forced to look beyond the Plea Agreement and the Statement of Facts to determine this. Evidence will be presented showing that the conspiracy charged was a part of an extensive conspiracy between the defendant bank and many of its employees working in different countries, continents and wholly owned subsidiaries, and likely included agents in law enforcement, employees of other corporations and other individuals some of whom were politically placed.

It would be almost impossible that a highly profitable and corruptly protected conspiracy involving hundreds of staff did not grow over the decades. Greed predisposes its possessors to live in the illusion that they will be satisfied "with more of the object of their greed".

## B.    A Few Examples of the Defendant's Façades and Obstruction

On 26 Feb 2014 CEO Brady Dougan publicly claimed[2] that the bank had: *"invested enormous efforts to achieve as much clarity as possible about whether, and to what extent, Credit Suisse employees had violated U.S. laws or helped clients do so ......... and found only scattered evidence of improper conduct."*

The US DOJ exposed this as a sham. It found:

> *The bank's investigations were "shamefully inadequate" ...... hundreds of employees and their managers willfully aided and abetted criminal activity. They subverted disclosure requirements, destroyed bank records, and concealed transactions[3].*

On 19 May 2014, Credit Suisse plead guilty to rampant criminal conduct including evidence destruction spanning decades.

### Referring to the Statement of Facts:

§§31 – 33: CREDIT SUISSE SUBVERTED THE QI AGREEMENT[4]
§§47 – 50: CREDIT SUISSE'S INEFFECTUAL POLICIES, TRAINING, AND AUDITS
§§64 – 71 CREDIT SUISSE'S INTERNAL INVESTIGATION AND FAILURE TO PRESERVE CERTAIN DOCUMENTS

§§31 – 33: Compliance with the Q1 Agreement was mandatory for permission to operate in the US as was explicitly stated in the Order Approving Establishment of the Bank's Representative Offices[5]:

> *"To the extent that the provision of such information may be prohibited by law, Credit Suisse and Credit Suisse Group have committed to cooperate with the Board to obtain any necessary consents or waivers that might be required from third parties for disclosure of such information."*

Credit Suisse not only failed to cooperate but wilfully subverted the Qualified Intermediary Agreement ("Q1 Agreement") and deceived the Board of Governors of the Federal Reserve System. This made it liable for termination in the US as described in 12 U.S. Code § 3105 (e). An Order to Cease and Desist was issued by

---

[2] http://www.hsgac.senate.gov/download/?id=39a9fca2-2253-4d97-8116-51e87659dbdb
[3] http://www.justice.gov/iso/opa/ag/speeches/2014/ag-speech-1405192.html
[4] CREDIT SUISSE SUBVERTED THE Q1 AGREEMENT: Statement of Facts §31. Effective in or about January 2001, CREDIT SUISSE entered into a Qualified Intermediary Agreement ("Q1 Agreement") with the IRS. The Qualified Intermediary ("Q1") regime provided a comprehensive framework for U.S. information reporting and tax withholding by a non-U.S. financial institution regarding U.S. securities. The Q1 Agreement was designed to help ensure that non-U.S. persons were subject to the proper U.S. withholding tax rates and that U.S. persons were properly paying U.S. tax, in each case, with respect to U.S. securities held in an account with the Q1. Q1 agreements were subject to a "documentation transition period' announced by the IRS in Notice 2001-4 (Jan. S. 2001) that gave Q1s until the end of 2002 to achieve "substantial compliance" with the provisions of the Q1 Agreement. The Q1 Agreement expressly recognizes that a non-U.S. financial institution such as CREDIT SUISSE may be prohibited by foreign law, such as Swiss law, from disclosing an account holder's name or other identifying information. In general, a Q1 subject to such foreign-law restrictions must request that its U.S. clients either (a) grant the Q1 authority to disclose the client's identity or disclose himself by mandating the Q1 to provide an IRS Form W-9 completed by the account holder, or (b) grant the Q1 authority to sell all U.S. securities of the account holder (in the case of accounts opened before January 1, 2001) or to exclude all U.S. securities from the account (in the case of accounts opened on or after January 1, 2001). Following the effective date of the Q1 Agreement, a sale of U.S. securities, if any, held by a U.S. person who chose not to provide a Q1 with an IRS Form W-9 was subject to tax information reporting on an anonymous basis and backup withholding.

[5] http://www.federalreserve.gov/boarddocs/press/bhc/1998/19981123/

the Board of Governors of the Federal Reserve System: Docket No. 14-009-B-FB, 14-009-CMP-FB, 19th May 2014. That order stated:

*"Credit Suisse lacked adequate enterprise-wide risk management and compliance policies and procedures sufficient to ensure that all of its activities comply with applicable U.S. laws and regulations ……. "*

§§47 – 50: CREDIT SUISSE'S INEFFECTUAL POLICIES, TRAINING, AND AUDITS
Four internal audits by Credit Suisse did not identify the rampant violations of U.S. tax law and CREDIT SUISSE's own policies that had occurred. A French Parliamentary Report claimed that Swiss banks' pretence to comply with money laundering law was merely a façade[6]. FRCS can submit documents which also indicate this. Indeed, an accountable solution which complies with Swiss law may be impossible to achieve due to "Swiss Banking Secrecy".

§§64 – 71 CREDIT SUISSE'S INTERNAL INVESTIGATION AND FAILURE TO PRESERVE CERTAIN DOCUMENTS
Past cases of confirmed criminal activity in Credit Suisse[7] showed a similar pattern of evidence destruction and obstruction in criminal investigations. Consequently:

*The full extent of Credit Suisse's currently charged or previous criminal activity was never established.*

The United States Senate Permanent Subcommittee on Investigations reported[8]:

*"The Swiss government's active involvement in DOJ's Swiss bank investigations was unusual. A national government interposed itself into another country's investigations of criminal conduct by private entities and attempted to negotiate protections for an entire industry, using as leverage its laws and regulatory procedures to limit the information turned over to DOJ. Its intervention also enabled Swiss banks to stymie U.S. criminal investigations into their conduct in the United States by claiming they could not produce requested information under order of their home jurisdiction."*

Here, a foreign government intervened, forced the USA to abandon US law and submit to Swiss banking secrecy, even after the Defendant had subverted the "Q1 Agreement" which was intended to work around this problem. The bank thus concealed important information about its criminal activity and allowed *certain "protected people"* to go free.

*The adverse inference implied is that intimidation from the Swiss government protected "important people" from criminal exposure. Such lawless secrecy is against the DOJ's principles and makes meaningless the defendant's guarantees that no one involved in the underlying criminal activity will be involved in future banking activity. They effectively forced the United States into the humiliation of denying its own laws.*

---

[6] Available at: http://www.assemblee-nationale.fr/11/rap-info/i2311-3.asp or PDF version at:
   http://www.assemblee-nationale.fr/11/pdf/rap-info/i2311-3.pdf
[7] Credit Suisse "Culture of Corruption" Summary
[8] REPORT - OFFSHORE TAX EVASION: The Effort to Collect Unpaid Taxes on Billions in Hidden Offshore Accounts (Feb 26, 2014) Senate Committee on Homeland Security and Governmental Affairs.

## C. Adverse Inference

Because Credit Suisse has illegitimately destroyed evidence in virtually every recent major case of confirmed criminal conduct, we submit that it is necessary to invoke the principle of adverse inference as a mandatory sanction:

> *When a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him. When illegal means are used to destroy or otherwise make the evidence unavailable, the adverse inference principle becomes a mandatory sanction.*

For Credit Suisse, the adverse inference is that extensive and diverse criminal activity in the charged conspiracy was deliberately concealed and that the conspiracy was extensive.

Credit Suisse is a serial offender regarding evidence destruction and obstruction of criminal investigations. Whatever deterrent value previous sanctions may have had, they were manifestly inadequate. Due to the defendant's repeated evidence destruction, the United States has not been able to inform the court of many fundamentally relevant details. The adverse inference is:

> *The remaining criminal conduct hidden within the defendant bank is so profitable, that the defendant prefers to endure the lesser penalties applied in order to continue to enjoy the greater profits from the still concealed criminal conduct. Considering that an estimated $2 trillion of criminal and corrupt money is laundered through banks annually, a once off penalty of $2.6 billion or 0.1% of the annual amount available is insufficient deterrent.*

We submit that the doctrine of adverse inference is sufficient alone to accept this for the court's current requirements. However, as confirmation, we also submit convincing direct evidence of this, starting with: the Bank's Deadly Conspiracy Report (with Appendices) and the Obstruction Report (with Appendices).

## D. The Information from the Victims' Group

Credit Suisse-TNST is somewhat of a "Rosetta Stone" for deciphering the Swiss Bank's technique of sabotaging US and foreign law enforcement and creating elaborate facades. We achieved what the DoJ could not achieve. By using Swiss lawyers, investigators and private actions, our efforts were rewarded with full lawful access to the Swiss Prosecutor's investigation files including the confidential correspondence and confidential reports from the Swiss regulator. I personally worked at the Zürich High Court with my investigator examining and copying the complete investigation. I did the same at the Lisbon Criminal Court and the Philippines Security and Exchange Commission in Manila to trace trans-national activities of the same crime syndicate which operated inside the defendant bank. Our reports detail exactly how the bank systematically obstructed criminal investigations in a manner which was only possible with the support and approval of senior management. Several direct proofs are presented that it was a top-management supported and protected crime. The bank structured this crime to conceal the worst criminal activity in the USA but used a curious "USA secrecy strategy" to refuse access to those incriminating US documents. It was Swiss bank secrecy in reverse.

The characteristic that screamed for attention was that Swiss bank secrecy was not the real point – the truth was: *Secrecy of incriminating documentation through obstruction.*

Swiss bank secrecy was used for convenience even when illegal in Switzerland and ignored for convenience. This also is not new. It was reported by Chief Judge Edward R. Korman: United States District Court Eastern District of New York - In Re: Holocaust Victim: Case No. CV-96-4849 Assets Litigation[9].

The Swiss authorities were MORE than complicit. They actively participated in the criminal cover-up and deceived multiple foreign authorities, even every EU securities regulator at CESR-Pol (now ESMA-Pol the EU securities enforcement sub-committee). They used ways that were illegal even in Switzerland. Their actions indicate that at times the modus operandi was protection and concealment of financial crime.

Credit Suisse systematically obstructed the criminal investigation into its activities by both the official criminal authorities and victims – using abuse of bank secrecy, submitting false information, evidence destruction, delays, refusals and concealing documents. Our court-submissible reports describe Credit Suisse's obstruction of the criminal investigation, its abuse of bank secrecy and its secret profits from participation in crime. We presume that the illegal profits were moved through "secret slush funds".

> *Since the defendant abused bank secrecy while it was convenient for it, we submit that it is unacceptable that the United States be humiliated into deferring to it.*

> *If the bank is serious about giving up criminal partnerships, then it must reveal the names of all the criminal co-conspirators in its tax evasion crimes. Some of these "protected people" are presumably still in positions of power having illegitimate influence and enjoying their illegal profits. It is precisely because they have such illegitimate power that they should be exposed before they incite further corruption in their subordinates. If the bank insists on concealing these "protected people", then its concealment must not be rewarded & encouraged by being allowed to continue its US operations.*

> *The United States has adequate available remedies enabling it to honour the integrity of the US justice system and administer US law in this matter without risking serious economic harm.*

The Swiss intimidation that certain Credit Suisse executives might face Swiss jail if they comply with US law is a de minimis consideration:

1. Our documents show that Swiss government authorities had actively protected criminal activity, deceived foreign authorities and sabotaged foreign efforts to investigate crime in our case.
2. Multiple staff in foreign criminal authorities complained to us about Swiss obstruction of criminal investigations to the point that they refused cases only because they involved Switzerland. This is giving criminal organizations an incredibly dangerous combination of "Protection plus Respectability". That was the fundamental complaint of the Victims' Group.

---

[9] See: http://www.nyed.uscourts.gov/96cv4849mo021904.pdf Credit Suisse co-managed the case.

## E. Credit Suisse has Broken the Plea Agreement

It will be shown that Credit Suisse has broken the Plea Agreement making it liable for possible criminal prosecution. In its recent Application No. D-11819 (hereafter the "Application") to the U.S. Department of Labor ("DOL"), it has omitted information about its conduct as required by the Plea Agreement at §7C1: *It has failed to truthfully admit its conduct in the offense of conviction.*

**Referring to the Plea Agreement:**
§7C: The United States specifically may, at its sole option, be released from its commitments under this plea agreement, ……. if at an time between its execution of this plea agreement and sentencing, Credit Suisse AG:
§7C1: Fails to truthfully admit its conduct in the offense of conviction OR
§7C2: Falsely denies, or frivolously contests, relevant conduct for which Credit Suisse AG is accountable under U.S.S.G. § 1B1.3 OR
§7C3: Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Credit Suisse AG is accountable under U.S.S.G. § 1B1.3

The relevant conduct under U.S.S.G. § 1B1.3 is defined expansively: it includes all harm that resulted from or were intended by all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant, and all reasonably foreseeable acts and omissions of others in furtherance of any jointly undertaken criminal activity that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

The following conduct was omitted from the Application:
**Referring to the Statement of Facts:**
§§31 – 33: CREDIT SUISSE SUBVERTED THE QI AGREEMENT
§§47 – 50: CREDIT SUISSE'S INEFFECTUAL POLICIES, TRAINING, AND AUDITS
§§64 – 71 CREDIT SUISSE'S INTERNAL INVESTIGATION AND FAILURE TO PRESERVE CERTAIN DOCUMENTS
This is discussed in detail in Sections B and F

**Again referring to the Plea Agreement:**
§7E: Credit Suisse agrees that it shall not, through its attorneys, agents, officers, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or Credit Suisse AG's representations set forth in this plea agreement. ……… Any contradictory statement by Credit Suisse AG shall constitute a breach of this plea agreement, and trigger the provisions of sub-paragraphs 12a-12c.……
(This allows the US to criminally prosecute Credit Suisse where its guilty plea remains and all evidence and statements collected are submissible for that criminal prosecution).

On May 25, 2014 CEO Brady Dougan reportedly stated[10]:

> *Credit Suisse held itself to strict rules ……… Credit Suisse participated fully in all investigations ………*
> *The investigations lasted three and a half years. Everything was on the table. Many lawyers and*
> *officials investigated very thoroughly……Unfortunately we found out too late that there were people*
> *who ignored [the bank's] rules …… I never tolerated anything illegal. Never. I say it at every*
> *opportunity: we adhere to the laws…….*

This allegedly broke §7E of the Plea Agreement and rendered the bank liable to criminal prosecution. It would also indicate that CEO Brady Dougan is of the opinion that:

---

[10] English language URL: http://www.swissinfo.ch/eng/dougan-says-he--and-his-bank--played-by-the-rules/38655742
The original German language interview is at URL: http://www.blick.ch/news/wirtschaft/interview-mit-brady-dougan-ich-bin-frustriert-id2872376.html

*No significant changes are necessary in Credit Suisse management, nor will they be made*

CEO Brady Dougan's several statements that he didn't know about illegal activity at the bank must be false since we formally notified both him and Chairman Rohner of serious criminal activity at the bank during 2012 and 2013 but both ignored our warnings. Nor has he or Chairman Rohner responded since the bank's criminal conviction.

We interpret CEO Dougan's statements as deceptions to gain improper advantage, e.g.:

- The Department of Labor is considering Credit Suisse's request to retain its status as a Qualified Professional Asset Manager (QPAM).
- The above deceptive propaganda could incite unrest within some Labor Union members if loss of QPAM eventuated and caused inconvenience or loss of value to members.
- If it were widely known that extensive criminal conduct continues within Credit Suisse with the protection of senior management, and that the bank had offended against its Plea Agreement then Credit Suisse should unconditionally lose its QPAM status.

We note that Chairman Rohner has recently accepted additional employment as director of the GlaxoSmithKline Board[11]. We would respectfully suggest that his time would be better spent in receiving the evidence of serious criminal conduct at Credit Suisse and honestly investigating it before taking on additional part-time employment.

Such a casual laissez-faire attitude evidenced by the bank's CEO and chairman apparently imply a lack of serious concern for the bank's welfare, and for the bank's customers.

**Credit Suisse has apparently offended against 18 U.S. Code § 371 - Conspiracy to defraud United States**

The Defendant bank has made deceptive statements and material omissions from the DOL Application dated May 19, 2014 referred to above and consequently appears to have offended against 18 U.S. Code § 371 (Conspiracy to defraud United States) by interfering with or obstructing the DOL's lawful functions by means that are dishonest. Notable was the defendant's unrealistic claim at §24 of the Application that the requested exemption is administratively feasible – which is a mandatory requirement for the requested exemption. This unrealistic claim was made to appear persuasive by the following omissions:

1. No details of the size, extent or number of affiliated and related asset managers was given, even though this was mandatory according to: 29 CFR Part 2570.34 (2) . However, the defendant was concurrently eager to point out to this court, in the first paragraph of its Motion to Continue sentencing, that:
   "Through its affiliated asset managers, Credit Suisse manages several billion dollars of assets for more than one hundred such pension plans, which the DOL regulates under the Employee Retirement Income Security Act of 1974 ("ERISA")."
   This information would have been embarrassing in the application because the defendant's plan was to have just one auditor supervise all affiliated and related asset managers for compliance in an environment where the defendant criminal felon had been given exemption from a raft of compliance requirements intended to safeguard pension investments.
2. While some criminal conduct was conceded in the Application, the Defendant did not admit to the following which we described above in detail at **Section B. The Defendant's Obstruction:** §§31 – 33: CREDIT SUISSE SUBVERTED THE QI AGREEMENT

---

[11] http://online.wsj.com/articles/credit-suisse-chairman-rohner-to-join-glaxosmithkline-board-1412351808

§§47 – 50: CREDIT SUISSE'S INEFFECTUAL POLICIES, TRAINING, AND AUDITS
§§64 – 71 CREDIT SUISSE'S INTERNAL INVESTIGATION AND FAILURE TO PRESERVE CERTAIN
DOCUMENTS (it can be argued there was partial admission of §§64 – 71 because of overlap with the
criminal conduct which was conceded).

The above omissions are critical for assessing the required level of supervision and determining whether
they are administratively feasible. The omitted information concealed that the volume of work (number and
size of asset managers) was too great, and the quality of supervision (for a felon with a long history of
deceptions, obstruction and manipulation) would have been far too demanding. As submitted, the
application was persuasive. This is evident from the fact that none of the comments submitted (with the
exception of the comment submitted by the undersigned and partial exception of the comment submitted
by the defendant) noticed this defect despite being unanimously critical of it. However, when the omitted
information is taken into account, it is apparent that the proposed supervision would be utterly impossible,
administratively NOT feasible and therefore causing the application to fail. The Defendant admitted as much
in a late comment but it still did not supply the missing mandatory information. Instead, the defendant
proposed an even less demanding level of supervision which still appeared persuasive in the absence of the
omitted facts mentioned above.

## F.  Termination Statute Offenses

The bank was twice subject to the termination section at 12 U.S. Code § 3105 (e), namely where:
12 U.S. Code § 3105 (e) (i) there is reasonable cause to believe that such foreign bank, or any affiliate of such
foreign bank, has committed a violation of law or engaged in an unsafe or unsound banking practice in the
United States.

These resulted in the following Cease and Desist Orders:

19th May 2014: The Board of Governors of the Federal Reserve System, Order to Cease and Desist: Docket
No. 14-009-B-FB, 14-009-CMP-FB
and
16th December 2009: The Board of Governors of the Federal Reserve System, Order to Cease and Desist:
Docket No. 09-210-B-FB

The order dated 16th December 2009 was for conduct which the US Attorney General described as[12]:

"…massive financial misconduct at one of the world's largest global banks, Credit Suisse. In both its scope
and complexity, the criminal misconduct perpetrated by Credit Suisse in this case is simply astounding.
Indeed, as set forth in the court documents filed today, this case offers a stark and disturbing example of the
lengths to which some corporate wrongdoers are willing to go in seeking ill-gotten financial gains…… They
created a 'how-to' book on committing a crime… Credit Suisse thought it didn't need to play by the rules….
Credit Suisse's decades-long scheme to flout the rules that govern our financial institutions robbed our
system of the legitimacy that is fundamental to its success."

Credit Suisse employees had systematically stripped the identities of Iranian banks enabling funds to be
transferred to the Atomic Energy Organization of Iran and the Aerospace Industries Organization, entities
involved in the production of nuclear weapons and long range missiles[13].

---

[12]  See: http://www.justice.gov/ag/speeches/2009/ag-speech-091216.html
[13]  See: http://en.wikipedia.org/wiki/Credit_Suisse ; http://www.justice.gov/criminal/pr/documents/12-16-09-CreditSuisse-
factualstatement.pdf

In the above two cases, the Board of Governors determined not to exercise its discretionary authority under section 7 of the IBA to terminate the activities and operations of Credit Suisse's offices in the U.S.

We speculate that if Credit Suisse continues serious criminal misconduct as is implied by the results of our investigations (evidence of this can be presented to the court):

> Then Credit Suisse's US operations will be terminated.

Yet a third Cease and Desist Order dated Feb. 21, 2014[14] was issued by the SEC because Credit Suisse willfully violated Section 15(a) of the Securities Exchange Act of 1934 and Section 203(a) of the Investment Advisers Act of 1940 by providing unregistered securities services to as many as 8,500 U.S. client accounts that contained an average total of $5.6 billion in securities assets.

## G. The Mandatory Victims Restitution Act

The Mandatory Victims Restitution Act (MVRA) contains an important addition to its definition of the term "victim" at 18 U.S. Code § 3663A (a) (2) as a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

Relevant case law will be summarized here:

When the count of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, as in a conspiracy to defraud, in violation of 18 U.S.C. § 371, or mail fraud, in violation of 18 U.S.C. § l341, the restitution order may include losses caused by acts of related conduct for which the defendant was not convicted. 18 U.S.C. § 3663(a)(2); *see United States v. Foley,* 508 F.3d 627, 635-36 (11th Cir. 2007) (restitution amount properly included acquitted conduct; district court could award restitution to any victim of the scheme furthered by the defendant's mail fraud offense); *Brock-Davis,* 504 F.3d at 998-99 (restitution may be ordered for losses to persons harmed in the course of the defendant's scheme even beyond the counts of conviction); *United States v. Farrington,* 499 F.3d 854, 860-61 (8th Cir. 2007) (restitution may be ordered in wire fraud case for criminal conduct part of a broad scheme to defraud regardless of whether the defendant is convicted of each fraudulent act in the scheme); *Wright,* 496 F.3d at 381-82 (where fraudulent scheme is element of offense, court may award restitution for actions pursuant to that scheme; restitution limited to specific temporal scope of indictment) (quoting *Inman,* 411 F.3d at 595); *United States v. Gordon,* 480 F.3d 1205, 1211 (10th Cir. 2007); *United States v. Dickerson,* 370 F.3d at 1339, 1342-43 (district court may include in restitution order losses caused by acts outside the statute of limitations, when losses resulted directly from criminal conduct in course of the scheme and loses are closely related to the scheme) (citing *United States v. Welsand,* 23 F.3d 205, 206-07 (8th Cir. 1994)); *United States v. Lawrence,* 189 F.3d 838, 847-48 (9th Cir. 1999) (district court found that acts underlying bankruptcy fraud charges were part of overall scheme alleged in mail fraud count).

A defendant in a conspiracy may be held liable for all reasonably foreseeable losses caused to the victims by the conspiracy. *See United States v. Cohen,* 459 F.3d 490, 500 (4th Cir. 2006) (court properly ordered defendant to pay restitution to all victims of the offense even if the defendant did not expressly admit to each and every overt act alleged in support of the conspiracy); *United States v. Solares,* 236 F.3d 24, 26 (1st Cir. 2000); *United States v. Boyd,* 222 F.3d 47, 50-51 (2d Cir. 2000) (jury acquitted defendant on conspiracy charge but convicted defendant on substantive counts on theory of coconspirator liability under *Pinkerton v.*

---

[14] SECURITIES EXCHANGE ACT OF 1934, Release No. 71593 at www.sec.gov/litigation/admin/2014/34-71593.pdf

*United States*, 328 U.S. 640 (1946); not plain error for district court to require defendant to pay restitution for losses that were reasonably foreseeable; VWPA allows courts to order conspirator to pay restitution even on uncharged or acquitted counts; collecting cases); *United States v. Collins*, 209 F.3d 1, 2-3 (1st Cir. 1999) (defendant convicted of conspiracy responsible for all reasonably foreseeable losses caused in the course of defendant's criminal conduct, whether defendant is convicted of each offense); *United States v. Nichols*, 169 F.3d 1255, 1278 (10th Cir. 1999); *United States v. Hensley*, 91 F.3d 274, 276-77 (1st Cir. 1996); *see also United States v. Mann*, 493 F.3d 484, 498 (5th Cir. 2007) (court can include in restitution amount all losses caused by scheme when defendant is convicted of scheme to defraud)

Cases which do not refer to offenses that involves as an element a scheme, conspiracy, or pattern of criminal activity may claim that the (relevant) definition of a "crime victim" is virtually the same under the Victims' Rights and Restitution Act ("VRRA"), the Victim and Witness Protection Act of 1982 ("VWPA"), the Crime Victims' Rights Act of 2004 ("CVRA") and the MVRA. These cases are inapplicable in the present matter.

In re McNulty, 597 F.3d 344, 350 (6th Cir. 2010) can be misinterpreted. It refers to the specific and narrowly defined form of conspiracy of 15 U.S.C. § 1 – the crime of antitrust conspiracy. This is a different to the expansive 18 U.S. Code § 371 with which the defendant is charged. Just after finding that McNulty was not a victim of Arctic Glacier's conduct, the district court acknowledged its ability to impose the condition of restitution to a sentence of probation. (Tr. at 119.)

McNulty states: "it appears logical that those directly and proximately harmed by criminal conduct in the course of the conspiracy beyond the overt act required to prove the conspiracy would be victims under CVRA, just as they would be under the VWPA and the MVRA." This reasoning is uni-directional and expansive. It expands a narrow understanding of victim under the CVRA to include a broad range of conspiracy victims and affords all MVRA conspiracy victims the full entitlements according to the CVRA. It does not operate in reverse direction. I.e. it doesn't reduce the definition of an MVRA conspiracy victim, just because he may not appear to qualify under the CVRA.

A plain reading of the MVRA is expansive: (2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

The statute describes an offense that <u>involves</u> as an element a scheme, conspiracy …. and harmed in the course of the conspiracy …. Conspiracy harm is to be broadly read.

McNulty quotes case law which is expansive: Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." *In re Stewart*,552 F.3d 1285, 1289 (11th Cir. 2008) (CVRA mandamus petition; circuit court held that mortgage borrowers were CVRA victims of conspiracy to deprive bank of honest services, where defendants were bank officer and co-conspirator whose offense caused borrowers to pay excess fees that defendants pocketed). *See, e.g., United States v. Johnson*, 440 F.3d 832, 835-39,849-50 (6th Cir. 2006) (victims of four predicate criminal acts in RICO conspiracy conviction were MVRA victims, where district court found trial evidence established by a preponderance of the evidence that defendant was actively involved in all four predicate acts); *United States v. Washington*,434 F.3d 1265, 1266-70 (11th Cir. 2006) (police department and another property owner were MVRA victims as to police car and property damaged during chase of defendant fleeing after bank robbery); *Moore v. United States*, 178 F.3d 994, 1001 (8th Cir. 1999) (bank customer was MVRA victim of attempted bank robbery; defendant had stood within six feet of customer and pointed sawed-off gun at him).

We conclude that victims of the Credit Suisse –TNST conspiracy are entitled to restitution under the MVRA provided that conspiracy is sufficiently closely related to the larger conspiracy which included the defendant's offense as a "sub-conspiracy".

## H. Conspiracy

The conspiracy charged lasted for decades, and in one case reported, for over a century. The defendant bank both destroyed evidence, altered records, and refused to submit evidence which was in its possession. The adverse inference is that such missing, destroyed, altered or refused evidence was adverse to the defendant bank. Because of the bank's evidence destruction and other obstruction of justice, the extent of the conspiracy involved cannot be precisely specified. We must rely on the doctrine of adverse inference and on the reports we ask the court to receive in order to discern a workable estimate.

It is virtually impossible for any enterprise including a criminal enterprise to stay identically the same for decades, let alone a century. It is natural and normal to seek ways to expand profitable activities especially through development and extension of existing skillsets – regardless of whether these are legitimately creative or criminal. The known criminal conspiracy at the bank involved thousands of participants and the true extent may have been greater. Therefore, it is too remote to be credible, that the narrow activity described by 26 U.S. Code § 7206 (2) was the entire criminal activity of the conspiracy during the decades of its activity. Indeed, considering the dynamics of managing thousands of participants, such a proposition would be impossible.

It is well established that a single conspiracy may have multiple objectives and involve a number of sub-agreements to accomplish the specified objectives. *Braverman v. United States*, 317 U.S. 49, 53 (1942); *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990); *United States v. Warner*, 690 F.2d 545, 550 n.8 (6th Cir. 1982); *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980); *United States v. Rodriguez*, 585 F.2d 1234, 124849 (5th Cir. 1978), *overruled on other grounds by United States v. Michelena-Orovio*, 719 F.2d 738 (5th Cir. 1983) (*en banc*). A single conspiracy does not become multiple conspiracies simply because of personnel changes or because its members are cast in different roles over time. *E.g.*, *United States v. Richerson*, 833 F.2d 1147, 1153-54 (5th Cir. 1987); *United States v. Spector*, 793 F.2d 932, 935-36 (8th Cir. 1986); *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979); *United States v. Mayes*, 512 F.2d 637, 642-43 (6th Cir. 1975).

To show that the defendant was a member of a wider conspiracy can be satisfied by a showing even a "slight connection" to the conspiracy, so long as the connection is proven beyond a reasonable doubt. *United States v. Strickland*, 245 F.3d 368, 385 (4th Cir. 2001); *United States v. Ward*, 190 F.3d 483, 488 (6th Cir. 1998); *United States v. Slater*, 971 F.2d 626, 630 (10th Cir. 1992); *United States v. Boone*, 951 F.2d 1526, 1543 (9th Cir. 1991); *United States v. Moya-Gomez*, 860 F.2d 706, 758-59 (7th Cir. 1988). A defendant's knowledge of a conspiracy need not be proved by direct evidence; circumstantial evidence is sufficient. *United States v. Hayes*, 190 F.3d 939, 946 (9th Cir. 1999), *aff'd en banc*, 231 F.3d 663, 667 n.1 (9th Cir. 2000); *United States v. David*, 940 F.2d 722, 735 (1st Cir. 1991); *United States v. Beale*, 921 F.2d 1412, 1430 (11th Cir. 1991); *United States v. Christian*, 786 F.2d 203,

In the current case, there is much more than a "slight connection". The participation of top management and senior management in the cover-up and in refusing to investigate multiple formal notifications of crime even after being notified of the DoJ criminal investigation is damming. Also is the close similarity in the methods of obstruction of criminal authorities, even demonstrated by the bank's CEO Mr Dougan in sworn testimony (see Sections N and O). Both conspiracies were so extensive, so actively concealed, and the criminal investigations into both were so intensely obstructed using such similar methods requiring sufficient knowledge and sufficient approval by senior and top management that we respectively submit that they

were both part of the same large conspiracy. This finding can be accepted without the need for the doctrine of adverse inference. Even a cynical skeptic surely could not deny it with the support of adverse inference.

A corporation may be found criminally liable for conspiracy under Section 371. *United States v. Stevens*, 909 F.2d 431, 432-33 (11th Cir. 1990); *United States v. Peters*, 732 F.2d 1004, 1008 (1st Cir. 1984); *United States v. S & Vee Cartage Co.*, 704 F.2d 914, 920 (6th Cir. 1983). Moreover, a corporation can enter into a conspiracy with its own employees. *United States v. Ams Sintering Co.*, 927 F.2d 232, 236-37 (6th Cir. 1990); *United States v. Hartley*, 678 F.2d 961, 972 (11th Cir. 1982).

In sentencing and restitution, the assessment is arrived at by the preponderance of the evidence. For this adverse inference is adequate since there is no question of further criminal conviction requiring proof beyond reasonable doubt.

We will produce overwhelming evidence of this without the assistance of adverse inferences at Section I below. We also submit that the key facts of this can be demonstrated either beyond reasonable doubt or at least sufficient for an indictment, if the United States chooses to exercise its right to criminally prosecute the defendant for expanded charges.

It is not essential to establish that each conspirator knew of all the activities of the other conspirators or that each conspirator participated in all of the activities of the conspiracy. *United States v. Berger*, 224 F.3d 107, 114-15 (2d Cir. 2000); *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981); *United States v. Brunetti*, 615 F.2d 899, 903 (10th Cir. 1980).

In the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

The key language of the statute is:
   a.  "an offense that involves as an element a scheme, conspiracy, or pattern", and
   b.  "defendant's criminal conduct in the course of the scheme, conspiracy, or pattern".

The plain language does not restrict the size and extent of the "scheme, conspiracy, or pattern" in comparison to the size and extent of the offense. It merely must involve a scheme, conspiracy, or pattern, e.g. that scheme, conspiracy, or pattern may be more extensive than the offense.

The fact that the statutes require the offender to pay restitution for all his crimes with identifiable victims is common sense justice based on sound judicial values fulfilling one of the fundamental aims of the criminal justice system – to make victims of crime whole and to dissuade others from crime, especially those inclined to cold calculations that such crimes might turn a profit.

The fact that there is a disincentive to commit the organized premeditated crime which involve a scheme, conspiracy, or pattern is also common sense justice. It is rightly meant to dissuade potential offenders (especially banks) when making the cold criminal calculation of profit and loss of whether to sell their integrity and public trust on the basis that even if caught, the crime might still pay a profit.

US financial institution enjoy special privileges of trust and judicial protection – bank fraud and similar Federal offences have double the usual statute of limitations, and some bank offences like check kiting which may cause no financial loss, are punishable by years in jail. The defendant has grossly betrayed the special privileges granted to it for the purposes of organized crime.

Scheme, conspiracy, and pattern all describe pre-meditated, calculated crime. The criminal mind calculated that it would make a profit from the intentional harm of innocents with disregard for their welfare. For the Victims' Group, the harm to the innocents, in some cases, resulted in the utter destruction of their lives through divorce, illness, psychological malaise, incurable depression lasting years with no end in sight, while others were spared such misery through death only to have their near ones continue the suffering. For them, the bank traded their lives for pocket change.

According to the Statement of Facts and the Plea Agreement, the bank's offenses included all three – scheme, conspiracy, and pattern.

We respectfully submit that the court should simply and firmly insist that the defendant bank comply with US law, both in its banking businesses and in response to appropriately notified criminal investigations. We further submit that the defendant bank must experience the consequences of its wrongdoing. Banks which comply with criminal investigations generally don't face the additional burden of adverse inference.

*It is an incentive for the defendant bank to reform when previous deterrents have proven ineffective. We respectfully submit that it would be grossly irresponsible to deny the defendant this perhaps last opportunity to reform, and so avoid continued recidivism with likely loss of financial licenses.*

We also submit that further evidence is unnecessary to establish that the defendant's charged conspiracy extended to the Credit Suisse-TNST Criminal Conspiracy which involved multiple offenses against the United States. It was another object of that one conspiracy which had grown to monstrous proportions through decades of the bank's indulgence. The bank has established the criteria for this already by adverse inference due to its disrespect for US law, even after being notified of a criminal investigation.

## I. The Credit Suisse-TNST Criminal Conspiracy

**Credit Suisse-TNST: A Criminal Conspiracy Operated in the Bank**

On behalf of clients, we investigated an apparent embezzlement which had been concealed by fake securities transactions and this led to the discovery of a criminal combination within Credit Suisse, protected by senior and top management and the Swiss regulator.

### 1. Past Cases show a Similar Pattern of Criminal Misconduct

Past cases of confirmed criminal activity in Credit Suisse[15] showed a similar pattern of evidence destruction and obstruction in criminal investigations. Consequently, the full extent of Credit Suisse's previous criminal activity was never established and the management conspiracy never exposed.

*The misconduct described is not new – it represents a continuation of an established pattern*

### 2. Top Management Ignored Multiple Warnings of Criminal Activity in the Bank

We made several formal notifications of the criminal activity we had confirmed in the bank to senior & top Credit Suisse management which were ignored:

| | |
|---|---|
| 12 April 2012 | Formal Notification to CS CEO Brady Dougan |
| 9 May 2012 | Negative reply from office of CS CEO Brady Dougan |
| 27 July 2012 | 2nd Formal Notification to CS CEO Brady Dougan |
| 4 June 2013 | Reminder Letter for 2nd Formal Notification to CS CEO Brady Dougan |

20 June 2013    Negative reply from office of CS CEO Brady Dougan warning that there would be no further discussion on the matter.

| | |
|---|---|
| 21 January 2013 | Comprehensive letter to Senior Management of Credit Suisse |
| 23 May 2013 | Negative reply from office of CS General Counsel |
| 30 August 2013 | Formal Notification to CS Chairman and former General Counsel Urs Rohner |
| 2 September 2013 | US Post Signed Acknowledgement for Receipt of above letter but no reply has since been received. |

On 30 August 2013, we sent a formal warning notice to Credit Suisse Chairman Urs Rohner who had been General Counsel during the period of obstruction of the criminal investigation and the subsequent alleged corruption of international law enforcement:

*By law, Credit Suisse was obliged to diligently investigate. Rohner knew that Credit Suisse was under criminal investigation by the US DOJ but instead, chose to remain deliberately ignorant.*

---

[15] Document 1: Credit Suisse "Culture of Corruption"

### 3. Simple Proof of Credit Suisse's Criminal Damage of Victims

The Zürich criminal investigation led by Prosecutor Andreas Ochsenbein required Credit Suisse to document its direct share transactions. In response, the bank submitted the following false explanation[16]:

*Credit Suisse bought these shares over the stock exchange*

After the criminal investigation had closed, documents obtained from Credit Suisse showed that this was a lie. These shares were supplied illegally by an entirely different, secret, and abnormal procedure[17]:

*Worthless restricted private placements were secretly substituted for the free-trading shares which had been paid for by the clients. In many cases, Credit Suisse already owned these worthless shares BEFORE the orders were placed.*

The fake share transactions were a ruse to simply loot the victims' money from their accounts, not unlike the method used with the Holocaust victims. When the Zürich Police investigation challenged Credit Suisse about or attempted to expose other lawless activity, it would lose resources. Typically, the person making the embarrassing enquiries of the defendant would be taken off the case and not replaced. This continued until there were more or less no resources left and the investigation had to close.

The full details are more complex. They are better described in the attached reports. More detail beyond this can be supplied on request and is available.

### 4. Corruption Closed the Investigation, Swiss Regulator Deceived CESR-Pol

Every securities regulator in CESR-Pol unanimously voted[18] to write to the Swiss regulator (the SFBC) asking why nothing was being done. The SFBC then wrote to the Prosecutor requesting a case update. The prosecutor's reply[19] to the Swiss regulator ignored his obligations under criminal law. Instead, it emphasized matters which were entirely improper to consider, like the bank's liability to pay compensation and the manipulation of procedures to undermine the victims' efforts to obtain justice:

English Translation:
*"It is all about compensation and general justice for the victims. Foreign authorities also think the Swiss authorities are idle. Therefore they would increasingly attempt to apply political pressure. I can only invite you, as I said by telephone a week ago, to refer to me as the person in charge, all those institutions which are applying such pressure. If a criminal investigation isn't duly led in the canton Zurich, all sorts of possibilities are then open to the victims. ..... After all, this much is said: the investigation shall be stopped, which the leader of the victims knows and he doesn't want. ....... This is not about desperate individual victims, but about one very well organized group of victims. The accused are – as well as the victims – spread over the whole planet, only a front man is located in Switzerland. They are like the victims, scattered over the whole planet. The victims can hardly expect any compensation from him. But of course, like always in such cases, a wealthy Swiss Bank is involved in such matters, too."*

This thinly veiled intention to illegitimately and corruptly pervert the course of justice was confirmed in his rude refusals to receive important evidence offered by foreign criminal authorities discussed below at §7.

---

[16] Document 3. Simple Proof of Credit Suisse's Participation in Crime: page 1.
[17] Document 3. Simple Proof of Credit Suisse's Participation in Crime: pages 2 – 3.
[18] Further information is available on this.
[19] Document 4. Corrupt Prosecutor Closes Case; SFBC Deceives CESR: page 5.

The SFBC knew from its own secret investigation report (the Arthur Andersen Report discussed below at §6) that this was a criminal fake share broker under its direct responsibility and jurisdiction. However, after receiving the prosecutor's reply, it wrote the exact opposite[20] and deceived CESR-Pol into dropping the case.

Soon after that, Prosecutor Ochsenbein closed the case on false grounds:

*He claimed he needed a minor piece of evidence (of malicious intent). This was easily available – but he refused to examine it when submitted and refused to accept it when foreign authorities offered it.*

The Prosecutor's closing document was corrupted by omission of basic information, falsification of facts, inclusion of invented fabrications and denigration of the victims' credibility.

## 5. Counterfeit or Fake Share Certificates issued by Credit Suisse

Credit Suisse issued counterfeit or fake share certificates[21] to its customers which purported to have been signed by people who had left the relevant company 2 or 3 years previously.

## 6. Swiss Regulator Commissioned and then Ignored the Arthur Andersen Report

The Arthur Andersen Report was the only independent report of TNST-Credit Suisse while it was still operating. It revealed a shocking situation[22] of lawlessness and criminality. This was obviously known to both Credit Suisse and the SFBC (who had commissioned the report) but they both allowed the crime to continue.

*The Prosecutor omitted all of the important content of this report from his closing document. He only devoted half a page to it, in which he invented 3 fictional "conclusions". This was not done in ignorance, because the policeman who worked on the case had confirmed to the Prosecutor that this report showed very serious abnormalities most likely for the purpose of facilitating criminal profit.*

The SFBC knew very well to expect criminal activity in the TNST-Credit Suisse arrangement – it had been notified that it was operating illegally as an unlicensed share broker. In addition, it had previously commissioned two other reports on the same crime syndicate. All three reports showed, directly or indirectly, serious criminal abnormalities. Incredibly, the SFBC specified in its brief to Arthur Andersen, that:

*Arthur Andersen was not permitted to investigate criminal activity or any illegal activity apart from that related to the question of whether the SFBC was obliged to supervise the arrangement.*

Despite this injunction, the Arthur Andersen auditors reported criminal activity with which they were confronted. They reported that TNST had operated as an illegal fake share broker and devoted a chapter to indications of criminal activity. This made the SFBC directly responsible to close it.

## 7. Obstruction of European & AML Authorities

Many international authorities contacted the Swiss requesting cooperation – but were refused in all known cases. E.g., Norwegian ØKOKRIM received brief and rude rejections[23] when it attempted to send damming evidence to the Prosecutor including the evidence of malicious intent which he had claimed he needed.

---

[20]  Document 4. Corrupt Prosecutor Closes Case; SFBC Deceives CESR: pages 6 – 7.
[21]  Document 6. Counterfeit or fake share certificates.
[22]  Document 7. Arthur Andersen Report. See especially: Quotes from the Arthur Andersen Report.
[23]  Document 8. Obstruction of Foreign & AML Authorities: page 1.

ØKOKRIM specifically asked[24] these questions:

*c) Do the Swiss police and prosecutors want to receive evidence or reviews from Norwegian investors who feel deceived in this matter?*

*d) Will any transmission of such documents (as mentioned in subparagraph c) cause the Swiss police initiate an investigation against Trans-National Securities and Trust SA?*

*e) Can ØKOKRIM assist Swiss police and prosecutors in any way in this case?*

The Prosecutor's answers were:

*"No"*

*"No"*

*"No"*

Protecting criminal activity by intentionally refusing relevant evidence undermines the judicial system. This alone represents prosecutorial misconduct because under Swiss law, the Prosecutor was obliged to diligently receive evidence, investigate and prosecute where there was sufficient evidence.

The Finnish NBI also attempted to send evidence on several occasions, but were rudely refused[25]. The Swiss Money Laundering Reporting Office closed its investigation simply because Credit Suisse told them it was unnecessary.

## 8. Testimony of an Insider

A former TNST worker described the way Credit Suisse and the crime syndicate operated. He was adamant that Credit Suisse was part of the crime, and that worthless shares were manipulated. Legally obtained telephone recordings of the testimony are available.

## 9. Reports

**Ba Bank's Deadly Conspiracy Report**: A fully documented report which substantiates the above allegations against the bank.
**CS Obstruction & Participation Reports:** Two concise reports[26] which describe Credit Suisse's obstruction of the criminal investigation, its abuse of bank secrecy and its secret profits which presumably were moved through "secret slush funds".

## 10. Incalculable Dangers in Ignoring this Menace

No one can feel safe: It is an *extraordinarily dangerous criminal banking typology which is almost impenetrable to law enforcement – and which allows the bank(s) to commit almost any crime with impunity.*

---

[24] Document 8. Obstruction of Foreign & AML Authorities: page 3.
[25] E.g. see the second last page of Document 8.
[26] Folder 5. The Obstruction Report and the Participation Report, available in both English and German.

### J. Object of the Conspiracy: Rampant Greed – a Lawless Aberration

Criminal schemes typically mimic lawful activity while concealing criminal elements. Crimes of fraud, embezzlement, false statements etc. generally make little effort to conceal their largely "innocent" component. This makes the identification and classification of such crimes relatively easy.

However, that is not the case here. The Credit Suisse-TNST Criminal Conspiracy involved multiple offenses against the United States. It was extraordinary for its lack of a largely "innocent" component. At virtually every stage, there was contempt for regulations and the rule of law – and ultimately there was contempt for both national and international judicial authority and law enforcement.

*However, by exercising its repertoire of lawless skills, the defendant exposed and revealed the multiple objectives and sub-agreements of a cancer-like conspiracy. The overall objective appeared to have been to feed an insatiable greed where most conspiracy participants were intentionally compartmentalized from each other and insulated from the foreseeable and actual effects on their victims.*

It resembled the analogy of a gambling addict who had always believed that he could out-bid and out-bluff his opponents into winning – regardless of how bad his "hand of cards" happened to be. It is more a study in the psychology of addiction than of a rational person / corporation, even of a criminal one. Such destructive psychological mindsets are not new. Similar "dead-end" mindsets appear to have taken Enron and the ex-chairman of the Nasdaq Stock Markets Bernard L. Madoff, to bad ends. The difference here is that, due to extraordinary efforts by the Victims' Group, it has been possible to catch this case earlier – before total destruction has taken place. The offender still has a chance of reform, which we emphatically submit could not have happened under the Plea Agreement currently before the court.

The proof of that impossibility is found both in an understanding of addictions and in the behaviour of the offender in the short period between signing the guilty plea and sentencing. Apart from multiple offenses against the plea agreement and the alleged new felony committed, there is also the "couldn't care less attitude" towards outsiders regardless of their efforts and sacrifices ON BEHALF OF THE OFFENDER.

Both the defendant's presumption and the extraordinary efforts of the under-resourced staff at the DOL are self-evident in its submission to this court to extend the sentencing filed July 8, 2014:

*"The DOL likewise has been acting with dispatch, as two DOL lawyers have been working nearly full time on the matter, spending several hundreds of hours……. If sentencing takes place before final relief is granted, plans and their participants would be harmed, as discussed below. While there have been discussions about some sort of temporary relief, Credit Suisse believes that it is in the best interest of pension plans and their participants to be assured of permanent relief prior to sentencing."*

They are contrasted to the defendant's sense of entitlement in submitting a third-rate, incomplete, non-compliant and deceptive waiver application, which was a "cut-and-paste" version of a previous application from another applicant in an entirely different set of circumstances. It will presumably leave all unfortunate enough to be financially related to the defendant worse off than if the defendant had not accepted the good advice to simply request transitional relief.

### K. Meetings with Credit Suisse Legal Department in Zürich

After a meeting with Credit Suisse Legal Department at ParadePlatz Zürich on 25 May 2005, I met with Mr JR from Texas USA. He had met with Credit Suisse investment advisers at the same ParadePlatz branch that day. They (Credit Suisse) had advised him to put his money into a Liechtenstein Trust with Dörig Partners AG. He asked me because he was concerned about the legal conditions and feared losing control of his money.

He showed me a pamphlet he said was given to him by the Credit Suisse advisor which described Dörig Partners AG as having been established in approx 1979. We agreed that I would have a company search done to check their history. It turned out they had only been established in 1997. This was the same deception as was used by CS-TNST. I told him of this and advised him not to do business with them. He agreed. In the Credit Suisse-TNST case, we were dealing with the same Zürich Credit Suisse Legal & Compliance Department who had apparently approved the arrangements with Dörig Partners AG, including the deceptive investment pamphlet. Dörig Partners AG was an active and directly identified participant of the defendant's charged conspiracy.

At another meeting in Zürich with Credit Suisse Legal Department on 9 October 2008, we attempted to discuss the possibility of criminal involvement by Credit Suisse staff. However, the chief Credit Suisse Legal representative refused to allow any such discussion and warned that if we attempted to discuss possible criminal conduct by Credit Suisse staff, all further communication would cease. Soon afterwards in January 2009, our monitoring system recorded that Credit Suisse had hacked into the secure confidential zone of our website and that almost all of our documents there had been stolen.

## L. Formal Notifications to Swiss Government and FINMA

Formal notifications of crime in Credit Suisse were made to the bank's regulator FINMA and to the Swiss government through the Swiss embassy in Washington but were ignored.

## M. The Stipulation of Fact (Statement of Facts) was Non-Compliant

We strongly dissent from the stipulation of fact on the grounds that it is misleading, omits critical information known to the parties, purports there was agreement based on fact when neither actual agreement nor factual basis existed, and consequently grossly failed the following criteria:
1. The stipulation must fully and accurately disclose all factors relevant to the determination of sentence.
2. The stipulation should identify all areas of agreement, disagreement and uncertainty that may be relevant to the determination of sentence.
3. Stipulations are expected to be accurate and complete.
4. set forth the relevant facts and circumstances of the offender characteristics

In support of our dissent, we respectfully submit:

1. Quotes from the United States Sentencing Guidelines (USSG) Manual confirming that our objections are procedurally correct.
2. Quotes from the Transcript of Plea Agreement Hearing dated May 19, 2014 confirming that:
   a. the Plea Agreement, and by implication the stipulation of fact also, represented the full understanding of both the defendant bank and the United States
   b. The defendant bank was placed under oath to make all answers full and complete and truthful before affirming the above at 2a.
3. Sworn testimony and hearings taken from the published Printed Hearing Record from the US Senate Permanent Subcommittee on Investigations regarding: Offshore Tax Evasion: The Effort to Collect Unpaid Taxes on Billions in Hidden Offshore Accounts. This is presented in Sections N and O.

**The United States Sentencing Guidelines (USSG) Manual states:**

§6B1.4. Stipulations **(Policy Statement)**
(a)      A plea agreement may be accompanied by a written stipulation of facts ….. stipulations shall:
                (1)    set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics;
                (2)    not contain misleading facts; and
                (3)    set forth with meaningful specificity the reasons why the sentencing range resulting from the proposed agreement is appropriate.
(b)      To the extent that the parties disagree about any facts relevant to sentencing, the stipulation shall identify the facts that are in dispute. ……
(d)      The court is not bound by the stipulation……

*Commentary*
*This provision requires that when a plea agreement includes a stipulation of fact, the stipulation must fully and accurately disclose all factors relevant to the determination of sentence. This provision does not obligate the parties to reach agreement on issues that remain in dispute or to present the court with an appearance of agreement in areas where agreement does not exist. Rather, the overriding principle is full disclosure of the circumstances of the actual offense and the agreement of the parties. The stipulation should identify all areas of agreement, disagreement and uncertainty that may be relevant to the determination of sentence. Similarly, it is not appropriate for the parties to stipulate to misleading or non-existent facts, even when both parties are willing to assume the existence of such "facts" for purposes of the litigation. Rather, the parties should fully disclose the actual facts and then explain to the court the reasons why the disposition of the case should differ from that which such facts ordinarily would require under the guidelines.*

*§ 6B1.4(d) makes clear that the court is not obliged to accept the stipulation of the parties. Even though stipulations are expected to be accurate and complete, the court cannot rely exclusively upon stipulations in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information.*

**Referring now to the Transcript of Plea Agreement Hearing dated May 19, 2014:**

In order to do this, the Court will place you under oath and ask you certain questions about Credit Suisse's rights and the rights that are being given up and that you understand those, as well as I will be asking you about matters pertaining to the actions of Credit Suisse and the matters pertaining to the charge in the criminal information.
Now, in order to proceed, again, the Court places you under oath. Once you're placed under oath, all of your answers have to be full and complete and truthful. If they're not, you yourself and/or Credit Suisse can be subjected to a further prosecution for perjury or making a false statement to the Court.
(Credit Suisse was placed under oath to make all answers full and complete and truthful.)

THE COURT: Before I proceed with this plea agreement, I would ask the United States Attorney: Has there been any prior plea offers in this case other than what is contained in this written plea agreement?
MR. LYTLE (For US Attorney, Alexandria): Your Honor, there were a number of plea discussions that led up to this plea agreement. This plea represents the final agreement between the parties.
THE COURT: All right. If so, have they all been withdrawn or rejected at this point?
MR. LYTLE: That's correct, Your Honor.
THE COURT: And this particular plea agreement, then, represents the full understanding of the United States and Credit Suisse AG?
MR. LYTLE: That's correct, Your Honor.

THE COURT: Now, I would ask you, Mr. Wray: Is that your understanding as well?
MR. WRAY (Counsel for CREDIT SUISSE AG): That's my understanding as well, Your Honor.
THE COURT: All right. And I would also ask you, Mr. Reifenberg: Is that your understanding?
MR. REIFENBERG (CREDIT SUISSE AG'S REPRESENTATIVE): That's also my understanding, Your Honor.

## N. The Plea Agreement was Non-Compliant and should not Stand

The extracts from the following Section O describe a situation vastly different to that described in the Plea Agreement. The fundamental situation was that rampant criminal activity was being protected by the selective and inconsistent application of Swiss law. US law had been treated with contempt costing all US taxpayers billions of dollars.

§ O (i). Tax abuse was rampant, the old Swiss treaty was "hopeless"; the DoJ issued subpoenas against Credit Suisse in 2011 which could not be enforced; enforcing a subpoena is ineffective in Switzerland because "the Swiss block it".

§ O (ii). The bank put compensation ahead of compliance; greatly profited by hiding $ billions; undermined US law; became a safe tax evasion haven; fines were a mere slap on the wrist for concealing billions, an acceptable "cost of doing business"; "the United States has been deprived of $337.3 billion in potential revenue; the tax losses were estimated at 23 times the estimate given by the Plea Agreement. That should translate to a fine of $70 billion. By any standard, the Plea Agreement estimate is unrealistic and could not have a real basis for agreement between the bank and the United States.

§ O (iii). There were efforts to manipulate published data; data was different depending on "books versus public statements"; Dougan admitted: "you might double count revenues".
This is significant because our reports concluded there were "secret slush funds" financed by illegal profits. The "manipulation" of financial data could facilitate concealment of "secret slush funds".

§ O (iv) The bank is not cooperating or complying with US law; it claimed a comprehensive internal investigation but there was no written report; Mr. DOUGAN gave multiple conflicting explanations which were generally misleading. Much later, it was confirmed that no written reports were submitted because they were all (apparently intentionally) structured so that they were confidential and unavailable to the United States. It is questionable whether Mr Dougan was genuinely ignorant of this (excluding "deliberate ignorance").
This is remarkable because the style of insincere obstruction was almost identical to that used to conceal the "Management Report" in the Credit Suisse-TNST conspiracy. It suggests a corresponding "coaching" took place. See 5a. Obstruction Report, Appendix 3. CS Denies its Management Report on TNST.
Conversation between Mr Wiederman, legal secretary for the Zürich Public Prosecutor and Dr Wettstein of Credit Suisse Legal and Compliance. As typically happened after Credit Suisse was embarrassed by the criminal investigation, soon afterwards Mr Wiederman disappeared from the case and was never replaced. We interpreted this as "training" used to impose "corrupt control" over the criminal investigation authorities.
Mr. DOUGAN's (questionable) responses: we have not yet had a summary written report. We have had a number of reports, but we have not had a summary report; I think, in fact, the Subcommittee's report describes the different efforts that we have made over the past 5 years to get at this problem and to get it right; I believe we have provided on an ongoing basis; we have been asked for a lot of information; I do not know; there are some ongoing written reports, not yet a summary report; we have shared the conclusions of our investigation, but not any of these reports that we had to prepare for other regulators; will give a list of reports that have been asked for that have not been shared with this Subcommittee and the reason not shared.

Other Points: Bankers referred customers to create shell corporations in tax havens knowing that then those shell corporations would deposit those funds under the name of the shell corporation; egregious conduct but no one fired.

Note: This is a <u>criminal offence under Swiss law</u> more serious than bank secrecy infractions but selectively ignored.

§ O (v) 1,800 relation managers were in contact with U.S. persons, perhaps 80–90 percent of whom were not paying their U.S. taxes; it cannot be explained by: the rogue bankers were all located in SALN.

Mr. DOUGAN stated under oath: we have done a very extensive investigation across the whole Bank, including all of those, as you mentioned, 1,800, all of these other RMs, and we did not find any of the misbehaviour; we have not seen any of the abuses in that broad population;

This is significant because Mr. DOUGAN claimed under oath that they did a very extensive investigation across the whole Bank and did not find abuses – but the bank ignored 5 formal notifications of criminal activity from FRCS dated:

12 April 2012
27 July 2012
21 January 2013
4 June 2013
30 August 2013

Other notifications which were sent to the Swiss Embassy in Washington and to the bank's regulator FINMA were likewise ignored. None of the relevant Swiss parties can claim ignorance of the criminal activity in the defendant bank.

Other Points: The proposed treaty will not give the US the information they require.

## O. Sworn Testimony from the Permanent Subcommittee on Investigations

On February 26, 2014, the US Senate Permanent Subcommittee on Investigations released a report and conducted Hearings[27] on Offshore Tax Evasion: The Effort to Collect Unpaid Taxes on Billions in Hidden Offshore Accounts. Credit Suisse was the predominant focus. The following were questioned under oath and transcripts were taken:

Credit Suisse CEO Mr Brady Dougan and the Deputy Attorney General the Honorable JAMES M. COLE and the Assistant Attorney General - Tax Division the Honorable Kathryn M. Keneally (amongst others)
The following extracts are taken from the hearings and prepared statements all given under oath.

The Honorable Kathryn M. Keneally was the senior person in charge of the investigation which resulted in the defendant being charged and the Plea Agreement and Statement/ Stipulation of Facts which are the subject of these proceedings. Ms Keneally also signed the Plea Agreement for the Tax Division.

Note that both the United States and the defendant were present and active throughout the hearings and there is no possibility of ignorance of what was communicated.

§ O (i) Printed Hearing Record Vol 1 of 2 Pages 89 – 90:
Senator LEVIN questions Mr. COLE:
Summary Points: Tax abuse was rampant, the old Swiss treaty was "hopeless"; the DoJ issued subpoenas against Credit Suisse in 2011 which were blocked and could not be enforced; enforcing a subpoena is ineffective in Switzerland because "the Swiss block it"; the bank is bound by US law but cannot enforce it; frustrating and unacceptable.

---

[27] These can be downloaded at: http://www.hsgac.senate.gov/subcommittees/investigations/hearings/offshore-tax-evasion-the-effort-to-collect-unpaid-taxes-on-billions-in-hidden-offshore-accounts

Senator LEVIN.
And I can only tell you that tax abuse was rampant between 2005 and mid–2009. The amount of taxes being evaded with accounts opened during that period, from our investigation, was very high. And so we are going to have to go through the old treaty, apparently, to get that information, which is hopeless. And so the only way it is possible to get it, is using the tools that are at your service.
Would you also agree that targets of treaty requests have a right to challenge those requests in Swiss courts?
Mr. COLE. That is my understanding.
[Pause.]
Senator LEVIN. Mr. Cole, we have talked a bit, at least, about the subpoenas that were issued in 2011 involving Credit Suisse. The Department issued a grand jury subpoena to Credit Suisse in 2011, and they reiterated that today. It asked for client names in that subpoena, account information going back to January 2000.
I wonder if you can tell us why the Department of Justice has not attempted to enforce the subpoenas that it issued in 2011 against Credit Suisse?
Mr. COLE. First of all, I do not think I did talk about those because I cannot talk about grand jury subpoenas that were issued. But I can talk about——
Senator LEVIN. I talked about it.
Mr. COLE. You did. But I can talk generally about our view on the effectiveness of enforcing these grand jury subpoenas and I think we have talked about that. And I have heard your views and I have tried to express mine that I do not think that has proven to be an effective method to get the records. The Swiss block it. And so we have tried to——
Senator LEVIN. That is a terrible admission, by the way, that enforcing a subpoena does not have effects.
Mr. COLE. In the face of another country's laws that they then enforce on the banks that are resident there and say you cannot do this, this is very frustrating, Senator.
Senator LEVIN. Are they not bound by our law, Mr. Cole?
Mr. COLE. They are——
Senator LEVIN. Is there going to be an order——
Mr. COLE. They are subject to our law as well as to the laws of their home country. And this is where we get very frustrated. I share your frustration, Senator.
Senator LEVIN. This goes to the heart of the matter. If they want to operate here and they are bound by our laws, it seems to me, for us to give away the power of subpoena enforcement because that can get them in trouble back home when and if they are ordered by a court in the United States to do something, and they then do it, I do not think we have any alternative if people want to operate here. They abide by our laws. And if they do not abide by our laws, then it is our responsibility to then say, sorry, you cannot operate here. And if we say that—and you do not know whether or not that has been said to them and you do not know whether you have asked the licensee or the people who issue the licenses to people to operate here. If we do that, I can almost guarantee you that those banks, if they want to function here, are going to have to comply. They are going to want to stay in the United States.
It is an unacceptable explanation. That is their explanation.

## § O (ii) Printed Hearing Record Vol 1 of 2 Pages 7 – 8:
OPENING STATEMENT OF SENATOR MCCAIN
Summary Points: Bank put compensation ahead of compliance; greatly profited by hiding $ billions; undermined US law; became a safe tax evasion haven; fines a mere slap on the wrist for concealing billions Treasury as an acceptable "cost of doing business"; from 2009 to 2013, DoJ issued no summonses and enforced no subpoenas against Swiss banks; estimated "the United States has been deprived of $337.3 billion in potential revenue—the largest amount of revenue lost due to tax evasion in the world"

This is significant because the Plea Agreement estimated that the pecuniary loss from the offense over the untold decades was $666.5 million or 0.2% of the $337.3 billion estimate given for the collective loss by

**Senator MCCAIN. Switzerland accounts for 27 percent of total global offshore wealth[28] and Credit Suisse has conservatively around a 17% share of the Swiss amount. That should translate to 4.6% of total global offshore wealth and approx. $15.5 billion of the tax losses which is 23 times the estimate given by the Plea Agreement. That should translate to a fine of $70 billion. By any standard, the Plea Agreement estimate is unrealistic and could not have a serious basis for agreement between the bank and the United States.**

Senator MCCAIN. …….. The bipartisan investigation into tax haven banks focuses today on Credit Suisse, Switzerland's second largest bank. The investigation has revealed another unfortunate example of a foreign bank succumbing to the charms of compensation over compliance and uncovered how, for years, Credit Suisse greatly profited by helping U.S. clients hide billions of dollars of taxable assets from the U.S. Treasury. By willfully undermining U.S. tax and securities laws and taking advantage of Switzerland's opaque banking practices, the bank became a safe haven for tax evasion, pure and simple. To-day's hearing will examine instances of past misconduct, highlight how the bank delayed meaningful compliance for as long as possible, and consider how the Department of Justice's ineffective response allowed this conduct to persist.

How Credit Suisse bankers helped their U.S. clients hide their assets—and keep them hidden—from the view of U.S. tax authorities was egregious. As Chairman Levin mentioned, the bank orchestrated a wide range of surreptitious meetings with U.S. clients, on both sides of the Atlantic. Remotely controlled elevators leading to hidden rooms in the bank's Zurich headquarters, magazines in American hotel lobbies, and even family events were all used by bankers to unsuspectingly conduct illicit business with their U.S. clients. Credit Suisse bankers reportedly stated on customs forms that they were traveling to the United States for "tourism" purposes. But instead of sightseeing, they would secretly meet with clients—a violation of U.S. securities laws. In one instance, a Credit Suisse banker traveled to the United States, purportedly, to attend the wedding of a client's child. However, in addition to enjoying the wedding festivities, the banker also took advantage of this social occasion to secretly brief his client on the status of the client's undeclared Credit Suisse account. These alarming instances of illicit banking practices belong in a spy novel—not at one of the world's top banks.

The Swiss banking secrecy provisions that enabled such practices went largely unchallenged until 2008, when this Subcommittee conducted a seminal investigation and held public hearings into offshore tax evasion practices. Indeed, Credit Suisse prospered for years by not requiring its U.S. clients to be tax compliant. While it made some changes to its internal policies, it was slow to ensure sufficient compliance by its U.S. account holders. Even today, the bank still must answer for decades of ill-gotten profits.

Coincidentally—or not—just 5 days ago, with this hearing on the horizon and announced, Credit Suisse agreed to a regulatory settlement with the SEC whereby it would admit wrongdoing and agree to pay $196 million for providing banking services to its internal policies in the United States without registering with the regulator. This fine, however, pales in comparison to the severity of the full extent of Credit Suisse's misconduct. The Justice Department and other Federal regulators should not sit by and give these foreign banks a free pass for their role in enabling U.S. tax evasion, concealing billions of dollars in tax revenue, and deceiving the U.S. Government and the American people.

At a time of fiscal hardship, the Justice Department appears to have willingly given up on using the tools it has to collect taxes owed to the U.S. Government. In 2008 alone, the Justice Department obtained information on U.S. tax evaders from a Swiss bank, leading to 72 prosecutions. But from 2009 to 2013, the Justice Department seems to have abandoned its efforts, issuing no summonses and enforcing no subpoenas against Swiss banks.

In fact, I am sure the Justice Department will probably dispute that, but facts are stubborn things. From 2009 to 2013, the Justice Department issued no summonses and enforced no subpoenas against Swiss banks. In fact, even though in 2011 the Justice Department indicted a handful of individual Credit Suisse bankers for engaging in illicit banking practices, to date, it has failed to prosecute these indictments. That is since 2011. Instead, the Justice Department has opted to play the role of diplomat—helping to negotiate with the Swiss Government the creation of a program that allows Swiss banks to voluntarily disclose their tax evasion practices without risk of prosecution in the United States. As a result of this program, some banks may not

---

[28] See: https://www.bcgperspectives.com/content/articles/offshore_business_recovered_challenges_remain/

even have to admit any wrongdoing for their misconduct. Instead, these financial institutions will simply pay fines on the illicit accounts they hold—a mere slap on the wrist for their role in concealing billions of dollars from the U.S. Treasury and a payment that may be deemed by banks wishing to engage in similar wrongdoing as an acceptable "cost of doing business."

As a result of offshore tax haven practices by Credit Suisse and other financial institutions, as recently as 2011, it has been estimated that the United States has been deprived of $337.3 billion in potential revenue—the largest amount of revenue lost due to tax evasion in the world. With this in mind, the Justice Department should be relentless in continuing its investigations into foreign banks, such as Credit Suisse, and seek penalties that reflect the severity of the wrongdoing, disgorge them of their wrongful gains, make aggrieved taxpayers whole, and effectively deter similar misconduct in the future. It is past time to fully and clearly expose how offshore tax haven banks help American account holders evade paying their taxes.

### § O (iii) Printed Hearing Record Vol 1 of 2 Pages 47 – 50:

**Senator LEVIN questions Mr. DOUGAN, Mr. CERUTTI, Mr. MEISTER and Mr. SHAFIR all of Credit Suisse: Summary Points: There were efforts to manipulate published data; data was different depending on "books versus public statements"; Dougan admitted: "you might double count revenues".**

**This is significant because our reports concluded there were "secret slush funds" financed by illegal profits. The "manipulation" of financial data could facilitate concealment of "secret slush funds".**

Senator LEVIN. And are you going to be looking into whether or not the bank's net new asset numbers on the books were accurately stated to the public?

Mr. CERUTTI. Yes, that is definitely part of the investigation, but so far we have really no indication that they were not.

Senator LEVIN. All right. And are you going to look into whether the numbers on the books differed from the numbers that were shown to the public? Did they differ?

Mr. CERUTTI. I would not know. At this point I think I——

Senator LEVIN. How do you know that——

Mr. CERUTTI. I think at this point we have just——

Senator LEVIN. How do you know they are accurately stated?

Mr. CERUTTI. That is what I have been informed by the law firms who have looked into this already. At this point there is no reason to assume that the numbers are not accurately stated, but, please, give us the time to do the work and come back to your staff.

Senator LEVIN. Well, except you represented here that the numbers are accurately stated, and so now I am asking you whether you were told by your lawyers that the numbers that were on the books were different from the numbers that were shown to the public. Have you talked to your lawyers about that problem?

Mr. CERUTTI. No, I——

Senator LEVIN. Pardon?

Mr. CERUTTI. I am not—this is really——

Senator LEVIN. That is OK. If you have not talked to them about it, you just say so.

Mr. CERUTTI. Yes, OK.

Senator LEVIN. Is that true?

Mr. CERUTTI. Yes, I—really I do not have the information.

Senator LEVIN. That is not my question. But have you talked to the lawyers about whether or not the numbers on the books were different from the numbers stated——

Mr. CERUTTI. May I just——

Senator LEVIN. Yes, sure.

[Pause.]

Mr. CERUTTI. The lawyers inform me that you might be referring to internal scorecards versus externally published numbers.

Senator LEVIN. I.e., books versus public statements.

Mr. CERUTTI. I would not call it "books versus public statements."

Senator LEVIN. What is an internal scorecard?

Mr. DOUGAN. As you know, we obviously have a very robust and crisp process around all of our publicly stated numbers. This is another one of our publicly stated numbers. We are going to look into this. But we also have a set of what we call management information. You might think of it as the Management Information Systems (MIS). So there are MIS numbers which we use to judge individuals' performances, groups' performances, and those often have a number of different rules that might depart from the public numbers that are stated, and there is nothing unusual about that. In some cases you might double count revenues in order just to provide certain incentives to different groups and sort of those are the internal accounting methods of looking at numbers.

Senator LEVIN. Well, we call them "books." But we are going to get into this a little bit more.

Take a look at Exhibit 21,1 if you would. Now, this is a Credit Suisse email dated February 2012, and the subject is "Important— NNA, PBMC." The beginning of the email is on the last page of this exhibit, so that is 84. And it says, ". . . we will again discuss our NNA results which have been very disappointing until now. As our capability to attract clients and new assets is of utmost importance—also externally—we need to take all possible measures in order to change this into a positive story within the next weeks."

Now, this is a memo from Mr. Boegli. Is that correct?

Mr. DOUGAN. That is right.

Mr. CERUTTI. Correct, yes.

Senator LEVIN. All right. Now, did he work for you? I guess I will ask Mr. Meister this. Did Mr. Boegli work for you?

Mr. MEISTER. Yes, that is correct.

Senator LEVIN. He was the chief operating officer (COO)?

Mr. MEISTER. He was the chief operating officer, and this area was also the chief financial officer (CFO) part for the division.

Senator LEVIN. And he was then saying we have to "take all possible measures in order to change this into a positive story in the next weeks." And you were on the email, I gather.

Mr. MEISTER. Yes.

Senator LEVIN. So he was pushing toward a particular NNA result in part, because it was reported externally. Is that correct?

Mr. MEISTER. I think that that email was February 27, and generally because new net asset is one, as you said, of the key performance indicators. he makes everybody aware of all possible net new assets, positive or negative, that can be recognized within the FINMA rules.

Senator LEVIN. Well, he did not say that.

Mr. MEISTER. No, but it is a normal process——

Senator LEVIN. I am not saying it is normal. I am just saying what he said. "We need to take all possible measures to change this into a positive story." That is not positive or negative.

Mr. MEISTER. So perhaps——

Senator LEVIN. He did not say change this into a positive or negative accurate story. He said, "We have to take all possible measures to change this into a positive story." How do you say "positive or negative" when he says "positive"?

Mr. MEISTER. Perhaps the email, I am copied on the email, but perhaps the language is not the right one or the appropriate one. But generally it is that we go through all the possible bigger tickets within the Bank, in order to check if there is a change from custody to assets under management. This is a normal process. The BA heads all over the world are contacted to see that we have the accurate numbers in the system and for the end of the quarter.

Senator LEVIN. I am very glad to hear that you seek accuracy at the end of the quarter, but this is not what this email says. This does not say, "We have to be absolutely accurate because we are making external statements." It says, "We need to take all possible measures to change this into a positive story." That is a deviation from your policy, I take it.

Mr. DOUGAN. Mr. Chairman, we agree with that. We have a process to ensure that all of our NNA numbers are recognized properly. And you are right, this kind of language is not consistent with the way we would think about it.

Senator LEVIN. All right. Now, take a look, if you would, at Exhibit No. 26,1 Mr. Meister.

Mr. MEISTER. Yes.

Senator LEVIN. This is another Credit Suisse email dated December 2012. This is about a fourth quarter forecast, also from Mr. Boegli. "Our ambition to deliver WMC NNA of around CHF 6-7bn [Swiss francs] in 4Q12 is at risk." It does not say, Our ambition to have an accurate statement is at risk. It says we have an ambition to deliver WMC [wealth management clients] NNA of around 6 to 7 billion, it is at risk. And I take that back. I misspoke, because this is a slightly different issue. What he is saying is we want to try to bring in 6 to 7 billion, and I think that is a more accurate reading than what I said a moment ago. And I do not see anything particularly wrong with saying we have an ambition to add NNA. Nothing wrong with that. I do not think.

Then it says, "With 3 weeks to go until the year comes to a close . . . we still need CHF 2.5bn [Swiss francs] to reach the lower end of this ambition. This requires continued efforts on all levels . . ." What does that mean, "efforts on all levels?" What is that?

Mr. MEISTER. To give you perhaps a little bit of perspective, you have normal in-and outflows of net new assets, but you have these so-called big custody clients like the client in scope you had where we are looking in every single quarter. This was his intention to see if there was a change in the intention of the client or in the amount of advice we could provide or generally a change. And for that, you have to go through the world to all the different regions to see if there was a change on these big tickets. And then, of course, they have to go back to the relationship manager to look, and he does that in advance that we are of the respective quarter. That is what really the intention was, even if perhaps the language is not exactly what we want to have.

Mr. SHAFIR. Mr. Chairman, may I interject?

Senator LEVIN. Sure.

Mr. SHAFIR. It is hard for me to say specifically what Mr. Boegli was intending here, but if you look at this email specifically, the people it is addressed to are the sales managers and a couple of the product managers, who actually are the people who are interfacing with the clients. So, I mean, to have an ambition, as you said earlier, to hit a target, this would be very similar to hitting a sales target in a quarter, and addressing that to the sales managers seems to be a normal course of business, just looking at it objectively.

Senator LEVIN. Did you discuss, either one of you, with Mr. Boegli pushing bank employees to meet external NNA targets?

Mr. MEISTER. What I wanted to explain before, as a normal process now—we are co-heads, of course, we always push in our function, that we have the right figures in the system. That means that all new intents of the clients or investment advice are correctly reflected in the system. Mr. Boegli, who at the time was in charge of this process, made it aware to all the different business heads around the world that they have to take responsibility and ownership to see that the right figures are in place.

Senator LEVIN. All right. Did you ever talk to him about the language of this email?

Mr. MEISTER. I cannot recall that.

Senator LEVIN. Did you ever talk to Mr. Boegli about the language in this email?

Mr. MEISTER. Not to my memory.

## § O (iv) Printed Hearing Record Vol 1 of 2 Pages 30 – 32, 960:

**Senator LEVIN questions Mr. DOUGAN and Mr. CERUTTI both of Credit Suisse:**

**Summary Points: The bank is not cooperating or complying with US law; it claimed a comprehensive internal investigation but there was no written report; Mr. DOUGAN gave multiple conflicting explanations which were generally misleading. Much later, it was confirmed that no written reports were submitted because they were all (apparently intentionally) structured so that they were confidential and unavailable to the United States. It is questionable whether Mr Dougan was genuinely ignorant of this (excluding "deliberate ignorance").**

This is remarkable because the style of insincere obstruction was almost identical to that used to conceal the "Management Report" in the Credit Suisse-TNST conspiracy. It suggests a corresponding "coaching" took place. See 5a. Obstruction Report, Appendix 3. CS Denies its Management Report on TNST. Conversation between Mr Wiederman, legal secretary for the Zürich Public Prosecutor and Mr Wettstein of Credit Suisse Legal and Compliance. As typically happened after Credit Suisse was embarrassed by the criminal investigation, soon afterwards Mr Wiederman disappeared from the case and was never replaced. We interpreted this as "training" used to impose "corrupt control" over the criminal investigation authorities.

Mr. DOUGAN's (questionable) responses: we have not yet had a summary written report. We have had a number of reports, but we have not had a summary report; I think, in fact, the Subcommittee's report describes the different efforts that we have made over the past 5 years to get at this problem and to get it right; I believe we have provided on an ongoing basis; we have been asked for a lot of information; I do not know; there are some ongoing written reports, not yet a summary report; we have shared the conclusions of our investigation, but not any of these reports that we had to prepare for other regulators; will give a list of reports that have been asked for that have not been shared with this Subcommittee and the reason not shared.

Other Points: Bankers referred customers to create shell corporations in tax havens knowing that then those shell corporations would deposit those funds under the name of the shell corporation; egregious conduct but no one fired.
Note: This is a <u>criminal offence under Swiss law</u> more serious than bank secrecy infractions but selectively ignored.

Senator LEVIN. Of the Swiss Government. In that case, let us be real clear here what we are talking about. You are not cooperating with us, hiding behind a law which applies in Switzerland but does not apply here, and yet you want to do business here. And that is not the way the international law is applied. You want to do business here? You must comply with our laws.
Now, let me go back to this so-called investigation which you have carried on. In answer to Dr. Coburn's question—and I believe this was you, Mr. Dougan, who responded to this question. You have an internal investigation going on on the issue of aiding and abetting tax evasion, and you are conducting interviews and you are looking at documents and so forth. You indicated there is not going to be a written report. I do not understand how you can have something as serious as you say you are undertaking and not have a written report. But is that your testimony under oath that there are no written reports about that?
Mr. DOUGAN. I said we have not yet had a summary written report. We have had a number of reports, but we have not had a summary report because we view this as an ongoing process.
Senator LEVIN. All right. We have asked you for those ongoing written reports, have we not?
Mr. DOUGAN. I believe you have, and I think we have had many sessions with the Subcommittee updating them on the progress of the projects, and I think, in fact, the Subcommittee's report today chronicles in great detail through many pages, all of the different efforts that we have made over the past 5 years to get at this problem and to get it right.
Senator LEVIN. Let me go back to my question. You say that you have some written reports but not a summary report, and I believe we have asked you for the written reports that you do have. Is that correct?
Mr. DOUGAN. Well, I believe we have provided on an ongoing basis——
Senator LEVIN. No, I am just talking about the written reports that you do have. I am not talking about the summary report. I am talking about these ongoing written reports. Have we asked you for those reports?
Mr. DOUGAN. Mr. Chairman, we have been asked for a lot of information by——
Senator LEVIN. Do you know whether we have asked you for those written reports——
Mr. DOUGAN. I do not know——

Senator LEVIN [continuing]. As part of this very detailed investigation that you have undertaken? You have described this as a major investigation.

Mr. DOUGAN. Absolutely.

Senator LEVIN. OK. And there are some ongoing written reports, not yet a summary report. I think that is what you just said.

Mr. DOUGAN. Yes.

Senator LEVIN. Now, these ongoing written reports, have you made those available to this Subcommittee?

Mr. DOUGAN. I believe we have shared those with the Subcommittee, but maybe Mr. Cerutti can——

Senator LEVIN. Have you, Mr. Cerutti?

Mr. CERUTTI. Mr. Chairman, we have shared the conclusions of our investigation, but not any of these reports that we had to prepare for other regulators. Some are confidential and cannot be shared at this point with this Subcommittee.

Senator LEVIN. Well, would you give us a list of the reports that we have asked for that you have not shared them with this Subcommittee and the reason that you have not shared? Will you give us that for the record?

Mr. DOUGAN. Sure.

Mr. CERUTTI. OK, sure.

Senator LEVIN. All right.

Now, even though you have not shared those reports, I want to ask you whether you can tell us about some of the things that you found. For instance, have you found that Credit Suisse bankers repeatedly traveled to the United States to get prospective U.S. customers and to serve existing U.S. customers in violation of your own policies? Have you found that?

Mr. DOUGAN. Yes, we did find that with the limited group of people that we mentioned. Yes, we did find that.

Senator LEVIN. Did you find that some Swiss bankers advised U.S. customers to secure transactions under $10,000 which would then avoid triggering cash transaction reports?

Mr. DOUGAN. We did find some conversations around that, so we think that there may have been some of that activity, yes.

Senator LEVIN. All right. Was that limited, too, to the SALN?

Mr. DOUGAN. It was, yes. Materially it was, yes.

Senator LEVIN. Did you find that some Credit Suisse bankers helped refer U.S. customers to intermediaries who advised them to transfer their U.S. assets to foreign shell companies and then treat them as foreign account holders in the bank's own books?

Mr. DOUGAN. We did see activity with these private bankers referring to, as you say, outside potential arrangers. I am not sure that any of that came—if you are saying some of that came back on to our books——

Senator LEVIN. Oh, yes.

Mr. DOUGAN. Is that right? Yes, we did——

Mr. CERUTTI. We saw some of that, correct.

Senator LEVIN. Just think about that.

Mr. DOUGAN. Yes.

Senator LEVIN. Your bankers referred customers to create shell corporations in tax havens knowing that then those shell corporations would deposit those funds in their accounts with your bank under the name of the shell corporation.

Mr. DOUGAN. I view that just as egregiously as you do, Mr. Chairman. I agree.

Senator LEVIN. And who was fired for that?

Mr. DOUGAN. Well, as we said, a number——

Senator LEVIN. No. Was anyone fired who did that? I know a number of people have been fired, a number of people have been let go. I just want to know: People who engaged in that egregious act, illegal under our laws, by the way, were any of those people fired, for referring people to intermediaries for the purpose of then having that same money go in the name of a shell corporation back into your bank? Were any of those people fired, do you know?

Mr. DOUGAN. I believe all those people do not work for the bank anymore, but perhaps Mr. Cerutti can give you a more specific answer.
Senator LEVIN. Do you know, Mr. Cerutti?
Mr. CERUTTI. I do not know of anyone who was fired specifically because of that.

RESPONSE of CREDIT SUISSE
to
SUPPLEMENTAL QUESTIONS FOR THE RECORD
from
SENATOR CARL LEVIN
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
Hearing On
Offshore Tax Evasion: The Effort to Collect
Unpaid Taxes on Billions in Hidden Offshore Accounts
February 26, 2014

U.S. Offshore Private Banking

1.      Provide a complete set of reports that the bank, including any outside counsel or consultants, has prepared related to its internal investigation of the bank's involvement in aiding and abetting tax evasion by U.S. taxpayers. If the bank asserts any privilege or confidentiality claim over such reports, provide a privilege log of such materials that the bank believes it cannot provide in entirety, including the reason the bank believes it cannot provide a copy to the Subcommittee.

Response: The sole written reports that the bank prepared related to the internal investigation were created by Credit Suisse outside counsel Schellenberg Wittmer at the request of the Swiss Financial Market Supervisory Authority (FINMA). These reports are protected by attorney-client privilege and are confidential attorney work product. As bank regulatory materials, they are exempted from disclosure under 12 U.S.C. §1828(x). The reports are also 'supervisory privileged' under Swiss regulations and thus cannot be disclosed without FINMA's approval.

§ O (v) Printed Hearing Record Vol 1 of 2 Pages 37 – 39:
Senator LEVIN questions Mr. DOUGAN and Mr. CERUTTI both of Credit Suisse:
Summary Points: 1,800 relation managers were in contact with U.S. persons, perhaps 80–90 percent of whom were not paying their U.S. taxes; cannot be explained by: rogue bankers were all located in SALN.

Mr. DOUGAN stated under oath: we have done a very extensive investigation across the whole Bank, including all of those, as you mentioned, 1,800, all of these other RMs, and we did not find any of the misbehaviour; we have not seen any of the abuses in that broad population;

This is significant because Mr. DOUGAN claimed under oath that they did a very extensive investigation across the whole Bank and did not find abuses – but the bank ignored 5 formal notifications of criminal activity dated:
12 April 2012
27 July 2012
21 January 2013
4 June 2013
30 August 2013

**Other notifications which were sent to the Swiss Embassy in Washington and to the bank's regulator FINMA were likewise ignored. None of the relevant Swiss parties can claim ignorance of the criminal activity in the defendant bank.**
**Other Points: The proposed treaty will not give the US the information they require.**

Senator LEVIN. That is the purpose, whether it was 30 percent outside of those two units or 70 percent, this was spread out across the whole organization. So you had 1,800 or so, according to this, relation managers that were in contact with U.S. persons. And what that means, of course, is that when you have all those customers, most of whom—I think it is pretty clear perhaps 80–90 percent of whom were not paying their U.S. taxes—that is a very major problem for us, and it cannot easily be answered by saying that the rogue bankers were all located in SALN and that is where the problem was. You had bankers that were doing things that you acknowledge were improper, in some cases egregious, from other areas than SALN.

Mr. DOUGAN. Well, I think it is important to point out that, as we mentioned, Mr. Chairman, we have done a very extensive investigation across the whole Bank, including all of those, as you mentioned, 1,800, all of these other RMs, and we did not find any of the misbehavior, again, which we agree with you is egregious and should not have happened, that we found in SALN. We did not find it there.

So as you say, I think certainly from a business point of view, we would have rather seen it more concentrated, and that would have been better from a compliance point of view as well. But we have not seen any of the abuses in that broad population

Senator LEVIN. Well, are you saying that all of the abuses that we have identified and you have acknowledged were found in your investigation were concentrated in SALN? Is that what you are saying?

Mr. DOUGAN. Yes, I mean, virtually all——

Senator LEVIN. Mr. Cerutti says that he does not even known where what you call egregious conduct—and I would agree with you on that issue—was concentrated in SALN. He does not know that.

Mr. CERUTTI. It was—it was centered around SALN, but there was——

Senator LEVIN. Go on.

Mr. CERUTTI. Most probably also outside of SALN, there was also some——

Senator LEVIN. What you would call "rogue bankers"?

Mr. DOUGAN. It is hard to exclude that there were not issues outside of that, but, again, in the investigation, the vast bulk of that behavior was in that one area. So, there were smatterings of issues elsewhere, as you would expect, I think, and obviously we are disappointed with those as well. But the vast bulk of the behavior was in that area, and——

Senator LEVIN. The vast bulk. And were accounts outside of SALN undeclared?

Mr. DOUGAN. I think the answer to that is probably yes.

Senator LEVIN. That is the problem we are focusing on, of course. Mr. DOUGAN. Yes.

Senator LEVIN. It is not the problem you are focusing on. It is what we are focusing on. The billions of dollars that are uncollected in taxes, and there are a lot of reasons for that, but you folks have to look in the mirror if you want to help us identify one reason and go after the folks who have evaded paying taxes.

I just want to be real clear that you have a law there on your books, and you cannot simply say that if we ratify a treaty that that is going to solve that problem. Does your law get repealed if the treaty gets ratified, the law saying it is illegal to identify the name of people on accounts? Does that law go away when the treaty is ratified?

Mr. CERUTTI. Mr. Chairman, the law is not going to be repealed, but the law will permit to give you all the names under the treaty process.

Senator LEVIN. It will give us the names which comply with the treaty process, right?

Mr. CERUTTI. That is correct.

Senator LEVIN. Which is a long way from all the names. If we ask you for the names, you say, "We will give you the names. Just ratify that treaty." That is a commitment which I hope you will keep, because, remember, under that treaty, whoever wants those names is going to have to prove that the bank contributed significantly to the aiding and abetting. And this is after 2008, because we are not going to get any names before 2009 under the treaty, right? So we lose all those names, which is most of your accounts,

which were closed by then. And the accounts that you kept open are compliant, you say, because you have proof of tax compliance. So when we ask you for the names pre-2009, when the treaty goes into effect, are you saying that under this new treaty you are going to give us those names? Is that what you are saying?

Mr. CERUTTI. Mr. Chairman, we can give you any names of the accounts that were still open on September 23, 2009——

Senator LEVIN. And most were closed.

Mr. CERUTTI. If you look at the account numbers, that is, I think, not correct. I think number-wise——

Senator LEVIN. 50/50, let us say.

Mr. CERUTTI. Probably that might be right.

Senator LEVIN. OK.

Mr. CERUTTI. But then let me maybe just state that 50 percent of these accounts remained in Switzerland. They went to other Swiss banks, approximately 50 percent, and so they would have been opened at another bank in Switzerland, and you would then get them through a treaty request from another bank.

Senator LEVIN. And with that treaty request, again, whoever is making the request, has to prove that the bank was involved significantly in the aiding and abetting.

Mr. CERUTTI. That is again correct, Mr. Chairman.

Senator LEVIN. Now, let us just focus on that.

Mr. CERUTTI. Yes.

Senator LEVIN. Now, we are going to ask you for these names, I hope. We should use our subpoena power to get the names so we can collect the taxes owed. But you can expect that when this treaty is ratified that you are going to get a request for all the names prior to the effective date of that treaty. Will we get those names from you?

Mr. CERUTTI. The treaty works the way that the IRS may—— Senator LEVIN. Will we get those names from you, those half of the 22,000 names, are we going to get them from you?

Mr. CERUTTI. The Swiss legal system will most likely not let us provide those names.

Senator LEVIN. So do not tell us the treaty is going to get us what we want. It will not. You have just acknowledged it will not. The treaty is going to do some good in the future—some good—if we can prove that the banks that have the accounts have contributed to aiding and abetting in tax evasion, which is not an easy proof, and it is left up to the Swiss courts, and we know what the Swiss courts have done. OK?

So, most of us, I hope, want this treaty ratified. It has a slightly better test. But do not, please, represent to this Subcommittee and to the public that when the treaty is ratified, we can then expect those names from you. We are not going to get any pre-2009 names because of Swiss law. And the additional names, there is a burden of proof on the applicant for the names. You have to show that the bank significantly contributed to the problem. If you do not have the names, how do you show that the bank contributed to aiding and abetting the tax evasion if you do not have the names of the people? It is a chicken-egg problem.

So you have been helpful in acknowledging that that treaty is not going to get us the names that we are after.

## Conclusion

We respectfully submit that the non-compliant and deceptive or incomplete nature of the Plea Agreement and the associated Statement of Facts to far too severe for the court to accept. The truth is that gross and as yet undefined criminal activity has demoralized the DoJ into accepting a less than minimal penalty and exposing far fewer facts than are known.

The defendant has shown no real sign of taking responsibility for its crimes or reforming. Quite the opposite. It has offended against the plea agreement and apparently further offended against 18 USC §371 giving the United States the option of being released from all its commitments under the plea agreement. This is the best option. Otherwise the court may be obliged to reject the plea agreement giving the offender the right of withdrawing its guilty plea and needlessly wasting valued government resources already drastically economized due to the tax evasion exploited by the defendant and others.

There is powerful evidence that the charged conspiracy was a single conspiracy with multiple objectives and involved a number of sub-agreements to accomplish the overall objective of illegal profit. The evidence agrees with the charge that Credit Suisse AG was a conspirator who conspired with many of its employees, as well as US and foreign tax cheats and at least one significant crime syndicate. It is apparent that the acts of top and senior management in ignoring multiple formal warnings of criminal activity in the bank even concurrently with the criminal investigation by the DoJ were acts of deliberate ignorance, equivalent to actual knowledge under US law. This connected top and senior management to both conspiracies sufficient for them to be regarded as the same conspiracy. Considering the long history of corrupt and criminal conduct in the bank and its often repeated contempt for investigations by destroying and refusing evidence, we find no alternative credible assessment.

The bank destroyed evidence and refused to submit other documents subpoenaed of it, apparently in the mistaken belief that such crime pays. Consequently, it is necessary to exercise the principal of adverse inference as a mandatory sanction. This will have a twofold benefit. It will install a strategy to instil respect for US criminal investigations thus preventing continued undermining of the justice system. It also provides a quick and valid proof of the true membership of the Credit Suisse-TNST conspiracy within the main Credit Suisse conspiracy charged. The direct proof and evidence for indictment is available if needed as can easily be confirmed by studying the supplied reports. The duty of criminal justice to make victims whole can then commence for those unfortunates who have suffered unjustly for so long.

Dr Paul Morjanoff
Managing Director, Financial Recovery and Consulting Services Pty Ltd (FRCS)
Phone: +61 2 9918 8647
Fax: +61 2 9012 0066
Mobile: +61 411 113 457
E-mail: FRCS@tpg.com.au
P.O. Box 28, Avalon, NSW, Australia, 2107.