| | | | |
|---|---|---|---|
| Robert C. Huntley, ISB #894 | Michael J. Flynn, MA #172780 | Philip H. Stillman, CA #152861 | Christopher J. Conant, CO #40269 |
| 815 Washington Street | P.O. Box 690 | 300 So. Point Dr., Ste. 4206 | Conant Law LLC |
| Boise, ID 83701 | Rancho Santa Fe, CA 92067 | Miami Beach, FL 33139 | 950 Seventeenth St., Ste. 1700 |
| Phone: (208) 388-1230 | Tel. (858) 775-7624 | Tel: (888) 235-4279 | Denver, CO 80202 |
| Fax: (208) 388-0234 | Fax: (858) 759 0711 | Fax: (888) 235-4279 | Tel: (303) 298-1800 |
| rhuntley@huntleylaw.com | mike@mjfesq.com | pstillman@stillmanassociates.com | cconant@conantlawyers.com |

*Attorneys for all Plaintiffs Except Gibson, Koenig, Mushkin, Lafleur and Griffen Development LLC*

| | |
|---|---|
| James C. Sabalos | William L. Smith |
| Texas Bar # 17499100 | ISB #6134 |
| 1800 Augusta Drive, Suite 212 | Smith Horras |
| Houston, Texas 77057 | P.O. Box 140857 |
| Tel: (949) 355-6084 | Boise, ID 83714 |
| jimsabalos@hotmail.com | Tel: (208)697-5555 |
| | bill@smithhorras.com |

*Attorneys for Plaintiffs Gibson, Koenig, Mushkin, Lafleur and Griffen Development LLC*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH; AMY KOENIG, VERN JENNINGS, MARK MUSHKIN, MONIQUE LAFLEUR, GRIFFEN DEVELOPMENT, LLC, JUDY LAND, and CHARLES DOMINGUEZ, <br><br> Original Plaintiffs, <br><br> and <br><br> CHARLES and SUSAN L. BARKER; LAWRENCE E. BURGEE and MARY SLOAT; RENARD DAMON; PHILIP D. and VIRGINIA N. GRANT; SCOTT HOCH; SHANE and JESSICA LOCKE; NANCY K. MELLOR; HOWARD HESHY and JUDAH NEUMAN; LEONARD RASKIN; RONALD M. REBMANN; SEASCAPE VENTURES, INC.; LUIS SEGARRA; THOMAS SIMONE and JOANNE CONTI; PHILLIP TUFANO, MATHEW MADURE and SCOTT STUCKEY; DAN R. and KATHY O. BOESPFLUG; JEFFREY S. ELLENZ; LEEANN ELLENZ and TIM HOLLERICH; | Case No. 1:10-cv-00001-EJL-REB <br><br> **FOURTH AMENDED COMPLAINT** <br><br> 1. Tortious Interference with Contractual Relations     p. 87 <br><br> 2. Negligence/Gross Negligence   p. 89 <br><br> 3.   Fraud   (on behalf of Gibson, Koenig and Blixseth)     p. 89 <br><br> 4.   Negligent Misrepresentation (on behalf of Gibson, Koenig and Blixseth)     p. 92 <br><br> **JURY TRIAL DEMANDED** |

Fourth Amended Complaint - 1

**APPENDIX A**

RICHARD W. HOYLE; HS & WT LLC AND
TAMARACK TEE LLC, by and Through Warner
Tillman; DEGEN HS&WT JV by and Through
Warner Tillman and Alan Degen; SCOTT
HUERD and SOGOL NOWBAR; LINDA
POWELL JACOBY; BUDDY BECK; A.
STEPHEN ZAVELL; SCOTT and KATIE
LAMMING; NEWTON D. LESH II; KENT
MARANGI; RICHARD R. and SANDRA L.
NELSON; SHEELAGH PRICE and GARTH
KANIGOWSKI; ALAN and KATHRYN
PURWIN; KENT and CHARLOTTE STEELE;
STEVEN P. THAIN; GEORGE and PAMELA J.
WALL; ROD WALZ; 20 MONTOVA #310, LLC
by and Through John Passariello and William
Moskowitz; ROGELIO A. BALABIS; RUDY A.
BIANCHI; WILLIAM and ERICA CATTANEO;
LOUIS A. and NANCY CHITTY; DEBRA N.
FOUTS; ANGELO J. and CAROLE L. GIOIA;
SCOTT D. and DEBORAH A. HEGER; JOSEPH
M. HERZOG; JAMES and HEIDI HOPEWELL;
MICHAEL J. JAMES; JEFFREY KOZNICK;
JOHNNIE F. and GAY LAU; ART MARTELLO;
MAISHA MCGEE-SCOTT; DENNIS M.
McWILLIAMS; JOHN M. and SHARON L.
MIKULKA; RANDALL K. and NANCY M.
MINAS; ROBERT W. MITCHELL, III.; CAROL
A. MORABITO; DAVID and JULIE PALMER;
HEMANT and VIJYANTIKA PATEL; BFG
KOOL-AID LLC by and Through Chris Garlich;
JAMES J. and PATRICIA D. DOLAN;
VOYAGER PROPERTIES; LLC, KEVIN A.
AND DIANA L. HELMICK,

     Plaintiffs,

v.

Credit Suisse AG, a Swiss corporation; Credit
Suisse SECURITIES (USA), LLC, a Delaware
limited liability company, Credit Suisse FIRST
BOSTON LLC, a Delaware limited liability
corporation; Credit Suisse AG, CAYMAN
ISLAND BRANCH, an entity of unknown type;
and CUSHMAN & WAKEFIELD, INC., a
Delaware corporation,

     Defendants.

Fourth Amended Complaint - 2

Plaintiffs as their Fourth Amended Complaint against Defendants Credit Suisse AG, a Swiss corporation; Credit Suisse SECURITIES (USA), LLC, a Delaware limited liability company, Credit Suisse FIRST BOSTON LLC, a Delaware limited liability corporation; Credit Suisse CAYMAN ISLAND BRANCH, an entity of unknown type (collectively "Credit Suisse"); CUSHMAN & WAKEFIELD, INC., a Delaware corporation, allege:

## I. INTRODUCTION AND STATEMENT OF FACTS

1.     This action seeks to redress the rights and direct losses of the Plaintiffs and entities who purchased real property, club memberships, and an interest in other amenities in four similar resort land developments, often referred to as "Master Planned Communities" ("MPCs"): (i) Lake Las Vegas, in the State of Nevada; (ii) Tamarack, in the State of Idaho; (iii) Ginn sur Mer, of the Bahamas; and (iv) Yellowstone Club, in the State of Montana. In the case of each MPC the Defendants Credit Suisse and Cushman (hereinafter "Cushman") actively engaged in a course of nearly identical illicit conduct which proximately caused the MPCs' complete or substantial financial ruin and operational failure, thereby depriving all Plaintiffs of all or a portion of the value of their purchases.

2.     In or around the first quarter of 2004, Credit Suisse FB's Office in Century City-Los Angeles was thinking of ways it could make money for its Wall Street and international company, Credit Suisse AG. One of the ways it thought it could do so was to arrange financing for existing and/or new Master Planned Communities that could utilize new lending for expansion and/or retirement of debt. Over the years, it had worked with hedge funds such as Highland Capital and its affiliates out of Texas in such endeavors including joint venture lending. The primary participants in creating and developing and implementing this plan were

Jeff Barcy, Grant Little, Jeremy Rogers, Jeffrey Cohen, and David Miller out of their Wall Street New York Capital Division and Wayne Wilson ( hereinafter the "lender team").

3.      In the summer of 2004, the lender team recognized that the real estate market for Master Planned Communities, which were comprised of single or multiple subdivisions within each community, were doing very well in terms of sales.  Indeed, the marketing material that Defendant Credit Suisse lender team obtained from Lake Las Vegas described, as it did to all persons who visited at Lake Las Vegas to inquire about purchasing land or a home, the various nationally known golf courses (three in all), the promised amenities associated with those golf courses such as shops and the commercial infrastructure for a Master Planned Community (hereinafter "MPC") and resort.  What was equally attractive to the Defendant lending team was LLV's private clubs that offered additional amenities in the form of paid for Club Memberships that ranged from $20,000 to over $100,000, depending on the type of membership, but all of them offering special rights and privileges to the golf courses, use of private Club Houses with swimming pools, work out centers, boating rights and privileges above and beyond those of the amenities promised to all owners of property at LLV, together with many more paid-for rights and privileges that were being provided to each homeowner including the Plaintiffs herein.

4.      The lending team determined that Lake Las Vegas was made up of a number of entities or affiliates all owned by a joint venture between Ron Boedekker's Transcontinental company and that of various entities owned by the Bass family out of Texas, which Bass entities held an interest of nearly 90 percent of LLV with loans to the LLV joint venture of a little more than $400,000,000 to build and develop Lake Las Vegas from the 1990's to 2004.

5.      Credit Suisse and its lending team viewed Lake Las Vegas as a potentially perfect first target to get into the MPC/resort lending business for which it could make fees by

Fourth Amended Complaint - 4

competing with other lending institutions and serve, as they did for Highland Capital and other arranged lenders, as their loan Administrator, including managing potential defaults and bankruptcies for the arranged lenders as part of a joint venture.

6.      In or around June of 2004 the Credit Suisse lending team, initially through Jeff Barcy and Jeremy Rogers, contacted representatives of Lake Las Vegas in Henderson, Nevada to set up an appointment with Ron Boedekker, President and Chief Executive Officer of the MPC and its wholly owned affiliates. In late June and early July of 2004, many direct and telephonic communications took place in which it became clear that to do any business with Lake Las Vegas, the Bass family (which had a controlling interest in Lake Las Vegas) had to have its requirement to be bought out of its loans satisfied. That is, a loan that would provide at least $400 Million to the Bass group had to be arranged, with the loan being secured at first by the titled lands and assets of Lake Las Vegas.

7.      The request presented a problem for the Credit Suisse Defendants and their lending team. The lending team contacted their Credit Suisse "Bank and High Yield Finance Committee" in Wall Street about the project for guidance. At that very same time in early July of 2004, the Credit Suisse lending team began to undertake internal due diligence of Lake Las Vegas. In a secret and confidential internal memorandum, the lending team created several due diligence memoranda for review by their Wall Street Offices which were concealed from Lake Las Vegas, the Boedekker's, the Bass family, and the home and property owners: to wit: those Plaintiffs who then owned or soon would be purchasing at LLV. The secret internal memoranda of the lending team noted, in part, the following:  (a) that real estate development for subdivisions, and particularly MPC, are inherently risky because of market conditions such as interest rate fluctuations, (b) that the economy including employment levels could create a slump

in housing (c) that competition in the subdivision market and MPC market could dampen demand for housing and pricing for new homes and/or lots (d) that environmental and regulatory conditions in the expansion of new development in entitled land could harm pricing and a number of other noted risks for MPCs and developers including the homeowners and property owners in each MPC.

8.      In those same internal documents of July 2004 which were part of the internal due diligence of Defendants' Credit Suisse and its lending team, it was also equally obvious that the market was improving, pricing for homes in MPCs like Lake Las Vegas was improving, particularly at Lake Las Vegas because of the beautiful amenities it provided. In fact, nearly an entire document included was devoted to the amenities at Lake Las Vegas noting its nationally acclaimed golf courses, the Clubs and the fact that the Clubs, through their initial membership cost, and the monthly payments by members contributed to the financing of the MPC and the clubs.   On information and belief, the internal reports utilized in detail, much if not all of the information provided to each existing and prospective homeowner in the MPC known as Lake Las Vegas.

9.      In fact, Jeremy Rogers of Credit Suisse stated the following in an email from himself to other Credit Suisse employees:

> "I'd tell Chris that all the orders we have go up in smoke and the deal is dead if lenders do not get standard protection in the event of a downturn or if they don't get the collateral 'value' contained in the Cushman appraisal. The memberships and, I think you could argue, the value of the Lodge and ski facilities which makes up the 'common area', is part and parcel of the value of the real estate they are selling. I mean – where is the value in a piece of dirt in the middle of nowhere if you don't have the club and ski facilities?  Would you, as a lender think you were getting valuable land if it weren't tied to the ski, golf, Lodge, and other amenities up there?  Raw land in the middle of nowhere isn't super appealing unless it comes with all the fixens that buyers have been (and will be) paying for."

\*\*\*

> "This isn't just a dirt loan. It is a club dirt loan, so we need the club.
>
> Entitlements/permits/licenses; land not worth much if it doesn't come with the items that make it valuable. Must have. All term sheets going forward will reference these items in the collateral section to be super explicit, although this is the first time anyone has questioned our claims on these items…Again value of the dirt if we don't have the ski stuff/facilities…"
> (Barcy Deposition Ex. 94)

10.     It did not escape Credit Suisse, however, that if it could arrange loans through its Hedge Fund clients and joint ventures such as Highland Capital, it could earn great fees with no risk to it.

11.     One of the problems initially faced by the Credit Suisse lending group was the fact that LLV officers told the Credit Suisse lending group that Cushman had, only four months earlier, appraised Lake Las Vegas using USPAP ethical standards and those enacted under federal law (FIRREA) to arrive at a fair market value of about $370,000,000. Credit Suisse understood at that time, as did its lending team, that MPC communities made up of one or more subdivisions had to meet a certain standard of care in connection with appraising subdivisions for which loans were made. In fact, Credit Suisse and its internal lawyers knew then that dating back to as early as 1951, the American Institute of Real Estate Appraisers and later, the Appraisal Institute, set forth the standard of care in providing an appraisal of a subdivision regardless of whether it was a single subdivision or multiple subdivisions within a MPC like Lake Las Vegas, Tamarack, Ginn sur Mer, or Yellowstone Club. As early as 1951, the professional organization known as the American Institute of Real Estate Appraisers required appraisers, in meeting the *minimal standard of care,* must include what is referred to as a discounted valuation denominated as a "DCF Analysis" (Discounted Cash Flow) to arrive at a

fair market value ("FMV") of any and all real property appraised in a subdivision. Included in a subdivision methodology that was required to meet the minimal standard of care, was and remains to this date, not merely a DCF analysis that determines the appropriate discount rate and period of time to arrive at fair market value, but also a determination of developer profit to arrive at the overall fair market value of property located in each subdivision in any locality, including a MPC. The early 2004 Cushman appraisal was, in fact, for a bank loan to Lake Las Vegas in compliance with FIRREA and USPAP, as more fully described herein.

12.    In fact, use of DCF analysis and inclusion of developer profit is also the required appraisal standard imposed upon appraisers for real estate in downtown locations or center city locations. In fact, the national head of all appraisers for Cushman has testified as late at 2011 in state court in New York city that the standard of care for valuing any real property included a DCF analysis with only the rate being subject to some discretion and judgment, not the use of a DCF analysis, this because without the use of DCF and developer profit, the appraisal would artificially raise the value of all real property, developed and undeveloped to twice to nearly three times its actual fair market value at the date planned for sale or financing.

13.    Other appraisers have similarly testified for Cushman and, in fact, have presented papers on the very subject to other appraisers and mandatory appraisal education courses required of all MAI appraisers such as all of those who work for Cushman. Barcy testified at his deposition that he actually took courses in DCF analysis while obtaining his MBA from Harvard Business School. Rogers testified he was trained and understood how DCF analysis was performed.

14.    The reasons, according to Plaintiffs' experts and those in financial institutions, for using a subdivision methodology that includes a DCF analysis and developer profits is quite

Fourth Amended Complaint - 8

simple. It provides certainty and predictability in the valuation of real estate at MPCs and avoids skewed valuation schemes that undermine the existing valuation structure in a subdivision made up of existing homes or properties and future sites for development of entitled land within the subdivision or MPC. The subdivision methodology has been the standard of care and methodology for nearly 70 years in the appraisal and lending profession and has provided stability in the real estate market for subdivisions, their existing home and property owners, the lenders of existing home and property owners within that subdivision and prospective lenders and buyers in that subdivision. It is believed (and was known to Credit Suisse Defendants and its lending team in 2004) that by establishing a standard of appraisal methodology to arrive at a fair market value in all subdivisions, lenders, borrowers and existing homeowners in each subdivision had confidence that the market place, that is: the fair market present value, would determine land and home values, not indiscriminate skewed, suddenly changing "helter-skelter" schemes that would destroy confidence, predictability, and a high degree of continuity and certainty in valuing any land or property in a subdivision.

15.    Such stability was not merely critical to lenders and their immediate borrowers but also to other lenders who had previously years earlier made loans to home and property owners in the same subdivision relying only on *fair market value or present value* appraisals to determine land or home values and make their loans to, for example, the Plaintiffs, who purchased and or sold property based only on appraisals that were at the fair market value in subdivisions. The use of the Subdivision Methodology that had been and remains in place for nearly seventy years, using a DCF analysis and developer profit. ensured that the sale of new land by a developer or anyone else, would not undermine the existing values of the homeowners, land owners and others already living in a subdivision and MPC with outstanding loans to other

Fourth Amended Complaint - 9

banks and lenders who in turn depended upon the use of the Subdivision Methodology to ensure that no land fraud and appraisal schemes would be used to *deflate or inflate* existing subdivision values.  Doing otherwise would lead, and did lead, to the foreseeable and predictable collapse and default by each developer who procured a loan based upon inflated appraisals.

16.     The TNV scheme developed and utilized by the Defendants herein resulted in the destruction of the existing amenities, club memberships and land values at each MPC to each unsuspecting homeowner.

17.     Credit Suisse encouraged each developer at Lake Las Vegas, Tamarack, Ginn sur Mer and Yellowstone Club to announce the fact that it was the Lender.  The fact of Credit Suisse and Cushman's involvement was publicized in promotional brochures provided to Plaintiffs. The source of the came by way of promotional boat trips at LLV, and provision of information to real estate agents at all four MPCs, and through press releases.

18.     Several of the Plaintiffs have testified that had they known Defendants had concocted an appraisal scheme to inflate land values in a magnitude of two and one-half two to three times "as is market value" they would not have made their purchases. Others have testified they relied upon the reputation of Credit Suisse in making decisions to hold, rather than sell, properties they had purchased for investment.

19.     In 1986, prosecutors from around the nation and particularly in the Northern and Southern Districts of Texas had been swamped with appraisal and lending schemes that were resulting in substantial prosecutorial and FBI resources being dedicated to bringing to justice, those who departed from the standards of care in appraisal and lending practices and violated lending principles to commit financial schemes that both inflated or deflated land and or building values to deceive the public and victimize individuals such as the very Plaintiffs in this case.

Fourth Amended Complaint - 10

President Ronald Reagan, through Attorney General Edwin Meese, at the time, began with the complete support of Congress various bank fraud task forces in Texas and elsewhere to prosecute the abusers and criminals concocting these appraisal and lending schemes, much like the one in this very case. The Defendants' Credit Suisse and subsequently, their co-conspirator and aider and abettor, Cushman knew in 2004 that they were seeking to evade the very standards of care and ethical guidelines to generate fees for themselves at the expense of the Plaintiffs and others. Credit Suisse management went so far as to ignore their own advice and recommendations from their in-house lawyers in New York of the dangers inherent in the TNV scheme.

20.     Just prior to a meeting in July of 2004, Credit Suisse's lending team prepared a confidential internal memorandum for review by its New York offices after its meeting with Lake Las Vegas. There the lending team stated that they needed to appraise Lake Las Vegas at a value of approximately $900,000,000 to be able to arrive at a loan of at least $400,000,000 to be used to buy out the Bass family interest. The lending team knew that such a loan, after fees to Credit Suisse, would leave little if any money to maintain or develop Lake Las Vegas and or meet its obligations to the home and property owners unless they could meet certain very restrictive and extremely risky sales covenants based on some prediction years down the road that all projected sales would occur without regard to predictable, foreseeable and likely fluctuations in the market, just as Credit Suisse had noted in a secret internal memorandum.

21.     In short, what the lending team had in mind was the following: (1) Create a formula that would entitle Lake Las Vegas to receive a percentage of the sale price for each completed home, after a deduction of the initial land purchase cost and the actual costs of construction and sale.; and (2) This formula was placed on top of the already fully priced lots anticipated by Lake Las Vegas, and (3) At best, by the time the projected land sales were made,

Fourth Amended Complaint - 11

site development and regulatory approvals and permits were obtained, houses constructed, sold and paid for, the time period involved would be at least four to five years.

22.     Credit Suisse believed, as evidenced by internal memorandums, that there was a high probability of fluctuations in the market place for real estate housing sales and that they were highly risky and not predictable.   That is why they referred to their scheme, internally and secretly, as identical to "*high yield and junk bond leveraged lending*" In short, it set up a profit participation program based upon the assumption that land and home values would remain constant and never fluctuate downward, despite the fact that Credit Suisse noted in the their secret internal documents in June and July of 2004 that real estate values are risky and fluctuate, as more fully set forth hereinabove. Credit Suisse well knew it had concocted a "*high yield and junk bond ... leveraged lending*" financial scheme, never before used in the real estate lending market.

23.     This scheme was perpetrated with hedge funds such as Highland Capital as their joint venture/partner and client as a willing participant.

24.     Despite these known risks, and its knowledge of the contracts plaintiffs were entering into for purchase of their lots, homes and Club Memberships and other amenities, and despite the Defendants' knowledge of the MPC Developers' obligations to the Plaintiffs, the lending team went forward with their lending scheme which was unfolding in July of 2004.

25.     The Credit Suisse lending team was determined to obtain an appraisal for $900,000,000 or better despite the real, foreseeable, and likely risk that the covenants in the "Credit Facility" would likely never be met, resulting in the likelihood that Lake Las Vegas and the other MPCs would eventually go into default and subsequent bankruptcy.

26.     As Jeremy Rogers testified under oath, Credit Suisse was not concerned and did not care about what might happen to the Plaintiff home and property owners because they were not the clients of Credit Suisse.

27.     After several power point meetings with the Lake Las Vegas Developer, Credit Suisse decided to move forward with the appraisal and lending scheme. It decided to make a "cold call" to their favored appraisal company, Cushman to engage it to perform an appraisal. The assignment was ultimately given by Cushman to Charles Reinagel, now deceased. Reinagel, a competent and experienced MAI appraiser for co-conspirator Cushman, believed he was going to perform a new appraisal at Lake Las Vegas in accord with USPAP ethical standards and  in compliance with FIRREA and at a very minimum, utilize and perform a proper Subdivision Analysis and appraisal employing a Discounted Cash Flow ("DCF") methodology.

28.     Use of a DCF analysis to arrive at the "fair market as is value" of land was then, and remains today, the standard of care required of all MAI appraisers of subdivision land. Also incorporated in what is referred to in the appraisal profession for performing a subdivision appraisal is "developer profit" in at arriving at the fair market value for land. Such has been the standard of care since the late 1940's in the appraisal profession.

29.     Consistent with his belief that he could perform an appraisal following the standard of care set forth by the subdivision analysis and adopted by USPAP and utilized by his most senior appraiser in New York, Mr. Corcoran, and others at Cushman and Wakefield over the decades prior to 2004 to arrive at a fair market value, Reinagel was asked by Cushman to execute a contract for his company with Credit Suisse and perform the appraisal for Lake Las Vegas.

30.     On August 9, 2004, Mr. Reinagel was provided a contract from Credit Suisse First Boston that was executed by Credit Suisse's lending team executive and Director, Jeff Barcy. Made part of the contract was an Attached Exhibit that spelled out the terms and conditions for that appraisal project. Reinagel executed the contract on behalf of defendant Cushman and himself and proceeded to move forward with his work.

31.     At his deposition, Jeremy Rogers opined that it was his belief that the document provided to Reinagel for his signature was actually prepared by Credit Suisses' New York in-house counsel. The executed August 9, 2004 contract between Cushman required, among other things, the following:

  a.     That Cushman (hereinafter "CW") through its appraiser would establish an "As Is" Market Value at Lake Las Vegas;

  b.     That the appraisal would be prepared by an MAI appraiser and Member of the Appraisal Institute;

  c.     That the analyses. opinions and conclusions in the appraisal report would be in conformity with the "Code of Ethics and Standards of Professional Practice of the Appraisal Institute" and "USPAP" and those of FIRREA 12 CFR Part 34 (RTC) and comply with FIRREA to arrive at a market value;

  d.     That the definition of "Market Value" that which was defined under under federal law set out in the Federal Register, Vol. 55, August 22, 1990 which by definition required the use of a "reasonable time for exposure in the open market" which required a DCF analysis;

  e.     That the appraiser, Reinagel, was required to certify that no bias or pre-determined result or value would be allowed and that in all respects, the

appraisal of Lake Las Vegas would comply with FIRREA and all ethical standards in his profession which included prohibition of undue influence by anyone.

32.    Not only was the appraisal contract with CW demanding compliance with FIRREA to arrive at a fair market present value of Lake Las Vegas, but the actual USPAP Ethics Rules set forth by USPAP and the Appraisal Foundation were demanded: that is: that **no** *predetermined values* were to be arrived at by the appraiser, that *no undue influence* would be allowed or accommodation of Credit Suisse desires in the report accomplished that were contrary to the professional opinion of Reinagel or any other reporting that would be grossly negligent and violate the standard of care in appraising a MPC or constitute misleading or fraudulent activity.

33.    Reinagel gladly accepted the assignment recognizing that an earlier appraisal arrived at a fair market value of nearly $370,000,000 by his colleague, Mike Miller also of Cushman.  What Reinagel was not told and was concealed from him was that Jeff Barcy, Jeremy Rogers, Grant Little, and others including David Miller had all determined that the appraisal somehow and someway had to reflect and arrive at a predetermined value of at least $900,000,000 to meet the "loan-to-value" ratios Credit Suisse and Lake Las Vegas believed was necessary to provide justification and cover for a loan of at least $400 to $500 million dollars and to give comfort for  arranged lenders such as Highland Capital.  As Rogers testified, they wanted to see in any appraisal report a justification/ "LEGITIMACY" for their investment into this *"high yield-junk bond"* lending scheme.

Accordingly, Reinagel and CW were sucked into a scheme orchestrated by the Credit Suisse lending team.  As described below, but for the direct command and orders by their top

national appraiser in charge, Brian Corcoran and his top assistant, John Busi out of their New York headquarters, the appraisal by Reinagel would not have exceeded a value of $450 million to $500 million. As described below, Credit Suisse had already predetermined the values they would arrive at.

34.    Evidence of the effort to predetermine a $900 Million appraised value from an appraised value of approximately $370 million four months earlier by Cushman was planned for by the defendants is demonstrated by an email dated August 4, 2004, five days prior to the date of the engagement letter between Credit Suisse and CW executed by Barcy and Reinagel, Grant Little of the lending team wrote his colleagues:    "we're asking the wrong question externally and internally.  Let's find out where we need to be to get something done" ...  "what is the minimal appraisal needed to get financing done and work from there."  Only a few weeks later, Mr. Little wrote in another email:  "let's figure out minimum appraisal value to move forward."  Then in another email, Mr. Rogers testified at his deposition that Mr. Little also wrote an email to David Miller in New York, stating in pertinent part: " ...  let's include the 'Kitchen Sink' to get at the value we need to make the loan."

35.    There can be no question that Credit Suisse was preparing to sand-bag Cushman lead appraiser, Charles Reinagel, to arrive at a predetermined valuation and, if need be, utilize undue influence to get the value it needed to convince Highland Capital to make the loan to LLV; in short, to provide cover for a loan that would be based on an appraisal that was more than two times the value of the market value Reinagel was to prepare under his contract of engagement. Further, the covenants loan repayment covenants in the Credit Facility ignored the high risk of a softening of the real estate market.

36.     Rogers testified at his deposition that he did not understand why CW was even retained to perform any appraisal because a real estate appraisal was not needed.  When asked why one was done, he stated under oath that Credit Suisse believed the hedge fund managers at Highland Capital and others liked to see them, meaning its only purpose therefore was to provide cover for a scheme to provide a loan that was nothing more than a _"high yield-junk bond"_ financial scheme.  Rogers admitted that according to an email he received from Jeff Barcy, he and others at Credit Suisse were never to use the term, "junk bond" in their dealings but instead use the term "high yield" meaning that junk bond would scare everyone away from Credit Suisse, which might undue its marketing scheme to arrange loans to other and MPCs such as Tamarack, Ginn sur Mer or Yellowstone Club.  This was important because the fees earned for the Lake Las Vegas loan made on November 1, 2004 were in excess of $11,000,000 with similar amounts to be charged for Tamarack, Ginn sur Mer and Yellowstone Club and at least 12 to 15 other MPCs that this scheme would infect and destroy.

37.     To accomplish the scheme, it became necessary to put pressure on Reinagel from the very beginning to find a way to get an appraised value of at least $900 million at Lake Las Vegas and Credit Suisse did just that.

38.     In accord with the requirements of the August 9, 2004 contract and engagement letter described above, Cushman thru Reinagel prepared a series of DCF estimates for Lake Las Vegas employing the required Subdivision Methodology which met the standard of care required of appraisers in valuing subdivision property.  On or about August 25, 2004, Reinagel prepared and distributed to Credit Suisse a DCF analysis of Lake Las Vegas reflecting a net present value of $496 Million.  In an alternative analysis, he was able to arrive at a net present value of $507 Million.  In each case, he relied on what appeared to be a nine percent discount rate and a ten

Fourth Amended Complaint - 17

percent rate for developer profit. These values were consistent with reasonable valuations by appraisers and believed to be the valuations used by Cushman when it performed its appraisal months earlier for the Bank of Scotland in connection with its loan of about $370 Million to Lake Las Vegas. This value was, according to Rogers, Barcy, and others with the Credit Suisse lending team, some $400 Million below the predetermined value of $900 Million by Credit Suisse. In fact, the lending team recognized that if they could not turn Reinagel around and make drastic changes, the loan would never be accomplished.

39.     Credit Suisse's lending team struck back at Reinagel. The lending team of Credit Suisse First Boston began to undertake its own DCF analysis of Lake Las Vegas adding new assumptions to the appraisal methodology, all in violation of the very contract their in-house lawyer in New York promised under contract they could not do that would violate USPAP and FIRREA.

40.     It is a serious violation of USPAP Standards for a lending banking institution to involve itself in that which is required to be an **"independent" appraisal.** Quoting the contract specifically that Barcy signed for Credit Suisse that was prepared by "in-house" counsel for Credit Suisse and which Reinagel executed on August, 9, 2004, Cushman & Wakefield was to not merely comply with the "Code of Ethics & Standards of Professional Appraisal Practice ("USPAP") as promulgated by the Appraisal Standards Board of the Appraisal Foundation and FIRREA", Reinagel was directed to "CERTIFY" that his findings were his *"personal, impartial and unbiased professional analysis, opinions, and conclusions".* While in-house counsel for Credit Suisse prepared a contract for his company (Credit Suisse) to be executed by Cushman & Wakefield in accord with the standards of care and ethics of MAI appraisers and appraisals, it was ignored.

Fourth Amended Complaint - 18

41.    To undermine Reinagel, the Credit Suisse lending team, through Rogers and Barcy, sent DCF opinions in spreadsheets to Reinagel with an email stating they were correcting his opinions and work product stating in pertinent part: "We've tried to lay out some of the things that appeared to be in error in the model we received earlier...We have also corrected the 'Developer Case" provided in your earlier email.  Given that your numbers do not reflect any of the view premiums of golf course sales provided by the developer, we had added those in as to more accurately reflect the developer's forecast of 3/31/2004 that you received.

42.    Reinagel was aware of the contentions that the view premiums would generate an additional $300 million or nearly a 61 percent increase from his valuation but he rejected that valuation as inconsistent with proper methodology and valuation of the premiums.  The Credit Suisse lending team during that same period of time objected to Reinagel's value as to the developer profit (also referred to as entrepreneurial profit allowance)  to be included in his proposed appraisal as  too  high, despite the fact that a developer profit amount of nine (9) or ten (10) percent was standard for appraisals of subdivision developments.  Credit Suisse wanted the entire profit allowance to be removed, to which which Reinagel objected vigorously since it violated USPAP and the ethical obligations he had to employ to perform the proper appraisal which was called for in the executed August 9, 2004 contract.

43.    The Credit Suisse lending team also objected to Reinagel's valuation of the three golf courses which were critical amenities promised to each homeowner and property owner.  Reinagel would not budge and explained to a frustrated and angry Jeremy Rogers that the golf courses could not have a higher value because they were losing money.  The developers understood they were not, standing alone, profitable but the golf courses were necessary to

maintain and promote Lake Las Vegas as the premier golf MPC and resort in the Southwestern United States.

44.     Out of anger and fear that the loan to Lake Las Vegas would not be able to be accomplished, Jeremy Rogers and the lending team went over Reinagel's head to Cushman's worldwide head and director of its appraisal division, Brian Corcoran and complained about Reinagel.   In fact, Rogers, Barcy and Corcoran of Cushman had a telephonic conversation on August 24, 2004 seeking to order Reinagel to change his values to accommodate Credit Suisse's demands.     Corcoran agreed knowing that the changes he was instructing Reinagel to make violated the most of the ethical standards imposed under USPAP, FIRREA and the engagement contract between Cushman  and Credit Suisse.  In simple terms, the most senior executive at Cushman, from that point on, agreed to contact Reinagel soon thereafter, which agreement to do so was unethical conduct  in violation of the standard of care required of MAI appraisers.

45.     Shortly after August 24, 2004, Cushman became a co-conspirator with Credit Suisse which conspiracy, as describe below, included egregious misconduct at Tamarack, Ginn sur Mer and Yellowstone Club.  The fight between Reinagel and the lending team of Credit Suisse was heightened before Corcoran could get to Reinagel. '

46.     Reinagel tried to fight back.  On or about August 25, 2004, Reinagel sent an email to Rogers and the Credit Suisse lending team stating in part that the dispute involved the lending team's objection to his valuations not being high enough to meet defendants Credit Suisse lending team's pre-determined valuation of Lake Las Vegas at $900 million.   Reinagel stated he knew the lending team went over his head but that he wanted permission to send his DCF analysis to Mike Miller in the Houston Office to get his opinion since he, Mike Miller, had

performed the nearly identical appraisal for the Scotland Bank and Lake Las Vegas months earlier.

47.     Miller and Reinagel were ordered by Corcoran and Credit Suisse lending team member Barcy to have no contact with Miller. One day later, Rogers accused Reinagel of being a fraud in order to force Cushma & Wakefield's hand. The tactic succeeded! Reinagel, an extremely experienced and respected MAI appraiser, was effectively ordered to comply with all demands of Credit Suisse and he did so after having been overridden by Corcoran and by his assistant Busi.

48.     Reinagel obeyed his superior as directed in or around the last few days of August of 2004. Despite every effort to inflate the "fair market value" of Lake Las Vegas using perverted and dishonest valuation assumptions about view premiums and golf course values, each grossly over-inflated, Credit Suisse could not reach the per-determined valuation. With the help of Cushman, Credit Suisse embarked on a plan to change the terms used in the contract referring to their appraisal as one of Total Net Value (TNV). What TNV meant was that they would not incorporate a DCF valuation or developer profit into their appraisal of Lake Las Vegas which, once done, inflated the appraisals by twice its fair market value. The scheme of not discounting to present cash value was implemented with Reinagel carrying out his orders from Credit Suisse and Corcoran. When the loan was closed on November 1, 2004, emails circulated around Credit Suisse for their work preparing to receive their $11 million dollar fee and planning to embark with their co-conspirator, Cushman on their next victims, the property and homeowners of Yellowstone Club, Tamarack and Ginn sur Mer. It is also clear that appraisers throughout Cushman & Wakefield, learned about the decision of Corcoran and were not about to risk their careers at Cushman & Wakefield by objecting to an appraisal and lending scheme they

Fourth Amended Complaint - 21

knew to violate their obligations as MAI appraisers. Accordingly, the nearly same marketing, appraisal and lending scheme was implemented at Tamarack, Yellowstone Club and Ginn sur Mer along with more than a dozen other MPC and developments that also went into default and/or bankruptcy.

49.     There can be no doubt that had Cushman & Wakefield complied with the ethical standards of USPAP, the standards and standard of care required for subdivision appraisals employing a DCF analysis with developer profit, the loan would not have been made at Lake Las Vegas, the development would not have been taken into predictable and foreseeable default and bankruptcy, and the MPC community of Lake Las Vegas would have done as every other MPC did during the downturn of real estate beginning in 2006-2007, that is manage carefully their spending and development to protect the MPC and the contractual obligations it owed to the home and property owners of that MPC, ensuring the Plaintiffs would not have seen their amenities wiped out in bankruptcy proceedings, their loss of the Club Memberships and clubs, and the destruction of their home and land values of 80 percent or more, rendering their MPC a ghost town, just as Jeremy Rogers predicted when amenities are lost and or destroyed in a MPC not centrally located like Lake Las Vegas, Yellowstone Club, Tamarack and Ginn sur Mer.

50.     There can be no doubt that the scheme by Credit Suisse was one, in part, that was loan to own, in nature. While working as the "Loan Administrator" for Highland Capital and other arranged lenders for Lake Las Vegas, Tamarack and Ginn sur Mer, Credit Suisse undertook a joint venture with the lenders by agreeing, as part of the lending scheme, to provide loan administration which included administration in the event of predictable defaults and bankruptcies to protect the arranged lenders. As part of their selling scheme, it was made clear to the lenders such as Highland Capital that (a) there was substantial value in each of the MPCs

Fourth Amended Complaint - 22

in view of their TNV appraisals and (b) that in the likely event of default, they would be acquiring with Credit Suisse as their Administrator, MPCs that had such substantial value that each could overcome any risk impose by defaults.   The lenders such as Highland Capital took the bait, just as Jeremy Rogers testified to at his deposition, implying the lenders such as Highland Capital just want to see numbers to invest their hedge fund capital into that seemed well valued with little risk, contrary to the known risks stated in Credit Suisse's internal and secret memoranda of July and August 2004 that was never provided to the Plaintiffs, their developers at Lake Las Vegas, Tamarack, Yellowstone Club or Ginn sur Mer.

51.     In a telephone call between Ron Boedekker and his counsel and Highland Capital in mid- 2007,  months before the final default of that developer, Highland Capital, referring to the loan documents arranged for it by Credit Suisse, told Mr. Boedekker that if he thought about suing Credit Suisse or Highland Capital, it would fail because they knew how to "loan-to-own."

52.     If there is any doubt about the predictable scheme, on information and belief, every TNV loan made to each MPC or their developer failed. Most MPCs that did not participate in the Credit Suisse/Cushman appraisal and lending scheme survived the market downfall in 2006 and 2007 because the loans they undertook were in compliance with the standard of care required in appraising subdivisions, that is, employing a DCF analysis and developer profit to arrive at a fair market value to protect the lenders, borrowers, existing home and property owners (and their banking and mortgage lenders) and prospective homeowners from the perversion of appraisal and loan fraud that was perpetrated against the Plaintiffs in this case.

53.     Having perfected the appraisal and lending scheme on Lake Las Vegas, the co-conspirators, Credit Suisse and Cushman embarked on a plan to employ these same tactic, refined to avoid conflicts with those like Reinagel, at each MPC thereafter at Tamarack,

Yellowstone Club, Ginn sur Mer and others with the exact same predictable and foreseeable result: defaults and bankruptcies with the loss of contractual amenities, clubs and land values at eighty (80%) percent or more. Without the employment of a DCF component in their appraisals with developer profit, Credit Suisse was able to convince Tamarack, Ginn sur Mer, Yellowstone Club and more than a dozen other MPCs that their land and developments were worth two to three times what they thought or believed and that with the higher loan to value ratios they could buy out debt, partners and promote their MPCs.

54.     A similar pattern of direct involvement in the management of the MPCs by Credit Suisse was perpetrated at Yellowstone Club, Tamarack, and Ginn sur Mer. The Credit Suisse involvement included pricing of lot sales and scheduling of development, application of funds, and other predatory loan practices, each with Credit Suisse personnel frequently "on campus." Cushman also continued to promote its violations of USPAP and FIRREA thru making the quarterly appraisal updates mandated by the Credit Suisse "Credit Facility" documents, which updating also involved Cushman personnel being "on campus."

55.     Both Credit Suisse and Cushman approved and promoted the placement of their logos on marketing literature utilizes by the four MPCs.

56.     Cushman's continuing involvement in the scheme included, in the case of Ginn sur Mer, if its changing of its appraisal **nomenclature** from "Total Net Value" to "Total Net Proceeds" without changing the appraisal **methodology.**

57.     The Lake Las Vegas MPC began defaulting on its loan repayments and other terms of the Credit Facility within approximately five months after the Credit Facility was finalized. Rather than suffer the consequences of the publicity of forcing a bankruptcy which would spell the end of the TNV scheme and its attendant Credit Facility, Credit Suisse granted at

Fourth Amended Complaint - 24

least three waivers, one of a magnitude of $10 Million. During the time frame of the waivers, Credit Suisse was marketing the TNV/Credit Facility package to first Yellowstone, then Tamarack, and then Ginn sur Mer, and other MPCs throughout the country (approximately 17 in total) **without disclosing the distress the scheme was already imposing on LLV.**

58.     The loan to own scheme has come to full fruition in the case of Tamarack where Credit Suisse has taken ownership through a credit bid on March 10, 2014 to obtain ownership in three major sections of the resort, including the ski areas. Credit Suisse has formed an entity called "New TRAC" to operate the area.

## Credit Suisse Launches Its Deceptive and Illegal *"Loan to Own"* Scheme

59.     As further detailed, herein, Credit Suisse, in concert with Cushman, pursued this "new" perceived business opportunity that its investment banking division identified in the high end resort real estate sector. Understanding that United States real estate prices were hovering near all-time highs, and were teetering precariously on an imminent bubble burst decline, Credit Suisse cynically determined that it could extract exorbitant – although patently deceitful, reckless and avaricious – banking profits from a select set of high end MPCs that constituted not only attractive loan customers, but additionally lucrative assets for Credit Suisse's real estate portfolio.

60.     Aptly dubbed the *"Loan to Own"* strategy, Credit Suisse's scheme took the form of a generally standardized process that was actualized as follows.

61.     Credit Suisse would aggressively solicit targeted MPCs and induce them to enter loans (often denominated as a "Credit Facility") through a set of identical deceptive and misleading representations meant to convince resort owners that the "appraised" value of their

operations was great enough to easily and comfortably bear literally hundreds of millions of dollars in leveraged debt. Having initially induced a developer to take a nonrecourse loan based on an inflated value, Credit Suisse would then further induce a developer to take subsequent unjustified loans driving the MPC further into a debt structure which could not be sustained.

62. To materially assist it in its *Loan to Own* scheme, Credit Suisse engaged co-defendant Cushman, a previously respected international appraisal house chosen for its expected imprimatur with the targeted resort owners. Cushman authored and supplied the MPCs with flagrantly misleading business valuations and appraisals of their operations that apparently gave concrete substantiation to Credit Suisse's assurances of debt capacity.

63. Unbeknownst to the MPCs, however, each Cushman appraisal (used as an illicit inducement toward a ruinous Credit Suisse loan) was thoroughly and materially false and deceptive because it massively inflated the resorts' calculated net worth, and their corresponding ability to incur and adequately service loan debt without destroying their viability:

(i) Specifically, the Cushman appraisals employed an inappropriate – and expressly illegal – appraisal methodology termed "Total Net Value,"[1] which presented MPCs with purported operational values and projected revenues for their enterprises that had not been discounted in such a way (e.g., back to present value) so as to provide accurate and reliable bases for configuring reasonable debt load capacity. In point of fact, the "Total Net Value" appraisal methodology was so inherently misleading to sales and loan transactions that it failed to conform to applicable United States appraisal and lending standards, as mandated by the

---

[1] Later the terminology "Total Net Value" was changed to "Total Net Proceeds" in later appraisals, with the TNP appraisals having the same illegal methodology as the TNV appraisals.

Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 3331, et seq. ("FIRREA")[2], and the Uniform Standards of Professional Appraisal Practice ("USPAP") adopted by each applicable state.

(ii)   Credit Suisse and Cushman deployed their seductive "Total Net Value" appraisals with full and explicit knowledge of their illegality; indeed, Credit Suisse was so acutely aware of the appraisals' prohibition under United States law that it created and attempted to use a sham overseas "subsidiary" entity – denominated "Credit Suisse Cayman Island Branch" – to appear to funnel any loan transactions with MPCs through this offshore operation to avoid the purview of both FIRREA and USPAP. Notably, the Credit Suisse Cayman Island Branch was at all relevant times nothing more than a postal drop, with no personnel, facilities, or banking operations located in the islands.

64.   As the targeted MPCs were unfairly lulled and persuaded to acquire Credit Suisse's toxic *Loan to Own* product, the Defendants uniformly gained unfettered access to each resort's confidential, proprietary and key business information, inclusive of financials, business models, sales, service and product strategies, etc.  Through this process (which it effected under the guise of "underwriting activities" and "forecasting") Credit Suisse and Cushman acquired comprehensive and determinative knowledge of how each MPC did business, what loan amounts

---

[2] FIRREA was enacted by Congress after the financial failure of numerous financial institutions (the Savings and Loan Crisis) in the late 1980's for the purpose, among others, to "provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision."

it could rationally borrow without risk, where its key operational pressure points lay, and how each resort might be most vulnerable to interference.

65.    Credit Suisse and Cushman also obtained detailed understandings of the contractual and legal obligations that each MPC owed directly to the individuals (and entities) who purchased and owned residential properties within their confines. As such, both Credit Suisse and Cushman learned and exquisitely appreciated that every MPC homeowner had determined to buy their residences in reliance on the MPCs' provision of a variety of "luxury resort" services and amenities, including without limitation, club houses, exclusive club memberships, golf courses, marinas, ski resort facilities and much more. The Defendants correspondingly conclusively knew that any interference with, or hindrance of, the MPCs' present or future supply of such aspects of resort life would utterly derogate or destroy the distinct legal rights and benefits which the MPC homeowners had purchased and expected.

66.    Credit Suisse's and Cushman's intimate understanding of the MPCs, the MPC's' duties to their residential homeowners, and the resultant position of trust it created toward all such parties, inexorably allowed the Defendants to assume the role of a lending advisor, lending fiduciary, and even co-developer with resort management. Pointedly, in the case of every MPC, their development officers looked to Credit Suisse as a source of honest lending advice that not only would refrain from misleading them, but would protect their best interests and known vulnerabilities – the very definition under law of a fiduciary. Moreover, both Credit Suisse and Cushman, by virtue of their insider understanding of, and potential to affect, MPC homeowners' rights and positions, were vested with a duty to refrain from actively infringing upon or damaging the same.

67.     Yet, in abject abuse of their entrusted duties, Credit Suisse and Cushman pressed forward in the knowingly deceptive inducement of the MPCs to receive increasingly larger and more fatal self-destructive loans. Moreover, Credit Suisse even employed its holistic knowledge of the MPCs to create lending contractual agreements with them that contained covenants, limitations and controls which could be utilized by Credit Suisse to manipulate each MPC's business, interfere with their profitability, and essentially further assure that the resorts would all be ineluctably forced into such financial distress that they could not avoid patently breaching their fundamental legal obligations to their residential homeowners, ceasing gainful operation, defaulting on debt, and crashing into a sea of devaluation and dysfunction. Such fomented distress and devaluation was precisely – and insidiously – the objective of Credit Suisse, as its *Loan to Own* strategy contemplated the bank's acquisition of the MPCs at whatever time it could. The MPCs could no longer maintain independent operations and were auctioned to the bank in one form or another, at a level akin to "junk" status.

68.     Astoundingly, perhaps the most calculated (and nefariously brilliant, as Wall Street greed is wont to be, in recent times) aspect of Credit Suisse's illicit *Loan to Own* arrangement involved the deceptive and unfair elimination of any default or other contingent risk to the bank. Per the loan structures it created for every MPC, Credit Suisse was empowered to syndicate, or essentially sell off, its creditor status after effecting the transaction. It divvied up its right to repayment under the loans into "bonds," and traded such investment paper to a variety of willing buyers, thereby transferring to numerous syndication purchasers all risk of loan default, non-payment or loss of value. Stated another way, Credit Suisse, with the assistance, facilitation, and cooperation of Cushman, evolved a debt vehicle whereby:

a) it misleadingly induced previously functioning businesses to purchase loans that Credit Suisse and Cushman knew were based on inflated appraisal values;

b) it advanced the initial loan sums, and thereby collected all of the massive service fees which were calculated in relation to the unfairly high loan amounts (instead of receiving proportionately smaller fees from more rational loan sums);

c) it received insider information that positioned it to assure the economic destruction of the loan recipients, and subsequently acquire their assets and operations at an extensively undervalued rate;

d) it convinced *other* financial institutions and individuals to bear all risk of loss; and

e) after creating this predatory loan product, earning millions in fees for doing so, shifting all risk of default to third party note or bondholders, it then bet on the failure of these very same predatory loan products by selling (and perhaps buying) credit default swaps to act as insurance policies that would payout when the predatory loans ultimately failed, which failure both Credit Suisse and Cushman knew would ultimately occur.[3]

---

[3] As already noted by the Court, the loans that Credit Suisse made to the MPCs diverged significantly from the traditional lending paradigm whereby banks lent money based on conservative risk and value ratios and whereby the banks bore the risk of loss for the loans they originated. As is now a matter of common knowledge, the loans that Credit Suisse to the MPCs were characteristic, in part, of the consumer real estate loans and associated derivatives that ran rampant during the turn of the new millennium. The new lending paradigm driven by the largest investment banks, including Credit Suisse, involved a scheme whereby originating lenders, investment banks, and their brokers made risky loans to credit unworthy borrowers and then syndicated those loans to investors, thereby retaining no risk of loans losses, yet earning fees and commissions on each transaction. To compound the problem, the investment banks then purchased and sold credit default swaps which served as insurance policies that would payout when these junk loans ultimately defaulted. In short, the investment banks were selling and funding these junk loans at the same time they were selling and purchasing credit default swaps to and from others so that they would profit again when their junk loans defaulted. In one sense, this was one big ponzi scheme where homeowners and taxpayers were the victims, while

Although it transferred virtually all risk of loss of these loans to third party investors,
Credit Suisse remained involved in the loan as a the "Administrative Agent," "Collateral Agent,"
"Syndication Agent," "Book-running Agent," or "Lead Arranger." In these roles, it collected
millions in fees for "administering" the loan and was also able to remain in a position within the
MPCs where it could and did direct development and capitalization decisions for the MPCs.

### Credit Suisse's "*Loan to Own*" Scheme Functions Exactly as Predicted, Inflicting Direct, Immediate and Lasting Damage

69.     As expected, by dint of both their deceptive representations and violations of
trust, Credit Suisse with the complicity of Cushman,[4] was ultimately successful in seducing
every targeted MPC to enter onerous *Loan to Own* transactions. Likewise, in close accord with
Credit Suisse's seminal predictions, each MPC spiraled into financial distress, causing it to lose
profitability, default on its central obligations to homeowners, and then fail completely.

70.     And as contemplated by Credit Suisse, the bank has resultantly achieved total
control and/or ownership of the Tamarack, Lake Las Vegas, Ginn sur Mer and Yellowstone after
their falls – at hugely discounted prices – by directly or indirectly receiving such rights through
various bankruptcies, receiverships, and by using sham debtors in possession to avoid its
responsibility as the actual developer in control of these MPCs. Credit Suisse approached each
MPC requesting that it be allowed to re-appraise each resort to more accurately reflect its true
value for which it could base a loan to each of them. As more fully described below and as to
each MPC, the appraisals were in violation of FIRREA and USPAP and were part of a scheme to

---

investment banks and their complicit appraisers made and retained billions. This is all explained
in compelling detail in Charles Ferguson's, *Inside Job*.

[4] The "Credit Facility" required Cushman be engaged to provided updated appraisals each
quarter, and thus Cushman's complicity continued until the bankruptcies of the four MPCs in
2008.

use a methodology that violated state and federal laws, appraisal guidelines and approved standards.

71.     Prior to their failures, each MPC's decision making was tortuously interfered with through the domination and control by Credit Suisse as a co-developer. As the co-developer, Credit Suisse deemed itself the "Administrator" of the loans with enormous power and dominating influence over each MPC.  By example, at Lake Las Vegas, Credit Suisse dominated and controlled the resort in 2007 by requiring one of its representatives and agents, a Mr. Chin, to be placed in control of the MPC calling him, the "restructuring" representative for Credit Suisse.  Through its agent Chin, Credit Suisse made all the decisions with respect to the MPC thereby exercising the bank's power and control as the co-developer over Lake Las Vegas. Through Chin, Credit Suisse tortuously implemented its scheme.  Within months of Chin's appointment, the resort's clubs were shuttered, memberships cancelled, and the golf courses at the Falls and Reflection Bay were closed.  The Plaintiffs' bundle of property and contract rights that were owed by the original developer were stripped by Credit Suisse.  By the end of 2007, the developer was in foreclosure status and Credit Suisse through Chin and his new group, the "Atalon Group," transformed from co-developer to actual developer with complete control over the MPC in all respects.  The takeover plan by Credit Suisse had worked.  In furtherance of the scheme and plan, Credit Suisse tortuously interfered with the rights of the Plaintiffs by informing Chin and his sham group, the Atalon Group, that it was prepared to give them a non-recourse loan to operate the resort for six months in order to prepare it for bankruptcy to wipe out the rights of the property and homeowners as well as other creditors of the MPC.  The offer was accepted and implemented.  As a pre-planned sham nominal "debtor in possession" of Lake Las Vegas, Credit Suisse would be able to control the bankruptcy proceedings by placing Chin and

the Atalon Group in charge of the creditors committee to ensure its ability to perpetuate the scheme within the context of the bankruptcy. Through its puppet Chin and the Atalon Group, Credit Suisse retained control of the resort, while attempting to avoid obligations it otherwise owed, as the true successor owner and developer. During the Chapter 11 bankruptcy proceedings, the Court scolded Credit Suisse, stating on the record that the Chin/Atalon Group (the "debtor in possession") was "nothing more than a Credit Suisse puppet."[5]

72. Prior to the loan by Credit Suisse on June 1, 2006 for $250,000,000, Tamarack had a management team run by its Chief Executive, Jean Pierre Boespflug. The team was made up of at least seven members, including Amy Koenig. The management team met regularly to discuss the critical details of the MPC and its phased development. The pre-Credit Suisse meetings included critical planning and decisions that were necessary for the safe and sound development of the MPC. Prior to the involvement of Credit Suisse, the management team was careful to ensure that development of the resort (including timing of development in phases) was in conformity with, among other things, economic conditions, market conditions for property and development and cash flow. After the loan was made, and for the first two months thereafter, the management team operated as it had prior to the loan. Immediately thereafter, however, the members of the management team, including Amy Koenig, soon discovered that the critical decisions it previously participated in for Tamarack were no longer being made by it, but, were being made by a new team of Credit Suisse bankers. The now displaced management team members assumed that their MPC community was in good hands with Credit Suisse, as it had held itself out to be in a June 1, 2006 press release, wherein Credit Suisse was touted as being

---

[5] Case No. BK-S-08-17814-LBR, In the Matter of Lake Las Vegas Joint Venture, et al., proceedings held on September 29, 2009.

Fourth Amended Complaint - 33

one of the largest and most experienced international banks in the world with skill at providing advisory services. The management team's role was reduced to considering ministerial matters, and was removed from making short and long term decisions for the MPC, such as the pace of development of the MPC and the pricing at which lots would be sold. Prior to the loan by Credit Suisse, the management team had taken a careful conservative approach to development at Tamarack.

73.     The prior conservative management was displaced by decisions made through the dominant influence and control of Credit Suisse without regard to the general economic conditions, market surveys and demand, cash flow, necessary reserves, and economic projections Tamarack had been utilizing. Credit Suisse instructed the MPC's most senior executives when to build, where to build, and the pace of construction. The decisions were made without considering the economic factors that the displaced management team formerly utilized on behalf of the MPC on a weekly basis.

74.     In late 2006 and through 2007, Tamarack's senior management team, including Boespflug, complained to Credit Suisse that the pace of phased development at the MPC could not proceed as Credit Suisse demanded in view of economic conditions. Credit Suisse rejected Tamarack's request and instructed Tamarack to proceed with accelerated development, threatening to foreclose on the MPC for potential violation of its loan covenants. Credit Suisse as Administrator, promised it would do so if Tamarack did not comply. This constituted both tortious interference and gross negligence on the part of Credit Suisse, leaving Tamarack with a *Hobson's* choice. Tamarack obeyed the bank's instructions and proceeded with accelerated development. Not long after, after having forced Tamarack to deplete its cash flow leaving insufficient reserves, Credit Suisse then claimed Tamarack did not comply with the conditions

and covenants of the loan and took control through a sham receivership proceeding, knowing

Credit Suisse would be in a position to use the proceedings, and later bankruptcy, to seize control

of the resort, wipe out the property rights of the Plaintiffs and take complete ownership of the

MPC and its assets. By exercising dominating control and influence over Tamarack as a co-

developer, the scheme by Credit Suisse, aided and abetted by Cushman, was perfected, similarly

to the control exercised by Credit Suisse at Lake Las Vegas.

75.     Nearly the identical dominating and tortuously and grossly negligent influence

and control was carried out by Credit Suisse with respect to Ginn sur Mer, leaving the owners

and managers of that MPC under its complete control and domination after its loan in June 2006

"loan" of $675 Million. Within just a little over one year of entering the loan transaction, and

unknown to Plaintiffs and investors for this period of time, Ginn was in a default position, just

like Tamarack, Lake Las Vegas and Yellowstone. Ginn owners had been told by Credit Suisse

that, based upon the appraisal Cushman performed at Credit Suisse's direction, it had sufficient

liquidity and resources under the Credit Suisse credit facility to develop Ginn sur Mer at Grand

Bahama Island, and, to use the balance of the credit facility at other developments. Ginn

management soon learned in 2007 and through 2008, that the MPC was being placed in default

by Credit Suisse, exactly as the bank had planned and with the same appraisal and lending

scheme employed at Lake Las Vegas, Tamarack and Yellowstone. Ginn management was told

that Credit Suisse did not want to complete the foreclosure at Ginn sur Mer because, as an

international bank, it had the resources to operate the resort and build it out. Credit Suisse told

Ginn that although it would allow Ginn to operate as the nominal developer and give it time to

buy out Credit Suisse, Ginn would not be permitted to build or construct anything at Ginn sur

Mer, except the completion of the infrastructure and golf course which was paid for by

Fourth Amended Complaint - 35

purchasers such as Plaintiffs and investors from an escrow account and not by Credit Suisse. Credit Suisse, controlling Ginn as it did with Lake Las Vegas and Tamarack as a co-developer and in a position of domination and control over the MPC, refused to allow any development of the MPC. Today, some eight or more years after Plaintiffs and other investors in property entrusted their life savings into this MPC, none of the promises made to Plaintiffs and other investors at Ginn sur Mer have been kept. Credit Suisse intentionally tortuously interfered with and prohibited the development, build-out and completion of an operating golf course, spas, work-out centers, shops, pools, theme water parks, a hotel and much more. Through its puppet, Ginn, all operations were shut down and not one promised amenity was built or undertaken by the co-developer, Credit Suisse. The *Loan to Own* scheme it employed worked exactly the same as it did in Tamarack, Lake Las Vegas and Yellowstone, using the same illegal initial appraisals and quarterly updated appraisals, together with sham foreclosures and bankruptcy proceedings with Ginn, as its puppet, to wipe out the rights of the Plaintiffs.

76.     The facts concerning the Yellowstone Club are discussed below.

77.     The scheme at each MPC was substantially identical. Exercising domination and control, Credit Suisse, with the participation of Cushman, led each MPC over the cliff to catastrophe for each Plaintiff and developer.

78.     As part of its scheme, Credit Suisse knew and planned in early 2004, that once it made its loans based on inflated appraisals that violated USPAP and FIRREA, that it was critical to announce directly to existing property owners and prospective property owners that it had made loans to each of the MPC's. This, because the use of Credit Suisse as lender and financial advisor, would entice existing resident property owners to build-out their properties and entice others to purchase properties in each MPC. Credit Suisse also knew that ordinary consumers and

Fourth Amended Complaint - 36

investors in real estate would have no reason to distrust a bank of its stature, and that the owners or investors in property could reasonably rely on Credit Suisse to act in good faith with compliance with all laws and regulations and with the intention that each MPC would succeed. Credit Suisse also authorized each MPC to show their new appraisals to anyone who desired to read them. Cushman and Credit Suisse knew that untrained owners, or future owners, of property in the MPCs would not understand how Cushman arrived at the appraisal values, nor would any of them have reason to distrust the valuation of the MPC, regardless of whether they had read the appraisals.

79.     By example, on June 1, 2006, Credit Suisse along with Tamarack announced the following in a news release: "Tamarack Resort Reaches Major Milestone by Closing $250 Million Senior Credit Facility With Credit Suisse."  This press release was circulated on the internet, in interstate commerce, in the papers in Idaho and at nearly every real estate office in Idaho.  Credit Suisse represented that it was "one of the world's leading banks offering advisory services..." leading the Plaintiffs, existing owners of property, prospective owners and the world to believe that it, as a bank, was making the loan to Tamarack and would be in a position to provide advisory services to it, with the clear implication that it would naturally comply with all federal and state laws, regulations, statutes and guidelines in connection with the loan, and underlying basis for the loan including appraisals. By the Credit Suisse public announcement, it intended property owners and investors at Tamarack to rely on the information in the public news release.

80.     At Lake Las Vegas, after completion of the illegal and inflated October 26, 2004 "appraisal" by Cushman, Credit Suisse told the developer to aggressively market the community to existing homeowners and prospective purchasers of land for homes or home builders.  The

Fourth Amended Complaint - 37

developers at LLV were also instructed and encouraged to advise the public through their meetings, staff, and sales agents that Credit Suisse had made its loan to the MPC. In compliance with those instructions from Credit Suisse, Lake Las Vegas management conducted at least five or more boat cruise tours beginning in early 2005 to explain to existing property owners, prospective property owners, real estate agents, and visitors throughout Nevada and elsewhere, that the MPC had received a substantial loan from Credit Suisse and that the resort would develop at a much faster rate, thereby benefiting the existing owners of property and enticing prospective purchasers of land to invest. On one or more boat trips, staff members of the MPC told the public and Plaintiffs that with Credit Suisse's loan, development at Lake Las Vegas would be "balls to the wall." As in the case of Tamarack, Credit Suisse anticipated that the Plaintiffs and prospective property owners would rely on the fact that as a bank and lending advisor, Credit Suisse would comply with all laws and regulations in connection with the loans and the underlying basis for the loans. Credit Suisse intended that the Plaintiffs rely on its reputation in forming their decision to purchase properties at the MPC.

81.     The involvement of Credit Suisse, with the aiding and abetting thereof by Cushman, at Ginn sur Mer was nearly identical to its involvement at LLV. Plaintiffs and other prospective purchasers were informed that Credit Suisse had made a loan to Ginn sur Mer. Credit Suisse knew that the publication of its loan to the MPC and communication of the same by the Ginn's brokers and real estate agents would help market the property to Plaintiffs and other prospective owners at Ginn sur Mer. The public communication by real estate agents and brokers about the June 2006 $675 Million loan induced prospective owners to purchase lots (or in some cases influenced decisions not to sell such lots). Like Tamarack and Lake Las Vegas, Ginn sur Mer agents and representatives were then able to market and sell lots at the MPC based

Fourth Amended Complaint - 38

on the reasonable belief that the loan from Credit Suisse was lawful and compliant with all federal and state regulations.

82.     The actions and inactions alleged herein directly harmed defined legal interests of the classes pled herein by destroying such parties' legal entitlements and rights that existed, and, which they purchased.

## II.  PARTIES

**The Plaintiffs:**

83.     Plaintiff L. J. Gibson is a citizen of the State of Nevada who is a member of the class alleged herein through her purchase and ownership of residential real property in MPC developments at Tamarack, Lake Las Vegas and Ginn sur Mer.  As a result of these real estate acquisitions, Plaintiff Gibson sustained direct damage when the subject MPC's were forced by Defendants – through their control, interference and deceptive behavior - to re-trench, discontinue and otherwise fail to provide the rights, privileges, benefits and amenities to which Plaintiff Gibson owned and was entitled.   On September 9, 2005, Gibson purchased her Tamarack ski-in-ski-out lot for nearly $840,000 including a club membership with a minimal value of $30,000.   In or around May of 2006, Gibson learned from real estate agents at Tamarack that a major bank was proposing a long-term loan for Tamarack that would help promote further construction and development at the MPC. Instead of selling her lot which would have returned her investment and provide a profit of $400,000, Gibson instead kept her lot and developed it after a June 1, 2006 press release that the international bank, Credit Suisse, had provided a $250,000,000 loan.   Tamarack's public announcement made clear that it would be serving not merely as a lender but an advisor to Tamarack as the press announcement included its advisory experience in the lending field.  Gibson lost her Club Membership at Tamarack as a

Fourth Amended Complaint - 39

result of the lending and appraisal scheme described herein and lost the value of all the property rights and amenities at the MPC which was shuttered by Credit Suisse. At Lake Las Vegas, Gibson was invited to take a tour on a cruise for the purpose of learning about development at Lake Las Vegas. While on the boat tour at Lake Las Vegas in February or March of 2005, Gibson learned that the international banker, Credit Suisse, had made a substantial loan to the developer at Lake Las Vegas to promote the development and protect its existing amenities. In reliance on the loan and that the development would prosper from the lending facility, Gibson purchased two properties at the Falls of Lake Las Vegas in late May of 2005 and in early 2006. Gibson also purchased and received a Club Membership for the Falls Golf Club and South Shore Club with a value exceeding $25,000. The Credit Suisse-Cushman lending and appraisal scheme resulted in the shutting down of all amenities at Lake Las Vegas, including the Falls Golf Club and the South Shore Club. Prior to purchasing her property at Ginn sur Mer on January 1, 2007, Gibson learned from various real estate agents for Ginn and at a "Founders Day Weekend" at Palm Coast, Florida that, once again, Credit Suisse had made a substantial loan to the developer, Ginn/Lubert Albert (hereinafter "Ginn"). Gibson lost all the property rights and amenities that she and the class Plaintiffs were promised when the MPC was shut down by Credit Suisse.

84.    Plaintiff Beau Blixseth is a citizen of the State of Oregon who is a member of the class alleged herein through his purchase of residential real property in the MPC of Yellowstone Club in 2008. As a result of this real estate acquisition, Plaintiff Blixseth sustained direct damage when the subject MPC was forced by Defendants – through their control, interference and deceptive behavior –to retrench, discontinue and otherwise fail to provide the rights, privileges, benefits and amenities to which Plaintiff Blixseth was entitled. At the time of his purchase, Beau was aware of the Credit Suisse loan and therefore of the substantial purported

Fourth Amended Complaint - 40

value of the Club behind that loan. Based on that knowledge and in reliance thereon, Beau purchased his property. Just like Gibson, Blixseth was not aware of the scheme in place by the Defendants and suffered great loss as a result thereto.

85.   Plaintiff Amy L. Koenig is a citizen of the State of Utah who is a member of the class alleged herein through her purchase of residential real property in the MPC of Tamarack. Plaintiff Koenig purchased a cottage in January 2004 and purchased a lot in May 2004. She built a home on the lot, which she sold at a loss of approximately $1,000,000 in August 2009. (The cottage was sold prior to the collapse.) As a result of this real estate acquisition, Plaintiff Koenig sustained direct damage when the subject MPC was forced by Defendants – through their control, interference and deceptive behavior – to retrench, discontinue and otherwise fail to provide the rights, privileges, benefits and amenities to which Plaintiff Koenig was entitled. Plaintiff Koenig was also a former vice president of real estate and resort marketing at Tamarack, and a former shareholder in the MPC and on the management team of Tamarack   The Tamarack marketing materials, brochures, etc., contained the Credit Suisse logo and references to both Credit Suisse and Cushman and were relied upon by Plaintiff Koenig in deciding to build a home on the lot which she purchased. One of the comprehensive offering booklets contained an appendix which directed the reader to a website where the Cushman appraisal using Total Net Value could be read in full. She, like Gibson, had no knowledge of the scheme in place by Defendants which scheme was concealed from her, as well. Plaintiff Koenig learned of the Credit Suisse loan in or around May of 2006 and, like Plaintiff Gibson, read the press release by Credit Suisse in June of 2006 and believed Credit Suisse, as a bank, would comply with all lending laws, regulations and guidelines with respect to the loans and would act for the best interest of Tamarack and provide the advice it promised to provide in the press announcement.

Fourth Amended Complaint - 41

In early 2006, Plaintiff Koenig had invested her life savings in a property at Tamarack. It was her intention to complete the home in 2006 and live in it when completed.   After the announcement of the loan, real estate agents at Tamarack and throughout the area were contacting her to sell her home, even before completed, for a substantial profit. Plaintiff Koenig, like Gibson, decided to keep her property based on the announced loan by Credit Suisse and the prospect that a bank loan, such as that from Credit Suisse, would surely further promote the MPC and development at Tamarack. It did not and resulted in the destruction and shut down of Tamarack including all her rights as described above.

86.    Plaintiff Vern Jennings is a citizen of the State of Nevada who is a member of the class alleged herein through his purchase of residential real property in the MPC of Lake Las Vegas. As a result of this real estate acquisition, Plaintiff Jennings sustained direct damage when the subject MPC was forced by Defendants – through their control, interference and deceptive behavior – to retrench, discontinue and otherwise fail to provide the rights, privileges, benefits and amenities to which Plaintiff Jennings was entitled. Jennings suffered, like all of the Plaintiffs in a loss of his club memberships and property rights as set forth herein. Jennings purchased his Southshore Club Membership for nearly $175.000 in 2003. He owned properties on the South Shore of Lake Las Vegas in 2002. He learned about the Credit Suisse loan weeks after it was made from residents who had learned the same from the announcements of Lake Las Vegas. He believed that the loan by Credit Suisse bank would surely be sufficient to complete the project at the resort. He was unaware of the appraisal and lending scheme described above and suffered the total loss of his investment in the South Shore Club as all other club members did, as well.

87.  Plaintiff Mark Mushkin is a citizen of the State of Nevada and resides at Lake Las Vegas in Henderson, Nevada. Plaintiff Mushkin is a member of the class alleged herein through his ownership and purchase of residential real property in the MPC. As a result of his real estate acquisitions and ownership in club memberships, Plaintiff Mushkin sustained direct damage when the subject MPC was forced by Defendants- through their control, interference and deceptive behavior – to retrench, discontinue and otherwise fail to provide the rights, privileges, benefits and amenities to which Plaintiff Mushkin was promised and entitled. Prior to the appraisal by Credit Suisse in October of 2004 and the loan made immediately thereafter by Credit Suisse, Plaintiff Mushkin owned property on the South Shore of Lake Las Vegas and a Club Membership in the South Shore Golf Club for which he paid $175,000. As a result of the illegal acts of Credit Suisse and Cushman in connection with the appraisal and lending scheme described herein, Plaintiff Mushkin lost his investment in the Club Membership. In or around late 2004, Plaintiff Mushkin visited the offices of the prior and original developer at Lake Las Vegas when he learned from others who resided at the MPC that it had received a new appraisal from Cushman. Plaintiff and his family members were interested in making a substantial investment in raw law at the MPC. Accordingly, he went to the former developer's office at Lake Las Vegas and asked if he could look at the appraisal. Although not an appraiser or trained in appraisal, he learned that the property had a substantial value greater than he previously had believed and assumed that the appraisal was performed in compliance with all federal and state statutes, regulations, guidelines and standards for appraisers in connection with bank loans. While at the offices of the former developer at Lake Las Vegas thereafter, Mushkin learned of the loan made by Credit Suisse and determined that in view of the appraisal that he saw and a bank loan that was made shortly thereafter, that it was a sound time to invest. Muskin invested

Fourth Amended Complaint - 43

well over a million dollars of his funds in raw property that was adjacent to one of the well established and famous Lake Las Vegas Golf Clubs, Reflection Bay.   Reflection Bay was the venue for the Wendy's Golf Tournament on ABC network.   Plaintiff Mushkin was never informed that the appraisal performed by Cushman was intentionally inflated deliberately violated the laws, standards and guidelines of FIRREA and USPAP.  Mushkin was also not aware that the bank, Credit Suisse, would undertake a loan to own scheme as described herein. He, like other Plaintiffs and all prospective class members, would never have invested in the MPC had he and they known of the illegal scheme. Mushkin lost his investment in the Golf Club and the amenities and property rights he was entitled to resulting in damage described herein.

88.     Monique Lafleur was invited to see Tamarack resort in the Winter of 2003, before any development took place.  She did not purchase at the first Tamarack Resort property release in February 2004 because there was insufficient infrastructure in place and there were still questions about resort funding and its future.  As the resort began to further develop, she purchased two Estate home sites in approximately December 2004: one as a personal vacation home and another as an investment.  The primary draw of the Tamarack development was the planned amenities that transformed what would otherwise have been property in rural Idaho into a destination resort.  When Credit Suisse announced its credit facilities at Tamarack through press releases, LaFleur further invested based, in part, on such loan.  In 2006, LaFleur purchased a Tamarack Townhome as a home base for future building projects at Tamarack, and she formed Griffen Development LLC with Thomas Lafleur, her brother.  Griffen Developments' sole business was to develop property within the Tamarack Resort MPC. Griffen purchased additional resort homesites during 2005 and 2006. Currently, Griffen Development holds, in Tamarack, five home sites and one custom resort home with a total investment of over

Fourth Amended Complaint - 44

$5,000,000. The market value of Griffen's total holdings has fallen below the loan amount of the one custom home. The custom home, once estimated to be worth close to $3,000,000 upon completion is today worth less than $1,000,000. The home sites are now valued at one-sixth of their purchase price. The Monique Lafleur Trust holds a Townhome property acquired in 2006 for approximately $680,000 that is now valued close to $200,000.

89.     Plaintiff Griffen Development, LLC is a limited liability company whose members are citizens of California and which is a member of the class alleged herein through its purchase of residential real property in the MPC of Tamarack. As a result of this real estate acquisition, Plaintiff Griffen Development, LLC sustained direct damage when the subject MPC was forced by Defendants – through their control, interference and deceptive behavior –to retrench, discontinue and otherwise fail to provide the rights, privileges, benefits and amenities to which Plaintiff Griffen Development, LLC was entitled.

90.     Plaintiff Judy Land, is a citizen of the State of California. Ms. Land became the owner of five properties at Tamarack and lost all of them in short sales or foreclosures. During the period between September 1, 2004 and June 30, 2007, Ms. Land was at various times engaged on behalf of Tamarack in positions such as: (1) Director of Real Estate Sales for Tamarack Resort Realty, LLC, (2) Designated Real Estate Broker for Tamarack Resort Realty, LLC, and (3) Member of Tamarack Resort Realty, LLC (under that title she had other duties but these titles encompass the other duties and responsibilities) one additional duty was (4) National Director of Broker Referral Program. Ms. Land purchased (i) a cottage in 2004 which she sold at a short sale on April 14, 2010 at a loss of approximately $99,700; (ii) a parcel of land was purchase in August 2005 at a price of $638,062, engineering drawings were purchased for $17,000 and the property went into foreclosure on June 30, 2010 for a sales price of $125,000,

resulting in total losses for the land and drawings of $530,062; (iii) a townhome on October 25, 2005 for $515,665 (land and improvements thereon after purchase) which sold at short sale on May 5, 2009 for $185,000, for a loss of $330,665; (iv) a second townhome purchased October 25, 2005 for $682,325 for land and subsequent improvements which sold at foreclosure on February 4, 2010 at $204,000; (v) a condo purchase on October 25, 2005 at $999,500 which sold at foreclosure on February 3, 2010 for $216,000 for a total loss of $783,500 (Ms. Land had a partner investor in this parcel). Ms. Land was not aware that the appraisal by Cushman and promoted by Credit Suisse was illegal and not in compliance with federal and state law.

91.     Charles Dominguez is a citizen of the state of Washington. He purchased land in Tamarack Resort in November 2006 at a purchase price of $850,000, upon which he constructed a 6,000 square foot home at a cost of $2 Million. He lost the property at foreclosure on June 16, 2009. During the period between his purchase and the loss of the property, he also suffered a loss of the amenities that were a motivating factor in his purchase, those including the ski resort, the golfing facilities and the amenities provided by the "Village." At the time of the Trustee's Sale in 2009, the outstanding balance included (a) a principle balance of $1,631,386, accrued interest of $74,069, late charges of $3,695, and miscellaneous fees all resulting in a total obligation of $1,712,821.33 with interest accruing thereon after December 31, 2008 at $147.28 per day. At the time of the purchase in November 2006, Mr. Dominguez had no knowledge of the illicit nature of the Total Net Value appraisal authored by Cushman of March 31, 2006, and was not aware that the appraisal upon which the MPC was being marketed was in violation of either federal or state law. Had he had such knowledge, he would not have invested in Tamarack Resort LLC.

92.     The sixty (60) new Plaintiffs purchased real estate and memberships at one or more of the four MPCs, with their causes of action and damages being in all material respects the same as those incurred by the original nine named Plaintiffs:

**At Ginn sur Mer:** Charles and Susan L. Barker; Lawrence E. Burgee and Mary Sloat; Renard Damon; Philip D. and Virginia N. Grant; Scott Hoch; Shane and Jessica Locke; Nancy K. Mellor; Howard Heshy and Judah Neuman; Leonard Raskin; Ronald M. Rebmann; Seascape Ventures, Inc.; Luis Segarra; Thomas Simone and Joanne Conti; Phillip Tufano, Mathew Madure and Scott Stuckey;

**At Tamarack:** Dan R. and Kathy O. Boespflug; Jeffrey S. Ellenz; LeeAnn Ellenz and Tim Hollerich; Richard W. Hoyle; HS & WT LLC and Tamarack Tee LLC, by and through Warner Tillman; Degen HS&WT JV by and through Warner Tillman and Alan Degen; Scott Huerd and Sogol Nowbar; Linda Powell Jacoby; Buddy Beck; A. Stephen Zavell; Scott and Katie Lamming; Newton D. Lesh II; Kent Marangi; Richard R. and Sandra L. Nelson; Sheelagh Price and Garth Kanigowski; Alan and Kathryn Purwin; Kent and Charlotte Steele; Steven P. Thain; George and Pamela J. Wall; Rod Walz; Kevin A. and Diana L. Helmick;

**At Lake Las Vegas:** 20 Montova #310, LLC by and through John Passariello and William Moskowitz; Rogelio A. Balabis; Rudy A. Bianchi; William and Erica Cattaneo; Louis A. and Nancy Chitty; Debra N. Fouts; Angelo J. and Carole L. Gioia; Scott D. and Deborah A. Heger; Joseph M. Herzog; James and Heidi Hopewell; Michael J. James; Jeffrey Koznick; Johnnie F. and Gay Lau; Art Martello; Maisha McGee-Scott; Dennis M. McWilliams; John M. and Sharon L. Mikulka; Randall K. and Nancy M. Minas; Robert W. Mitchell, III.; Carol A. Morabito; David and Julie Palmer; Hemant and Vijyantika Patel;

**At Yellowstone Club:** BFG Kool-aid LLC by and through Chris Garlich; James J. and Patricia D. Dolan; and Voyager Properties, LLC.

**The specific information as to current residency, purchase information, and damages/losses of each of the new Plaintiffs is set forth in Appendix "A" hereto and made a part hereof as though fully set forth herein.**

**The Defendants:**

Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company with its principal United States office at 11 Madison Avenue, New York, New York. Credit Suisse Securities (USA) LLC was formerly known as Credit Suisse First Boston LLC, and is a wholly owned subsidiary of Credit Suisse (USA), Inc.

93.     Defendant Credit Suisse AG, Cayman Islands Branch, is a separate entity referred to as a "branch" and is a branch of Credit Suisse AG, or was a subsidiary of Credit Suisse First Boston LLC.   Credit Suisse AG, Cayman Islands Branch, operates in the Cayman Islands utilizing a postal drop box in the Cayman Islands but its transactions are forwarded to an office at 11 Madison Avenue, New York, New York.

94.     Defendant Credit Suisse First Boston is now known as Credit Suisse Securities (USA) LLC, an entity named separately as a defendant herein.

95.     Defendant Credit Suisse AG (and later Credit Suisse First Boston LLC is or was a Swiss corporation with a usual place of business in Zurich, Switzerland, and a usual place of business in the United States following Credit Suisse having acquired a major interest in First Boston. Its operations included publicly registered securities and warrants in the United States. Credit Suisse AG is a wholly owned subsidiary of Credit Suisse Group AG, which is a corporation organized under the laws of Switzerland.   Credit Suisse AG owns a subsidiary (jointly with Credit Suisse Group AG Guernsey Branch) known as Credit Suisse Holdings (USA) Inc., which wholly owns co-defendant Credit Suisse Securities (USA) LLC.

96.     Hereafter, all of the above enumerated defendant parties shall be collectively referred to as "Credit Suisse."

97.     Defendant Cushman, Inc. is a privately held New York corporation with a usual place of business in New York, NY.  Cushman, Inc. is wholly owned by Cushman Holdings, Inc.

98.     Plaintiffs are uninformed as to the true names and capacities of those Defendants sued herein as DOES 1 through 100, inclusive, and therefore sue said Defendants under such fictitious names. Plaintiffs are informed and believe that such fictitiously named Defendants are responsible in some manner for the events and happenings herein referred to,

Fourth Amended Complaint - 48

and proximately caused the damage to Plaintiffs as herein alleged. Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

## III.  JURISDICTION

99.    Diversity jurisdiction was originally conferred in this Court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), providing for jurisdiction where, as here, the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs and: (a) any member of a class of Plaintiffs is a citizen of a State different from any Defendant; and/or any member of a class of Plaintiffs is a citizen or subject of a foreign state. 28 U.S.C. §§ 1332(d)(2) and (6). This Court's jurisdiction originally conferred under CAFA when the Complaint was filed remains notwithstanding the Court entering an order denying class certification.

100.    In addition, this Court was originally conferred diversity jurisdiction under 28 U.S.C. § 1332(a) when the original Complaint was filed for the following reasons:

a. Each Plaintiff had diverse citizenship from each Defendant under 28 U.S.C. § 1332(a)(1)

b. Each Plaintiff had diverse citizenship from each domestic Defendant and there were additional defendants who were citizens or subjects of a foreign state under 28 U.S.C. § 1332(a)(3).

101.    Plaintiffs allege that the original jurisdiction conferred upon this Court when the Complaint was filed in 2010 was and is not divested by the addition of new Plaintiffs following denial of class certification.

Fourth Amended Complaint - 49

102.    Notwithstanding the preceding Paragraph, the addition of the new Plaintiffs to this
Fourth Amended Complaint vests this Court with diversity jurisdiction under 28 U.S.C. §
1332(a)(1),(2) because each new Plaintiff has diverse citizenship from each Defendant and
citizens of a foreign state are additional Defendants. The residence of each new Plaintiff is set
forth in Appendix A to this Fourth Amended Complaint.

103.    This Court has supplemental jurisdiction over the state law claims and causes of
action asserted herein for each jurisdiction, pursuant to 28 U.S.C. §1367(a).

104.    This Court has personal jurisdiction over all defendant parties pursuant to the
long-arm statute of the State of Idaho, codified at I.C. § 5-514, et seq., which subjects them
judicial process in this state as a result of their conduct of business activities within its territory
and/or the commission of tortious acts having a direct impact or effect therein.

## IV. VENUE

105.    Venue is properly in this Court pursuant to 28 U.S.C. 1391 (a) and (b), as a
substantial part of the events or omissions giving rise to subject claims occurred in this judicial
district, and a substantial part of the property associated with the subject claims is situate
therein.

## V. FACTUAL ALLEGATIONS

### A.    The Origin of Defendants' *"Loan to Own"* Scheme.

106.    In or about early 2003 Credit Suisse decided to "break new ground with a product
by doing real estate loans in the corporate bank loan market." *See* Partial and Interim Order, *In
re Yellowstone Mountain Club, LLC et al.,* Case No. 09--0014 (Bankr.D.Mont. May 12, 2009),
at page 6. Through its sophisticated internal financial research and modeling apparatus, Credit
Suisse determined with premeditation that massive profits of several kinds could be extracted

from an investment banking campaign to: (i) extend super-size loans to several key high end MPCs; (ii) collect exorbitant loan fees on the front end of such transactions; (iii) induce the MPCs to over-leverage themselves to such a degree that mid- to long-term financial and operating failure was inevitable; (iv) hasten such ultimate failure by utilizing Credit Suisse's own loan creditor and/or administrator status to impede optimal functioning for the debtor MPCs; (v) realize millions, even billions of dollars in additional profit on the "back end" of the loan transactions by acquiring each MPC (and or its primary assets) at significant discount following its demise. Now referred to as the *Loan to Own* scheme, this process of selling fatally super-sized leverage was immediately recognized as an opportunity for double dip profits. The inordinate loan amounts netted Credit Suisse correspondingly huge loan origination fees on the front end, and subsequently garnered them valuable assets at horrendously distressed "fire sale" prices within a period of a few years. It presented, therefore, an investment vehicle – like the now infamous credit default swap – too tantalizing to pass up, even if deception, illegality and collateral damage were required for its realization. Indeed, Plaintiffs are informed and believe, that at the same time it was originating the offensive loans to the MPCs, Credit Suisse was turning around and betting that these loans would ultimately fail through its purchase and sale of credit default swaps, which were essentially insurance policies on the loans that would payout to third party investors and to Credit Suisse when the loans ultimately failed. Plaintiffs are informed and believe that Credit Suisse failed to disclose the material fact to the MPCs and the homeowners, that Credit Suisse was selling these credit default swaps to third party investors who were betting for the failure of the loans, and that Credit Suisse was also buying credit default swaps so that it would profit when the loans ultimately failed. Had Credit Suisse disclosed to the public in its press releases and marketing campaigns described herein, that it

Fourth Amended Complaint - 51

was betting for the failure of the loans, and selling investment derivatives to third parties who were betting on the failure of the loans, Plaintiffs would not have purchased their properties.

107.   Credit Suisse's plot (including the Cushman TNV appraisal methodology), was particularly well tailored to exploit the times of its creation, as by early years of the 2000 decade, the Defendant perceived that the US and international real estate markets would soon soften, and were even likely to depreciate significantly in value.  The scheme Credit Suisse formulated and implemented contemplated that a typical real estate cycle would likely occur for a period of one to two years.  As part of the scheme, Credit Suisse created the function of "Administrator" to be able to dominate, influence and control each of the developers functioning as a co-developer to ensure its scheme of control would be carried out.

108.   Credit Suisse, in anticipation of the economic slowdown, did not want to be the sole developer for the MPCs as it would have to fund and maintain all of the obligations to the Plaintiffs and property owners once the developers failed or were foreclosed upon as a result of the inflated Credit Suisse loan.  Knowing that its loans were based on grossly inflated appraisals that violated USPAP and FIRREA, Credit Suisse knew that the resorts would ultimately fail. Yet this was part of the plan. Credit Suisse implemented this plan by: (1) foreclosing or forcing out the developer as it did at Lake Las Vegas in 2007 and use a nominee sham new owner to put it in bankruptcy as pretend the bank was a creditor when in truth and fact, its nominee sham "debtor in possession" (hereinafter "DIP") was under its complete control and domination.  In this regard, it could wipe out the Plaintiffs and property owners of their property rights and amenities, "cleanse" the resort and make it very attractive for resale;  (2) it would, as it did at the Tamarack MPC, force it into a development phase that would utterly cause it to immediately fail by violating its covenants and then allege either in bankruptcy or receivership, the

Fourth Amended Complaint - 52

"wrongdoing" of the developers, wipe out the property rights and amenities of the Plaintiffs, and if need be, shut down Tamarack, which in fact has taken place; (3) at Ginn sur Mer, once Ginn went under, it would allow the Ginn owners to remain as the putative owners of the planned resort while the anticipate money paid by the Plaintiffs would be used to build out the canal and infrastructure, then once the escrow fund was depleted, it would foreclose on Ginn and shut Ginn sur Mer down with no vertical development destroying the Plaintiffs promised property rights and guaranteed amenities and then flip the resort. Each of these pre-planned schemes was implemented at each of the MPC's.

109. This understanding provided additional solidity to the *Loan to Own* stratagem in several ways. First, it allowed Credit Suisse to conclude with even more certainty that a significant amount of debt would spell financial doom for each of the MPCs that had been identified as targets. Secondly, an impending real estate downturn provided additional assurance that Credit Suisse would eventually own and control each of the MPCs at discounted prices.

### B.     Cushman's Role in the Scheme

110. To implement its Loan to Own scheme, which was fundamentally premised on obtaining inflated appraisals to support the unsustainable loan amounts, Credit Suisse needed a complicit appraisal firm. It found that firm in Cushman.

111. In 2004, Credit Suisse contacted Charles Reinagel, an appraiser for Cushman, to perform a "Total Net Value" appraisal for Lake Las Vegas. This was a completely new and unheard of type of appraisal.

112. Nevertheless, Mr. Reinagel performed this appraisal for Lake Las Vegas.

113.    From that point forward, there was tremendous internal debate at Cushman about it performing these "Total Net Value" appraisals.

114.    In 2004, a Senior Director in the appraisal division of Cushman, Michael J. Miller, was the first to raise red flags within Cushman regarding the propriety of these appraisals.

115.    Specifically, in 2004 when Credit Suisse asked Mr. Reinagel to perform a "Total Net Value" appraisal for Lake Las Vegas, he contacted Mr. Miller because Mr. Miller had within the previous year performed an "as-is" market value appraisal for Lake Las Vegas. Mr. Miller offered to and did send Mr. Reinagel all of his working papers from his previous work on Lake Las Vegas. However, Mr. Reinagel informed Mr. Miller that Credit Suisse did not want any prior documentation from prior appraisals of Lake Las Vegas to be used for the new Total Net Value appraisal. In fact, Mr. Miller sent Mr. Reinagel his "working papers" from his prior appraisal of Lake Las Vegas by email but Mr. Reinagel responded by copying executive management and informed Mr. Miller that he was not to provide any information for the new appraisals that Credit Suisse was seeking and further that he was refusing to open Mr. Miller's prior working papers.

116.    From that point forward, Credit Suisse began ordering from Cushman a host of new Total Net Value appraisals for master-planned communities throughout the United States, including the MPCs. This caused great concern among the appraisers within Cushman.

117.    Specifically, Mr. Miller, Dean Paauw and John Busi (all Cushman appraisers) discussed with Reinagel the ability of Cushman to perform these types of appraisals. These conversations occurred over the telephone and in emails transmitted by means of interstate communications between Texas, California, Colorado and New York. Between 2004 and 2007

there were numerous internal emails within Cushman on the subject of the legitimacy and authenticity of the new Total Net Value methodology.

118.    These discussions and emails involved these Cushman appraisers discussing how this new valuation premise was not based on published dictionary terms or commonly used appraisal methodologies compliant with USPAP.  Nevertheless, Mr. Busi instructed Mr. Miller, Mr. Paauw and other appraisers to do these appraisals notwithstanding that the appraisals were not concluding to "as-is" market value.

119.    The definition of this new valuation premise was Total Net Value but changed to Total Net Proceeds in 2006.  The reason for the change to TNP was because Brian Curry was brought on at Cushman and he believed that the TNV methodology was not truly a "value" as used in the industry, and that there was a need for a new definition which would not be misleading.

120.    Specifically, the word "value" did not accurately reflect the conclusion because. the premise was just adding the total net revenue from all operations of the MPCs and this was not actually "value" because it did not account for any proper discount rate and had other deficiencies.

121.    Between 2005 and 2006 Mike Miller had discussions with Dean Paauw and Charles Reinagel and a new appraiser, Chris Donaldson, was added to the team.  The team had discussions about the appraisals being made under the Total Net Value and Total Net Proceeds methodology and concerns about the significantly higher numbers being concluded in those reports.  On several occasions, Dean Paauw called Mike Miller to discuss his concerns and the significant liability associated with those appraisals.  Mr. Paauw discussed the option of leaving

Cushman as a result of his concern of continuing to prepare these types of appraisals because of the significant values above "as-is" market value being represented.

122.   There were many discussions between Mike Miller, Dean Paauw, Charles Reinagel, Chris Donaldson and John Busi that the Total Net Value methodology was not a commonly accepted premise which might result in liability for Cushman. These appraisers knew that the appraisals were not FIRREA compliant because they did not require a "as-is" market value. Further, because all the reports were required to be USPAP compliant, in one conference call with this group John Busi instructed the group that Cushman nevertheless wanted the appraisers to continue to write the appraisal reports under the Total Net Proceeds valuation premise. Mike Miller, Dean Paauw, Chris Donaldson and Brian Curry expressed concerns during this conference call that the appraisal reports under the Total Net Value or Total Net Proceeds methodology may not be compliant with USPAP, but John Busi stated that he wanted the appraisers to conduct the additional assignments under the new premise.

123.   Because the valuation amounts being put on these new appraisal reports were significantly higher than market value, Dean Paauw, Mike Miller and other appraisers were seriously concerned as to their liability under the compliance approval recitations in the appraisals which were required under FIRREA and USPAP. So concerned about this new methodology was Dean Paauw, that at one point he commented to Mike Miller "...not in jail yet and still continuing to write these appraisals...."

124.   These appraisers did not know what upper level management at Credit Suisse was doing with these Total Net Value and Total Net Proceeds appraisals they were ordering and these appraisers could not believe that Credit Suisse would be lending money above the true market value of these properties. In the appraisers' minds, it made no sense for Credit Suisse to

Fourth Amended Complaint - 56

lend more money then what market value would allow because if Credit Suisse had to foreclose on its security, it could only sell the property for its value, and not the higher dollar figure it would lend out under a higher appraisal conclusion. This was contrary to all traditional notions of real estate loan underwriting.

125.    Because of these concerns, in 2005 or 2006, Mike Miller, on his own initiative arranged a meeting with the Credit Suisse executives who were ordering these appraisals in Los Angeles, California to better understand why they wanted this new valuation premise.

126.    Miller met with Credit Suisse personnel Eric Rielly, Jeremy Rogers, Grant Little, and Arik Prawer and discussed the significant number of appraisals Cushman was performing for Credit Suisse under the new methodology and the significant value conclusions in those appraisals. Miller was concerned about the potential liability to Cushman for the use of the TNV methodology. The Credit Suisse executives assured Miller that the appraisals were not being used to mislead or over-leverage the assets and that this new valuation process was being extended to even more new projects. The projects in existence at that time included seventeen or more developments, including Tamarack, Yellowstone, Ginn sur Mer and Lake Las Vegas.

127.    Despite the assurances by Credit Suisse, Mike Miller remained troubled because of the significant elevated valuations in these appraisals. He continued to have conversations with the other Cushman appraisers on whether they wanted to continue with this work for Credit Suisse.

128.    Despite the concerns of its appraisers, upper management at Cushman, including John Busi, disregarded these concerns in order to generate more income from the TNV appraisal methodology initiated by Credit Suisse, and refined by Cushman.

129.    Indicative of Cushman's guilt and conscious knowledge of its wrongdoing, in its appraisals and agreements with Credit Suisse, Cushman demanded and obtained from Credit Suisse complete indemnification from Credit Suisse for all liability arising to third parties as a result of any use of the appraisals by Credit Suisse, and in particular any use of the appraisals by third parties resulting from Credit Suisse circulating the appraisals or conclusions therein to the public in general.   The indemnity provision was unusual because usually a product is guaranteed by the vendor, not the purchaser, which is a further indicator of the scienter of the Defendants.

130.    Additionally, in the text of the appraisals, Credit Suisse agreed to not subpoena or otherwise require any employee of Cushman to testify regarding the appraisals in any litigation regarding the legitimacy of the appraisals.

131.    Cushman in preparing the TNV and TNP appraisals for Credit Suisse, knew or should have known that these appraisals were not simply determining a value of the developers' interest in the MPCs, but also that the value being determined also included the interest that each current and prospective homeowner had in their respective MPCs.   Each existing and prospective homeowner in the MPCs had a bundle of property rights that included their interests in the amenities and entitlements of each MPC as discussed herein.   Each appraisal, prepared by Cushman for each MPC, appraised in part, the value of the bundle of rights that each existing and prospective homeowner had in amenities and entitlements which were fundamental features of the MPCs.   Cushman knew or should have known that the Credit Suisse loans for which it was preparing these TNV and TNP appraisals would influence the value of not only the developers' interest in the MPCs, but also the value of the bundle of rights that each prospective and existing homeowner had in the MPCs' amenities and entitlements, as described herein.

Fourth Amended Complaint - 58

Because the values concluded to in the TNV and TNP appraisals were inflated far above what would have been concluded to in a legitimate "as-is" market value, FIRREA and USPAP compliant appraisal, Cushman knew or should have known that the amount of the Credit Suisse loans for which these TNP and TNV appraisals were being prepared, would be far in excess of what would be allowed under prudent lending practices. Thus, Cushman knew or consciously disregarded the fact that the bundle of rights that each homeowner had in the MPCs would be grossly over-leveraged by Credit Suisse's new loan product.

132.   By appraising the value of Plaintiffs' bundle of rights in the MPCs, Cushman owed a duty to Plaintiffs to appraise the MPCs according to FIRREA and USPAP standards and requirements and to not appraise the MPCs according to the TNV and TNP methodology which was in derogation of all accepted appraisal standards and requirements and which resulted in a grossly inflated appraisal value.

133.   The appraisals were inflated and violated USPAP and FIRREA in the following respects:

a.   Based on the information contained within the appraisals, the appraisal transmittal letters between Credit Suisse and Cushman, and the Credit Agreements between the MPCs and Credit Suisse, all Defendants were subject to the requirements of FIRREA and USPAP.  In fact, the Lake Las Vegas, Yellowstone Club, Tamarack and Ginn sur Merr appraisals stated that they complied with USPAP when in fact they did not.  The Ginn sur Mer appraisal even stated that it complied with FIRREA when in fact it did not.

b.   Defendants and the appraisals were subject, include without limitation, the following federal and state statutes and regulations: MT-ADC § 24.207.402;

Fourth Amended Complaint - 59

MCA § 37-54-303; MCA § 37-54-201; IDAPA §§ 24.18.01.004, 24.18.01.700; I.C. § 54-4106; NAC § 645C.400; N.R.S. § 645C.140; N.R.S.§ 645C.280; N.R.S. § 645C.170; 12 U.S.C. § 3331; 12 U.S.C. § 3339; 12 C.F.R. § 323.4; 12 C.F.R. § 34.44; 12 C.F.R. § 564.4; 12 C.F.R. § 225.64; 12 C.F.R. § 564.4.

c.      In relevant part, and without limitation, the appraisals prepared by Cushman for Credit Suisse for the MPCs violated USPAP and FIRREA by concluding to the TNV and TNP valuations under a formula not approved by the Appraisal Institute, by failing to properly discount to present value, and failing to utilize the Subdivision Development Method of determining values, thereby resulting in a much higher value conclusion than would have occurred under a legitimate "as-is market value" conclusion.

## C.      The Victims of Defendants' "*Loan to Own*" Scheme.

134.   Credit Suisse's exhaustive investment research quickly and reliably targeted the various MPCs which constituted the most lucrative victims of *Loan to Own*.  Indeed, the uncanny accuracy of the Defendant's financial stalking can be measured by the irrefutable circumstance that every MPC that received a *Loan to Own* product experienced relatively swift financial failure.  A Montana Bankruptcy Court has stated every loan recipient was "doomed to failure once they received their loans from Credit Suisse."

135.   With respect to the present action, the four MPCs of Lake Las Vegas, Tamarack, Yellowstone Club and Ginn sur Mer, numbered among Credit Suisse's primary objectives, for the reasons which follow:

**Lake Las Vegas**

136.    Until it received Loan to Own funds from Credit Suisse, Lake Las Vegas was a highly profitable 3,592 acre master-planned residential and destination resort, which included a 320-acre private lake, and maintained residential offerings such as custom home sites, waterfront and golf villas, resort condominiums and luxury executive homes. The MPC boasted attractive amenities including the 349-room Ritz-Carlton, Lake Las Vegas hotel, the 493-room Hyatt Regency Lake Las Vegas Resort, Spa and Casino, three award-winning golf courses and a full-service marina with water craft rentals and yacht cruises. Additionally, the Monte Lago Village Resort enclave at the center of the Lake Las Vegas Resort offered water's edge restaurants and cafes, boutiques and the 40,000 square-foot Casino Monte Lago.

137.    When it determined to target Lake Las Vegas, Credit Suisse knew that the MPC was designed, constructed and marketed as a "high-end" luxury real estate development with a specific included life-style.  Moreover, the understanding was universal to Credit Suisse and any individuals or entities considering or making a purchase of property in Lake Las Vegas that the MPC's appeal and benefits to residents involved the certain rights, privileges and amenities which ran with the land, including, among others, two year-round golf courses  ("Falls" and "Reflection Bay"); various fresh water, man-made lakes to complement the luxurious atmosphere of the development; first class restaurants, bar and pro-golf shop at each of the golf courses; owner discounts at all of the numerous stores at the golf courses and shops at the "Monte Lago Village" within  Lake Las Vegas; and a shuttle service for residents and guests at the Lake Las Vegas community; the right to join the "Yacht and Beach Club," (for those purchasing properties on the "South Shore"), the right of privacy in connection with their gated area, a private club and membership in a private golf course with a value of $150,000 to

Fourth Amended Complaint - 61

$250,000 per member, Yacht and Beach Club Memberships, all of which were lost and destroyed by the bankruptcy at Lake Las Vegas, resulting in losses in memberships ranging from $20,000 to $50,000 per resident to membership values as much as $250,000.

138.    As more fully described above, Credit Suisse employed a marketing campaign that caused the developers at Lake Las Vegas to announce to the residents and public, as a whole, that it had made a loan to Lake Las Vegas that would permit it to complete the development of the resort in just a few years. Lake Las Vegas, in response to Credit Suisse, held at least five boat cruise trips on the lake for hundreds of existing homeowners and prospective owners of property from Nevada and around the nation including real estate agents and brokers. Residents at Lake Las Vegas and prospective owners were impressed with the loan and the anticipated development, just as Credit Suisse anticipated. In reliance thereon, residents and purchasers invested in the MPC believing a major bank was lending resources to complete the project and believing all regulations and guidelines for lending were being complied with to protect existing property rights and amenities. The public announcement of the loan and accelerated development brought about by the loan encouraged the Plaintiffs to invest in their existing properties, retain properties which they might otherwise have sold, or purchase new properties in the MPC, unaware of the appraisal and lending scheme.

**Tamarack**

139.    Similarly, the Tamarack MPC was a coveted all-season recreation centered resort situated near Donnelly, Idaho. The development was advertised and sold as a first-class real estate enclave that included such features as ski slopes, numerous chair lifts to the mountaintop, hotels, shops, pools, restaurants, a world class golf course, and the nearby Lake Cascade, for swimming, boating and fishing. The Tamarack real property development was planned as a

phased development project, once characterized by the Governor of Idaho as one of the State's most valued treasures.

140.    Tamarack was so successful that between the years 2002 and 2004, the MPC sold out its initial real estate offering of 104 vacation homes and home sites – making it the largest resort home site launch in North American history.  Later in 2004, a second real estate release – 64 homes and home sites – also sold out, ground was broken at Tamarack Village, and Tamarack ski-mountain opened.  By the end of 2005, third, fourth, and fifth releases were successfully completed and construction of the Osprey Meadows golf course was in its final stages.  By January 2006, the Lodge at Osprey Meadows was opened, two more lifts were added to the ski resort, and a sixth successful real estate release was completed.

141.    As was well known by Credit Suisse when it determined to target Tamarack, the MPC was designed, constructed and marketed as a "high-end" luxury MPC development with a specific included life-style.  Moreover, the understanding was universal to Credit Suisse and any individuals or entities considering or making a purchase of property in Tamarack that the MPC's primary appeal and benefits to residents involved the certain rights, privileges and amenities which ran with the land, including, "ski-in/ski-out" home sites, access to world class hotels, shops, pools, restaurants, and a functioning world class golf course.  The Tamarack marketing materials, brochures, etc., contained the Credit Suisse logo and references to both Credit Suisse and Cushman.   One of the comprehensive offering booklets contained an appendix which directed the reader to a website where the Cushman appraisal using Total Net Value methodology could be read in full.  Further, and as set forth above, Credit Suisse caused a press release to be issued in Idaho on June 1, 2006 to promote its new loan to Tamarack and also to promote itself as the bank and cause existing property owners to further develop their

Fourth Amended Complaint - 63

land and for prospective purchasers of land to invest in reliance of the bank's reputation. Plaintiffs who purchased at Tamarack did indeed so rely and thereby suffered damage and injury as a result of the concealment of the scheme Credit Suisse and Cushman jointly, knowingly, intentionally and deliberately formulated and implemented. Plaintiffs also lost, as a result of the sham (Credit Suisse manipulated) receivership and bankruptcy of Tamarack, their investments in all the amenities, since ski runs, shops, food establishments, ski patrol and more were shut down and closed by the co-developer, Credit Suisse. Also lost were the Club Memberships that were valued between $25,000 to $50,000 for each of the Plaintiffs. Many Plaintiffs, including Gibson, never had their lots completed with the promised ski in/ski out development. Furthermore, the shutting down of the MPC's operations and amenities, resulted in a "loss of reputation" of the MPC which further diminished the values of Plaintiffs' purchases/investments. Many of these rights and amenities were included in the Plaintiffs' purchase documents and recorded covenants, which rights and amenities were known to Credit Suisse and Cushman at the time the appraisal and lending scheme was developed and promulgated.

### Ginn sur Mer

142.    Ginn sur Mer, located at the West-End of Grand Bahama Island, Grand Bahamas – only 48 miles south of Florida – was designed as a $4.9 billion "mega-mix" MPC on the ocean. It was conceived and sold as a first class luxury resort. The MPC's concepts and designs included 870 single family residential home sites along a functioning canal and beach front, two championship ocean-front golf courses and clubhouses; 4,400 condominium hotel units; two large marinas, a 130,000 square-foot casino; swimming pools and water park facilities; tennis court complexes; beach clubs and spas; a modern medical facility and private

airport expansion to accommodate owners and their guests while visiting the resort. None of these promised amenities were provided by the defendant co-developer/developer bank, Credit Suisse, and the resort has had no vertical development as a result of the scheme. There is no completed golf course, there are no pools, no exercise rooms or equipment. There is no water park, not one tennis court, no spa, no drinking water fountain, no beach club, no hotel, no functioning canal or beach front....nothing but barren land, with Credit Suisse ready to sell it to the highest bidder, but unable to do so because the bundle of rights (including the reputation) of the MPC has been destroyed or substantially diminished, as has the reputation and value of each of the other MPCs.

143.    Most of the purchasers of property at Ginn sur Mer were United States citizens who borrowed funds from Ginn Financial Corporation, located in the state of Florida, and subject to State of Florida's laws and all federal, lending and appraisal guidelines and standards. Substantially all of the transaction closings for Ginn sur Mer purchases occurred in Palm Coast, Florida at Ginn's Hammock Beach Resort.

144.    As was well known by Credit Suisse when it determined to target Ginn sur Mer, the MPC was marketed as a "high-end" luxury real estate development that was to include a life-style with all the rights and amenities described above. Moreover, the understanding was universal to Credit Suisse and any individuals or entities considering or making a purchase of property in Ginn sur Mer that the MPC's primary appeal and benefits to residents involved these above-described rights, privileges and amenities which ran with the land.

145.    The marketing campaign by Credit Suisse at Ginn sur Mer was substantially similar to that conducted at Tamarack and Lake Las Vegas. Credit Suisse anticipated individuals would promptly invest and purchase lots at the MPC. Credit Suisse knew that this

east coast targeted MPC on the ocean would attract many east coast investors familiar with Credit Suisse, which has branches in New York City. Accordingly, prior to the Credit Suisse loan for $675 Million, Credit Suisse instructed Ginn and its management to have its real estate agents and brokers advise all prospective purchasers, such as Gibson, that Credit Suisse was making a loan that would assist Ginn in carrying out all the promised property and contract rights and amenities described above. In reliance on and belief that the loan was accomplished in accord with all federal and state lending and appraisal laws, Plaintiffs invested in Ginn sur Mer. The investors had every reason to believe the developers, Bobby Ginn and Lubert Adler, would carry out the funding and construction of the development as advertised. Bobby Ginn himself made those same promises to the Prime Minister of the Bahamas who attended the launching of the resort at a "founders day" reception at Palm Coast, Florida. Sadly, unknown to Plaintiffs, the investors, and Bobby Ginn at the time, a man named Mike Miller at Cushman was on the inside fighting to stop the appraisal and lending scheme that would destroy Plaintiffs' investments.

146.    Had the developers at Lake Las Vegas, Yellowstone, Tamarack and Ginn sur Mer been aware of Mike Miller's concerns, Credit Suisse would have been stopped in its endeavor and proceedings brought against both Credit Suisse and Cushman. Instead, the developers' interests were destroyed, the Plaintiffs investments were destroyed or grossly diminished in value, and the MPCs were essentially destroyed by one of the most sophisticated inside lending schemes and appraisal scams in American history.

**Yellowstone Club**

147.    Yellowstone Club is a resort spanning roughly 13,400 acres of privately held land located in Madison County, Montana near the northwest corner of the Yellowstone National

Park.  The resort was constructed and sold as a private ski and golf community consisting of seven residential neighborhoods, and comprising 864 residential dwellings.  By all accounts, the development boasted the world's first private ski and golf community, open solely to members and guests.

148.    As described by Defendant Cushman in one of its appraisals, the Yellowstone Club:

> ...[a]ppeal[s] to ultra-wealthy families as a second-home (or third-home) location for its private recreational facilities (particularly the ski area), views, and proximity to winter and summer recreation...  The membership price for residents is $250,000 for a 30-year refundable deposit.

149.    At the time of the Credit Suisse loan in September, 2005, Yellowstone Club was established and well on its way to success.  It had sold approximately 351 residential units and was averaging about $50,000,000 a year in lot sales with very low debt.  The first year, 2000, there were only 19 sales, but that number steadily increased each year until 2005, when there were 48 lots sold at the time of the loan in September, plus another 42 lots under contract and in escrow.

150.    As Credit Suisse knew when it determined to target Yellowstone Club, the MPC was designed, constructed and marketed as a "high-end" luxury real estate development with a specific included life-style. Moreover, the understanding was universal to Credit Suisse and any individuals or entities considering or making a purchase of property in Yellowstone Club, that the MPC's primary appeal and benefits to residents involved the certain rights, privileges and amenities which ran with the land. These amenities included the aforementioned private ski resort, private golf course and use of the main lodge, the Warren Miller Lodge, a luxurious Club facility for the use of the Club members.

C.     **The Illegal Conspiracy of *Loan to Own: FIRREA and USPAP lead to the Cayman Islands and Co-Defendant Cushman***

151.    With its Loan to Own strategy and prey identified, Credit Suisse confronted the single most difficult obstacle to its otherwise assuredly profitable enterprise – the fact that applicable United States regulations and standards prohibited the very type of unlawful appraisal methodologies that Credit Suisse required for the highly leveraged loan product    To the contrary, the provisions of FIRREA and USPAP mandated that before they could originate their contemplated loans, Credit Suisse's American-based banking facilities must create and supply accurate and appropriately informative business/real estate appraisals of the MPCs and their included collateral in compliance with the appraisal standards of USPAP and FIRREA. Such appraisals were intended to, and would in fact, educate the MPCs about the relative size of financial risks entailed in any Credit Suisse loan.

152.    Cognizant that USPAP and FIRREA compliant appraisals would be certain to alert the MPCs of the massive and destructive over-leveraging that Credit Suisse planned to offer – and the near inevitability of debilitating debt service, default and failure – Credit Suisse invented an insidious yet ingenious avenue for their evasion.  It first determined to utilize an offshore bank "branch" in the Cayman Islands for the putative origination of any *Loan to Own* products.  In this manner, Credit Suisse sought to structure the transactions so that United States statutes and regulations purportedly did not apply, and the protections that those statutes offered to the MPCs (and to any ultimate holders of the risk of default on their debt) could be circumvented.

153.    Credit Suisse's Cayman Island Branch at all relevant times encompassed no actual physical presence, operations or personnel.  Instead, the branch consisted solely of a post

office box for incoming mail and a letterhead notation which could be applied to materials generated by other Credit Suisse locations in the United States.

154.    Having thus attempted to achieve immunity from United States financial laws with its Cayman Island Branch, Credit Suisse sought to involve a collusive partner in its *Loan to Own* plot – indeed, a co-conspirator (or aider and abettor) without which the entire scheme would have been impossible.  Specifically, Credit Suisse well knew that: (1) its ability to seduce MPCs into borrowing oppressive, commercially unreasonable loan amounts hinged almost exclusively on an apparent business appraisal which could justify them, and; (2) an accurate and appropriately informative appraisal would spell almost certain rejection of any excessive loan offered.  Consequently, Credit Suisse required a purportedly independent appraisal house which could be depended on to supply each *Loan to Own* victim with a tailored appraisal of its business that would make even a fatally burdensome loan amount appear easily manageable and low-risk. Moreover, the appraisal house in question would need to be willing to produce such misleading numbers with full knowledge that it violated governing United States laws and standards.

155.    Although Credit Suisse purported to employ its Cayman Islands Branch to fund these loans in an artifice to evade United States laws, its domestic banking entities were the ones responsible for ordering the TNV and TNP appraisals and marketing, negotiating and originating the loans.  Specifically: (1) on the TNV appraisal transmittal letter for Tamarack, Cushman addressed the letter to Credit Suisse Securities (USA) LLC, located in Los Angeles, California; (2) on the TNV appraisal transmittal letter for Ginn sur Mer, Cushman addressed the letter to Credit Suisse Securities (USA) LLC in New York, New York; (3) on the TNV appraisal transmittal letter for Lake Las Vegas, Cushman addressed the letter to Credit Suisse First Boston in Los Angeles, California; (4) on the TNV appraisal transmittal letter for the Yellowstone Club,

Cushman addressed the letter to Credit Suisse First Boston in Los Angeles; (5) the Lake Las Vegas Credit Engagement Letter with Credit Suisse, shows Credit Suisse First Boston at 11 Madison Avenue, NY as the sender; (6) the Yellowstone Club Credit Engagement Letter with Credit Suisse shows Credit Suisse First Boston at 11 Madison Avenue, NY as the sender; (7) the Tamarack Credit Engagement Letter with Credit Suisse shows Credit Suisse First Boston and Credit Suisse Securities (USA) LLC both at 11 Madison Avenue, NY as the senders; (8) the Ginn sur Mer Credit Engagement Letter with Credit Suisse shows Credit Suisse First Boston and Credit Suisse Securities (USA) LLC, both at 11 Madison Avenue, NY, as the senders; (9) the Ginn sur Mer Credit Agreement Cover Page shows Credit Suisse Securities (USA) LLC as "Fronting Bank" and "Paying Agent"; (10) the Lake Las Vegas Credit Agreement shows Credit Suisse First Boston as the lender; (11) the Yellowstone Club Credit Agreement shows Credit Suisse First Boston as the lender; (12) the Tamarack Credit Agreement shows Credit Suisse Securities (USA) LLC as "Fronting Bank" and "Paying Agent"; (13) the principals of the MPCs negotiated and dealt only with domestic representatives of Credit Suisse located in Los Angeles and New York when they were negotiating the loans; specifically, Jeff Barcy, Arik Prawer, Steve Yankauer, Michael Speller, and Grant Little, amongst others.

156.   Sometime in or before 2005, Credit Suisse chose the nationally and internationally prominent real estate firm of Cushman & Wakefield to fulfill this crucial role as described above. Cushman advertised itself as an appraisal service capable of appraising master planned communities, with a specialized team of involved personnel whom Cushman represented to have "extensive expertise in subdivision development appraisals and planned unit developments." Cushman's own resume materials described it as:

The world's largest privately held real estate services firm. Founded in 1917, the firm has 189 offices in 57 countries around the globe, and 11,000+ talented professionals. Cushman delivers integrated solutions by actively advising, implementing and managing on behalf of landlords, tenants, and investors through every stage of the real estate process. These solutions include helping clients to buy, sell, finance, lease, and manage assets. Cushman & Wakefield also provides valuation advice, strategic planning and research, portfolio analysis, and site selection and space location assistance, among many other advisory services.

157.    Together, Defendants Credit Suisse and Cushman devised the TNV appraisal method that would serve as their primary tool of deception in the solicitation and sale of the *Loan to Own* loans. This appraisal format was directly intended by Defendants to unrealistically inflate and overvalue the apparent worth of MPCs, making them seem comfortably able to assume the excessive amounts of debt load which would otherwise look ill-advised or even crippling. TNV appraisals accomplished this dissimulation predominantly by failing to apply standardized discounting methods which were critically and concretely required by all applicable United States financial/real estate standards and regulations, inclusive of FIRREA and USPAP. In so doing, TNV directly violated these governing laws and regulations in a material manner which was well known to both Credit Suisse and Cushman, and rendered the methodology inappropriate and deceptive for purposes of communicating about the loans which Defendants intended to sell to the subject MPCs.

158.    The Credit Suisse *Loan to Own* loans encumbered not only the MPCs but also the aforementioned bundle of rights that each existing and prospective homeowner in the MPCs had in the amenities and entitlements of each MPC. Since Credit Suisse had access to all of the MPCs' financial information, historic sales and sales projections, Credit Suisse knew that because of the excessive debt load, the MPCs could do nothing more with their cash flows but

service the Credit Suisse loan debt, leaving nothing left over for the MPCs to fulfill their obligations to the Plaintiffs to finish building out and maintain the promised amenities and infrastructure. In this regard, the Credit Suisse loans truly doomed the MPCs from the moment that the loans were originated (as the Montana bankruptcy court noted). Moreover, because the MPCs were doomed from the beginning, so too were the Plaintiffs' bundle of rights in the MPCs doomed, because the Credit Suisse loan also encumbered and directly interfered with those contracted interests of Plaintiffs in the MPCs.

159.   Yet despite their patent understanding of the illegality and fundamentally misleading nature of TNV, both Defendants agreed and proceeded to utilize that appraisal methodology in furtherance of their *Loan to Own* enterprise. As time would demonstrate, the deceptive artifice worked to perfection, causing the downfall of every MPC to receive it, directly engendering the derogation of the Plaintiffs' rights and interests.

**D.     The Ultimate "*Dolchstoss*" (stab in the back) of *Loan to Own*: Credit Suisse Positions Itself to Advise, Control, and Ensure the Financial Demise of, Its Victim MPC Loan Recipients.**

160.   Just as deceptive and deadly as its TNV appraisals was another aspect of the *Loan to Own* scheme which constituted a fundamental financial betrayal, or "backstab" (i.e. "dolchstoss"). From the outset of their wrongful enterprise, Credit Suisse intended that the numerous loan covenants, conditions, and restrictions to be included in the credit agreements of every MPC would allow Credit Suisse to:

(1) Gain full and complete insider information on every resort's operations, including their business models, historical performance, cash flows, cash flow requirements, risk and debt margins, projections for future sales and operations, overhead, infrastructure costs,

marketing information, and, most importantly, their primary financial vulnerabilities and bedrock contractual obligations to their residential homeowners which were determinative of their fates;

(2) Accede to a position of advisory authority and outright control over critical aspects of MPC functions, such as lot sales, earnings, infrastructure expenditures, distributions to owners, investments, loans and construction financing. For example, Credit Suisse directed Tamarack do build certain lodges even though neither the demand nor the cash flow existed to justify such expenditures;

(3) Employ the concomitant fiduciary status created by such power to influence, that of "Loan Administrator," and/or "Lending Advisor", to restrain and wrongfully undermine the performance of the MPCs in a significantly harmful manner which would ensure and hasten their outright failure, destroy their legal obligations to the Plaintiffs, and allow the consummation of *Loan to Own's* final chapter.

161.    By operation of these covenants contained in the loan documents, Credit Suisse became a trusted fiduciary and advisor, which the MPCs relied on and looked to for truthful advice from Credit Suisse as the Loan Advisor. For example, for Yellowstone Club, Credit Suisse used financial plans as exhibits to the loan agreement showing the debt being paid off within five (5) years, cherry picking the Cushman numbers with a much lower debt level. Defendants knew that the *sine qua non* of resorts was lifestyle and amenities, memorialized and embodied in the contractual promises to homeowners to provide upscale services and facilities. Defendants also knew that interference with these rights and obligations would destroy the MPCs' ability to sell product and continue profitability.

162.    With the addition of these incredibly lethal rights to misadvise and sabotage the MPCs, the illicit success of Defendants' *Loan to Own* scheme was essentially guaranteed.

Fourth Amended Complaint - 73

E. The Cherry on Top of *Loan to Own*: Syndication Insulates Credit Suisse from all Risk.

163.    The final masterstroke of Credit Suisse's illicit *Loan to Own* arrangement involved the deceptive and unfair elimination of any default or other contingent risk to Credit Suisse as the initial lender. Per the loan structure it created for every MPC, Credit Suisse was empowered to syndicate, or essentially sell off, its creditor status after effecting the transaction. It was allowed to divide its repayment obligations from the MPCs into "bonds," and trade such investment paper to a variety of willing buyers, thereby transferring to numerous syndication purchasers all risk of loan default, non-payment or loss of value.

164.    The result of Credit Suisse's syndication rights was that it could overleverage the MPCs, obtain huge fees both for originating the loan and then syndicating it, while eliminating all of its risk that would traditionally accompany an over-leveraged loan. In short, Credit Suisse could not lose.

F.    The Defendants Actualize *Loan to Own* on Victim MPCs and the Plaintiffs.

Lake Las Vegas

165.    Beginning in 2004, Defendants actively solicited Lake Las Vegas for receipt of their *Loan to Own* product, with intent to seduce the placing of an excessive debt load in conformity with the scheme and knowledge detailed in previous sections.

166.    At no time did Defendants reveal to Lake Las Vegas their knowledge that the proffered loan amounts were excessive, unsustainable, and almost certain to result in financial ruin for the resort, inclusive of the destruction of critical legal rights and expectations held by the Plaintiffs.

167.    On or about August 2004 through October 26, 2004, the date Cushman signed the illegal, misleading and deceptive appraisal, Defendants employed their materially deceptive

Fourth Amended Complaint - 74

TNV approach to supply Lake Las Vegas with an appraisal which they wrongfully represented as being compliant with all applicable United States financial laws and standards, inclusive of USPAP while erroneously posturing that it did not need to comply with FIRREA. However, this fundamentally improper TNV appraisal, in derogation of these aforesaid requirements, misled Lake Las Vegas so as to believe that severely excessive and crippling loan amounts were well within the MPC's conservative risk tolerance.

168.    As it received the Defendants' TNV appraisal, and the reasonable conclusions and explanations supplied by Defendants therewith, Lake Las Vegas had absolutely no hint or suspicion that it was being deceived by the Defendants. Such understandable reliance occurred in significant part because of the active conduct by Credit Suisse which rendered it a lending advisor to the MPC – one to which the resort looked for truthful and unbiased information. Specifically, through its extensive due diligence and underwriting process for the *Loan to Own* product, Credit Suisse acquired full knowledge of Lake Las Vegas' confidential, proprietary and critical business information, such as financials, business models, cash flow, sales, service and product strategies, etc.   Credit Suisse did so through the exercise of its unique power as "Administrator" of the loan, placing one of its employee agents, Frederick Chin, in total control of the affairs of Lake Las Vegas under the pretext that he would help restructure the resort and protect the rights of Plaintiffs. In truth and fact he was gathering data to implement the scheme, which he did by shutting down the resort and its amenities, including the Falls Golf Course and its restaurant and shops, Reflection Bay Golf Course and its restaurants and shops, the South Shore Golf Club and each of the golf courses set forth above.  All these amenities and the homeowners' rights to utilize them were destroyed by the implementation of the Credit Suisse

preplanned scheme to cleanse the debts of the resort through sham bankruptcy proceedings in Nevada.

169.    Defendants thereby acquired comprehensive understandings of how Lake Las Vegas maintained profitable operations, what loan amounts it could reasonable borrow without undue risk, where its key operational pressure points lay, and how it might be most vulnerable to interference or manipulation.

170.    Critically, Defendants' due diligence activities referenced above also bestowed detailed knowledge of the contractual and legal duties that Lake Las Vegas owed directly to those parties who purchased and owned its residential properties.  As such, both Credit Suisse and Cushman learned and exquisitely appreciated that every Lake Las Vegas homeowner had determined to buy their residences in reliance on the resort's provision of a variety of luxury and high-end services and amenities as previously described. The Defendants correspondingly well knew that any interference with, or hindrance of, Lake Las Vegas's present or future supply of such aspects of resort life would utterly derogate or destroy the distinct legal rights and benefits which the Plaintiffs had purchased and expected.

171.    Credit Suisse's and Cushman's intimate understanding of Lake Las Vegas, and its duties to residential homeowners, and the resultant position of trust Credit Suisse created toward all such parties, inexorably allowed Credit Suisse to assume the role of not just lending advisor and lending fiduciary, but even of co-developer with resort management.   Pointedly, the developer of Lake Las Vegas looked to Credit Suisse as a source of honest lending advice that not only would refrain from misleading them but would also protect their best interests and known vulnerabilities – the very definition under law of a fiduciary. Moreover, Credit Suisse, by virtue of its insider understanding of, and potential to affect, Lake Las Vegas homeowners' rights

Fourth Amended Complaint - 76

and positions, were vested with a duty to refrain from actively infringing upon or damaging the same.

172.    As a direct result of Cushman's active misrepresentations in its appraisals, coupled with Credit Suisse's active misrepresentations and omissions of material fact regarding the appraisals and its role in the resort, as well as abuse of its fiduciary status and/or duties of non-interference alleged hereinabove, Lake Las Vegas made the determination to accept a *Loan to Own* credit product, agreeing to borrow $570,000,000.

173.    In formalizing and imposing the terms of its loan agreement with Lake Las Vegas, Credit Suisse employed its holistic knowledge of the MPC to create contractual provisions that were consistent with, and further solidified, its co-developer status.  These terms took the form of covenants, limitations and controls which could be utilized by Credit Suisse to materially manipulate Lake Las Vegas's business, interfere with its profitability, and essentially further assure that the resort would be inescapably forced into such financial distress that it could not avoid patently breaching its fundamental legal obligations to Plaintiffs as residential homeowners, ceasing gainful operation, defaulting on debt, and ultimately facing failure and/or liquidation.

174.    As had been predicted at the inception of Credit Suisse's *Loan to Own* project, during the months and years that followed Lake Las Vegas's acceptance of its deceptively large debt, the MPC descended into financial instability and decline.

175.    This debilitating degeneration of operations was proximately caused by both: (1) the crushing debt service attendant on the excessive loan amounts induced by Defendants, and; (2) the direct and material interference and impediments deployed by Credit Suisse through the controls it held as a Loan Administrator and co-developer.

Fourth Amended Complaint - 77

176.    Inevitably, as the direct and foreseeable result of Lake Las Vegas's intended financial withering under an impossible *Loan to Own* burden, the MPC materially derogated and violated its core contractual duties to its homeowners (Plaintiffs herein) causing them damages.

177.    Finally, in 2007 as the macabre epilog of Credit Suisse's *Loan to Own* plot, Credit Suisse profited from Lake Las Vegas's independent demise by seizing control of the MPC through the sham nomination of Mr. Chin, and then through him, directing and manipulating LLV's bankruptcy proceedings for its own profit.

### Tamarack

178.    In late 2005 or early 2006, Credit Suisse actively solicited Tamarack for receipt of its *Loan to Own* product, with intent to seduce the placing of an excessive debt load in conformity with the scheme and knowledge detailed in previous sections.

179.    At no time did Credit Suisse reveal to Tamarack its knowledge that the proffered loan amounts were excessive, unsustainable, and almost certain to result in financial ruin for the resort, inclusive of the destruction of critical legal rights and expectations held by the Plaintiffs.

180.    On or about March 31, 2006, Defendants employed their materially deceptive TNV approach to supply Tamarack with an appraisal which they wrongfully represented as being compliant with all applicable United States financial laws and standards, inclusive of USPAP while erroneously posturing that it did not need to comply with FIRREA. However, this fundamentally improper Total Net Value appraisal, in derogation of these aforesaid requirements, misled Tamarack so as to believe that severely excessive and crippling loan amounts were well within the MPC's conservative risk tolerance.

181.    Defendants' TNV appraisal, and the reasonable conclusions and explanations supplied by Defendants therewith, provided Tamarack with absolutely no hint or suspicion that

Defendants were materially deceptive in their appraisal. Such understandable reliance occurred in significant part because of the active conduct by the Defendants which rendered them a Lending Advisor to the MPC – one to which the resort looked for truthful and unbiased information. Specifically, through their due diligence and underwriting process for the *Loan to Own* product. Defendants each acquired full knowledge of Tamarack's confidential, proprietary and critical business information, such as financials, business models, sales, service and product strategies, etc. Defendants thereby accrued comprehensive understandings of how Tamarack maintained profitable operations, what loan amounts it could reasonable borrow without undue risk, where its key operational pressure points lay, and how it might be most vulnerable to interference or manipulation.

182.     Critically, Defendants' due diligence activities referenced above also bestowed detailed knowledge of the contractual and legal duties that Tamarack owed directly to those parties who purchased and owned its residential properties. As such, both Credit Suisse and Cushman learned and exquisitely appreciated that every Tamarack homeowner had <u>inescapably</u> determined to buy their residences in reliance on resort's provision of a variety of luxury and high-end services and amenities discussed herein. The Defendants correspondingly knew well that any interference with, or hindrance of, Tamarack's present or future supply of such aspects of resort life would utterly derogate or destroy the distinct legal rights and benefits which the Plaintiffs had purchased and expected.

183.     Credit Suisse's understanding of Tamarack, and its duties to residential homeowners, and the resultant position of trust it created toward all such parties, inexorably allowed the Defendants to assume the role of not just lending advisor and lending fiduciary, but even of co-developer with resort management. Pointedly, the developer of Tamarack looked to

Credit Suisse as a source of honest lending advice that not only would refrain from misleading them but would protect their best interests and known vulnerabilities – the very definition under law of a fiduciary. Moreover, both Credit Suisse and Cushman, by virtue of their inside understanding of, and potential to affect, Tamarack homeowners' rights, were vested with a duty to refrain from actively infringing upon or damaging the same. For example, there came a time when the developer felt that it was undesirable, under the circumstance of the economy at the time, to proceed with later phases of development construction, as distinguished from using revenue to pay the principal and interest which would be coming due to Credit Suisse for the Phase 1 loan. The Credit Suisse representatives disagreed and required investment of resources at that time in the commencement of Phases 2 and 3, resulting in the loan going into default.

184.    As a direct result of the Defendants' active misrepresentations, as well as abuse of their fiduciary status and/or duties of non-interference alleged hereinabove, Tamarack made the determination to accept a *Loan to Own* credit product, agreeing to borrow $250 Million, as described in the June 1, 2006, press release.

185.    In formalizing and imposing the terms of its loan agreement with Tamarack, Credit Suisse employed its holistic knowledge of the MPC to create contractual provisions that were consistent with, and further solidified, its co-developer status. These terms took the form of covenants, limitations and controls which could be utilized by Credit Suisse to materially manipulate Tamarack's business, interfere with its profitability, thus further assuring that the resort would be forced into such financial distress that it could not avoid patently breaching its fundamental legal obligations to Plaintiffs, ceasing gainful operation, defaulting on debt, and ultimately facing failure and/or liquidation.

186.    As had been predicted at the inception of Defendants' *Loan to Own* project, during the months and years that followed Tamarack's acceptance of its deceptively large debt, the MPC descended into financial instability and decline. Ultimately the resort was required to cease all construction, and close down its operations. It was placed into involuntary bankruptcy by the actions of Credit Suisse and its surrogates.

187.    This debilitating degeneration of operations was proximately caused by both: (1) the crushing debt service attendant on the excessive loan amounts induced by Defendants, and; (2) the direct and material interference and impediments deployed by Credit Suisse through the controls it held as a loan administrator and co-developer as alleged above.

188.    Inevitably, as the direct and foreseeable result of Tamarack's intended financial withering under an impossible *Loan to Own* burden, the MPC materially derogated and violated its core contractual duties to its homeowners, causing them the loss of amenities and other damages herein alleged.

**Ginn sur Mer**

189.    As with Lake Las Vegas and Tamarack, Credit Suisse engaged in the same pattern of predatory lending and usurpation of developer control at Ginn sur Mer, ultimately leading to the MPC's demise as described above.

**Yellowstone Club**

190.    Beginning in 2004, Credit Suisse actively solicited Yellowstone Club for receipt of its *Loan to Own* product, with intent to seduce the placing of an excessive debt in conformity with the scheme and knowledge detailed in previous sections. These solicitations took the form of telephone calls to Timothy Blixseth, the owner founder, developer and manager of the Yellowstone Club. At first, Credit Suisse offered to make its loan in the amount of $150,000,000

but with the perversion of the inflated TNV appraisal, the loan amount increased to $230 million and then $330 million and to the final amount of $375,000,000. As the amount of the loan increased, so too did the fees earned by Credit Suisse; ultimately Credit Suisse earned $7,000,000 in origination fees alone. Yet the lending risk never increased because Credit Suisse simply shifted the lending risk to third party bond holders as described above.

191.    At no time did Defendants reveal to Yellowstone Club their knowledge that the proffered loan amounts were excessive, unsustainable, and almost certain to result in financial ruin for the resort, inclusive of the destruction of critical legal rights and expectations held by the Plaintiffs. As the Montana bankruptcy court found, the Yellowstone Club was doomed to failure from the moment of the loan's origination. At no time did the Defendants reveal to Yellowstone Club that the new appraisal of $1,165.3 Billion was reached by using a different method of appraising than the method used less than one year earlier, by Cushman. The earlier appraisal was approximately $450 million. Neither the Developer Blixseth, nor his attorneys were ever provided with a copy of the appraisal, nor were they informed that the TNV methodology was being utilized until years after the closing of the loan and the execution of the Credit Facility. Mr. Blixseth was first informed of the appraisal value of $1,165.3 Billion at a meeting in New York City in which representatives of Credit Suisse and Standards & Poors were present. The appraisal value was provided orally by Credit Suisse, but there was no disclosure of the method by which that value was reached.

192.    Significantly, the fundamentally improper TNV appraisal, in derogation of these aforesaid requirements, misled Yellowstone Club so as to believe that severely excessive and crippling loan amounts were well within the MPC's conservative risk tolerance. The fundamental problems with the TNV appraisal were compounded with the financial projections

Fourth Amended Complaint - 82

(a.k.a. "Sample Financial Plan") within the Yellowstone Club Credit Agreement, prepared by Credit Suisse, which purported to show how the debt under the $375,000,000 loan was to be paid. Specifically, the Sample Financial Plans attached to the Credit Agreement showed the Club being able to repay the entirety of the loan by the end of 2010 through lot sales and membership deposits. Any borrower looking at those financial projections would feel good about proceeding with the Credit Suisse loan.

193.    However, the Sample Financial Plan was fatally flawed. Not only did the Sample Financial Plan analyze a loan amount that was a full $100,000,000 less than the actual loan amount of $375,000,000, it ignored the Cushman appraisal, which increased the absorption rate an additional two years to 2012 and lowered the average selling price of each lot. Because the loan was a 5-year term, in order to syndicate the loan to bond holders, Credit Suisse had to show the debt being entirely paid off within the term, i.e., 2010 and not 2012 as contemplated by Cushman.

194.    By intentionally failing to adjust the Sample Financial Plan to account for a longer absorption period, less of an average price per lot sale, and keeping the principal loan amount $100,000,000 less than the actual loan amount, Credit Suisse lulled Yellowstone Club (and lot purchasers) into thinking that the loan was actually sustainable. Obviously, what should have happened was that the Sample Financial Plans should have been modified as the loan was ratcheted up to $375,000,000. If modified properly, the Yellowstone Club could have seen that either the term of the loan had to be lengthened, or the loan amount had to be decreased.

195.    A review of the Sample Financial Plan also shows why Credit Suisse was using the TNV methodology, as that enabled it to project how much cash would be available for debt

service, taxes and operational expenses. Not only did it enable Credit Suisse to project the cash, it allowed a very favorable and seemingly prudent 45% Loan-to-Value ratio.

196.    When it received the Defendants' TNV appraisal, the Credit Agreement, and the fabricated financial projections provided to it by Credit Suisse, Yellowstone Club had absolutely no hint or suspicion that Credit Suisse was materially deceiving it. Such understandable reliance occurred in significant part because of active conduct by Credit Suisse which rendered it a lending advisor to the MPC – one to which the resort looked for truthful and unbiased information. Specifically, through their extensive due diligence and underwriting process for the *Loan to Own* product, Credit Suisse acquired full knowledge of Yellowstone Club's confidential, proprietary and critical business information, including financials, business models, sales, service and product strategies, etc. Credit Suisse thereby accrued a comprehensive understanding of how Yellowstone Club maintained profitable operations, what loan amounts it could reasonable borrow without undue risk, where its key operational pressure points lay, and how it might be most vulnerable to interference or manipulation. Yet after receiving this information, Credit Suisse turned around and manipulated it as described above and represented to Yellowstone Club how it could service Credit Suisse's debt load.

197.    Critically, Defendants' due diligence activities referenced above also bestowed detailed knowledge of the contractual and legal duties that Yellowstone Club owed directly to those parties who purchased and owned its residential properties. As such, both Credit Suisse and Cushman learned, and exquisitely appreciated, that every Yellowstone Club homeowner had determined to buy their residences in reliance on resort's provision of a variety of luxury and high-end services and amenities as described above. The Defendants correspondingly knew well that any interference with, or hindrance of, Yellowstone Club's present or future supply of such

Fourth Amended Complaint - 84

aspects of resort life would utterly derogate or destroy the distinct legal rights and benefits which the Plaintiffs had purchased and rightfully expected.

198. Credit Suisse's and Cushman's intimate understanding of Yellowstone Club and its duties to residential homeowners, as well as the resultant position of trust it created toward all such parties, inexorably allowed Credit Suisse to assume the role of not just lending advisor and lending fiduciary but even that of a co-developer with resort management. Pointedly, the developer of Yellowstone Club looked to Credit Suisse as a source of honest lending advice that not only would refrain from misleading the Club but would protect its best interests and known vulnerabilities – the very definition under law of a fiduciary. Moreover, both Credit Suisse and Cushman, by virtue of their insider understanding of, and potential to affect, Yellowstone Club homeowners' rights and positions, were vested with a duty to refrain from actively infringing upon or damaging the same.

199. As a direct result of the Defendants' active misrepresentations and Credit Suisse omissions of material fact, as well as abuse of their fiduciary status and/or duties of non-interference alleged hereinabove, Yellowstone Club made the determination to accept a *Loan to Own* credit product, and agreed to borrow $375,000,000, effective September 30, 2005.

200. In formalizing and imposing the terms of its loan agreement with Yellowstone Club, Credit Suisse employed its holistic knowledge of the MPC to create contractual provisions that were consistent with, and further solidified, its co-developer status. These terms took the form of covenants, limitations and controls which could be utilized by Credit Suisse to materially manipulate Yellowstone Club's business, interfere with its profitability, and essentially further assure that the resort would be inevitable be forced into such financial distress that it could not

avoid breaching its fundamental legal obligations to Class members as residential homeowners, ceasing gainful operation, defaulting on debt, and ultimately facing failure and/or liquidation.

201.    As had been predicted at the inception of Credit Suisse's *Loan to Own* project, during the months and years that followed Yellowstone Club's acceptance of its deceptively large debt, the MPC functionally operated on the surface and could service its debt. Inevitably, as the direct and foreseeable result of Yellowstone Club's intended financial withering under an impossible *Loan to Own* burden, the MPC materially derogated and violated its core contractual duties to its homeowners, causing them damages.

202.    Tim Blixseth made all payments and met all loan covenants until he gave up ownership of YC to his ex-wife in August of 2008. She partnered with Sam Byrne through his Cross Harbor Capital fund which was a partner with Credit Suisse in the loan to YC, and YC filed bankruptcy 89 days after Edra Blixseth received ownership of the club.

203.    Credit Suisse, Sam Byrne, Ron Burkle, Mike Meldman, and indirectly Edra Blixseth teamed up as partners to purchase the assets of the club from the bankruptcy court for approximately 18% of the FIRREA and USPAP compliant 2004 appraisal.

204.    They succeeded and then sued Tim Blixseth on the YC loan through an entity they created in the bankruptcy plan entitled, The Yellowstone Club Liquidating Trust. In the plan they all inserted an exculpation clause that allowed them to sue Tim Blixseth but he could not sue any of them. Credit Suisse dominated and <u>controlled</u> 4 of 7 votes on the YCLT and sued Tim Blixseth for $286 million. Upon information and belief Credit Suisse promised many of the investment houses that it had convinced to invest in the YC loan, that Credit Suisse would collect the $286 Million from Tim Blixseth and pay that amount to the investors, as the investors had been forced to reduce their mortgage on the assets of Yellowstone Club from $307 million to $80

million in the reorganized bankruptcy plan. Several of the investors had begun to suspect they had been misled in investing in the September 30, 2005 YC loan and were threatening lawsuits against Credit Suisse and Cushman. Credit Suisse could not allow their loan to own scheme to be known to the investors who invested billions of dollars in the Credit Suisse MPC loan machination. That could have caused an avalanche of lawsuits by the investors and others against Credit Suisse.

205.    After the club's assets were bought from the bankruptcy court, Credit Suisse emerged as an owner alongside its co-conspirators, Messrs. Byrne, Burkle, Meldman, and indirectly, Edra Blixseth, and further, Credit Suisse held a first mortgage on the assets of the club.

## VII. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Tortious Interference with Plaintiffs Property Rights, including Amenities and Privileges at Each Resort Against All Defendants)**

206.    Plaintiffs incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Fourth Amended Complaint.

207.    Plaintiffs had substantively uniform contracts with the developers of each MPC, which contracts provided for the construction and maintenance of the rights, amenities and privileges running with the lands alleged hereinabove and which were known to Defendants at all times relevant hereto.

208.    Despite Defendants' knowledge of said contractual rights (both written and implied or imposed by law) of Plaintiffs, Defendants intentionally, without justification or privilege, and in pursuit solely of their own material gain, interfered with said contractual rights

by committing the unlawful, deceptive and illegal acts and omissions alleged in preceding sections.

209.   As a direct and proximate result of Defendants' unlawful, intentional and unprivileged interference with their contractual rights, Plaintiffs were caused economic damages in an amount to be determined at trial but well in excess of the jurisdictional minimum requirements of this Court.

210.   Furthermore, and as an independent basis for the claims pled here, the Defendants' contractual loan agreements with Plaintiffs' MPCs included concrete and enforceable legal benefits, as well as an implied covenant of good faith and fair dealing, all of which inured to the benefit of, and were therefore owed to, the Plaintiffs who were and continue to be third-party beneficiaries thereof.

211.   Consistent with the covenant of good faith and fair dealing inherent in said loan agreements and contracts, the Defendants owed, at all times, the duty and obligation to deal fairly, honestly and in good faith with the developers and for the benefit of the Plaintiffs in a manner consistent with accepted commercial practices and to do nothing to deprive them of the benefits to which they were entitled by virtue of their contractual rights in connection with their respective MPCs.

212.   By their wrongful conduct, Defendants, and each of them, breached: 1) the contractual agreements, both expressed and implied, benefiting Plaintiffs as third party beneficiaries; 2) the covenant of good faith and fair dealing owed to Plaintiffs which inhered in such contractual agreements.

213.   As a direct and proximate result of the Defendants' breach of contract and the covenant of good faith and fair dealing, Plaintiffs were caused and continue to suffer severe and

substantial economic harm, loss and damages in an amount which will be determined at trial. The damages to the named Plaintiffs are estimated to be approximately $86 Million.

## SECOND CAUSE OF ACTION
### (Negligence and Gross Negligence Against All Defendants)

214.    Plaintiffs incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Fourth Amended Complaint.

215.    Defendants owed duties of care to Plaintiffs as articulated above. Specifically, by virtue of their knowledge, control and position of trust relative to the MPCs and their third party beneficiaries, Defendants possessed a legal obligation to conduct all activity affecting them in observance of reasonable care.

216.    Defendants breached this duty through the conduct described above.

217.    Plaintiffs were directly and foreseeably injured as a result of Defendants' negligence and gross negligence.

218.    By reason of the foregoing, Plaintiffs are entitled to recover all of the damages sustained as a result of Defendants' negligence and gross negligence. The damages to the named Plaintiffs are estimated to be approximately $86 Million.

## THIRD CAUSE OF ACTION
### (Common Law Fraud Against All Defendants by Plaintiffs Gibson, Koenig & Blixseth only)

219.    Plaintiffs Gibson, Koenig and Blixseth incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Fourth Amended Complaint.

220.    As described in detail above, Defendants are liable to Plaintiffs for damages arising from their common law fraud committed by intentionally supplying materially false

Fourth Amended Complaint - 89

information to all MPC developers and the developers' third party beneficiary Plaintiffs and concealing material facts they had a duty to disclose, in connection with the described financial transactions.

221.   Cushman knew that the value conclusions in its TNV and TNP appraisals were far in excess of what would be allowed under a FIRREA and USPAP compliant appraisal. Thus, Cushman knew that such value conclusions were misleading. Cushman knew that the value conclusions in its inflated appraisals would be communicated to the Plaintiffs in one form or another, either through a communications of the value conclusion or in the fact that Credit Suisse would make a loan to the MPCs in an amount that would be supported by a legitimate USPAP and FIRREA compliant appraisal. Plaintiffs in fact did rely to their detriment on the value conclusions in the TNV and TNP appraisals as a result of Credit Suisse's marketing campaigns associated with their loans.

222.   Credit Suisse made material false representations, both through the appraisals, marketing activities and otherwise, that it knew would be communicated to and relied upon by Plaintiffs to their detriment. Credit Suisse made material misrepresentations to the developers when Credit Suisse communicated to the developers that loans would be beneficial to the MPCs and that the debt service under the loans would be manageable and sustainable as described above. Credit Suisse made further material false representations to the developers, loan brokers, real estate agents and the public in general when it publicized the fact that it was making its loans to the MPCs as described above but omitting from its public statements that the appraisals upon which the loans were based failed to comply with USPAP and FIRREA and further that the appraisals did not conclude to "as-is market value" but the inflated TNV and TNP value, and further that Credit Suisse betting that the loans would ultimately fail. Also omitted from Credit

Fourth Amended Complaint - 90

Suisse's public statements was disclosure of is scheme described above. When Credit Suisse made these public statements it held itself out as a banking institution regulated by United States laws. When Credit Suisse made these public statements and its private statements to developers as described above, it intended for those statements to reach the Plaintiffs, which they did as described above. Unfortunately, the Plaintiffs relied on these representations and omissions by Credit Suisse to their detriment by either purchasing properties in the MPCs or refraining from selling their existing properties within the MPCs.

223.    The Defendants' aforesaid false, misleading and untrue statements and omissions were material in that they related to matters that would have been of importance or significance in the developers' decision (on behalf of themselves and Plaintiffs, as known and foreseeable third party beneficiaries) whether to participate in the aforesaid financial transactions. Developers, on behalf of Plaintiffs, would have viewed the disclosure of the true facts as significantly altering the overall character and nature of the information available such that knowledge of the true facts would have materially affected Plaintiffs and their financial and economic decisions relative to the aforesaid financial transactions.

224.    At the time they entered into the aforesaid financial transactions, developers, on behalf of third party beneficiary Plaintiffs were not aware of the above-detailed untruths or omissions.

225.    Defendants made the aforementioned false representations, statements and omissions with knowledge of their falsity at the time they were made, or with reckless disregard for the truth and the rights of developers, Plaintiffs and knowing that developers, on behalf of Plaintiffs, would rely thereon to their detriment.

226. Developers, and Plaintiffs actually, reasonably and justifiably relied to their detriment on the material misrepresentations and omissions of the Defendants in entering into the financial transactions with Defendants, and that reliance caused the damages and harm for which Plaintiffs seek redress in this civil action. Had developers and Plaintiffs known the truth, developers would not have consummated the financial transactions or would have done so only on significantly different terms. Accordingly, the developers, would have remained the developers, the rights, amenities and privileges promised by the developers would have been honored, and the rights and property interests and values of Plaintiffs would not have been injured and damaged.

227. As a direct and proximate result of the aforesaid fraudulent, malicious and oppressive conduct of the Defendants, and each of them, Plaintiffs were caused severe economic damages in an amount to be determined at trial but which damages to the named Plaintiffs are estimated to be approximately $86 Million.

## FOURTH CAUSE OF ACTION

### (Common Law Negligent Misrepresentation Against All Defendants By Plaintiffs Gibson, Koenig, and Blixseth only)

228. Plaintiffs incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Fourth Amended Complaint.

229. As described herein, each of the Defendants is also liable to Plaintiffs Gibson, Koenig and Blixseth in damages for making negligent misrepresentations by supplying materially false information to all MPC developers, who were acting in part on behalf of Plaintiffs as third-party beneficiaries, in connection with financial transactions.

230.    Defendants furnished written and oral information to developers. Defendants prepared these documents and made these representations (including but not limited to the "Total Net Value and Total Net Proceeds" appraisals) with specific knowledge and intent that said documents would be distributed to developers and would foreseeably affect the latter's home buyers, in order to induce them to enter into the aforesaid financial and real estate transactions. Developers, on behalf of Plaintiffs, were thus the foreseeable recipients of said representations, and Defendants knew and intended that they would rely on the Defendants' representations, which Defendants knew were false and misleading.

231.    In connection with their respective proper business purposes in which they were lawfully engaged, developers, on behalf of Plaintiffs received the appraisals and other written and oral presentations from Defendants before entering into the financial transactions with Defendants. Developers, on behalf of Plaintiffs, also received the oral misstatements from the Defendants, and were subject to the aforementioned materially misleading omissions of the Defendants, in connection with said business purposes.

232.    Especially given the close relationship of trust and control between the Defendants and the developers and Plaintiffs, Defendants each had a duty to provide developers, on behalf of Plaintiffs, with materially accurate information and disclosures, and each Defendant had a duty to refrain from misrepresenting the terms of, or the basis for, the loans and loan agreements relative to each MPC. In violation of that duty, each Defendant failed to exercise reasonable care in connection with the aforesaid transactions, and the preparation, presentation, publication and communication thereof to foreseeable users of said information. Cushman was required to, and did, provide quarterly updates of its appraisals to the developers and to Credit

Suisse and thus the misconduct of Cushman continued beyond the date of execution of the Credit Facilities.

233.    Defendants and each of them failed to exercise reasonable care in making the oral and written presentations to the developers, on behalf of Plaintiffs.

234.    Defendants and each of them had a substantial pecuniary interest in the completion of the aforesaid loans and stood to receive substantial personal gain if the loan transactions were executed.

235.    Defendants and each of them negligently published and uttered untrue statements of material facts and negligently failed to affirmatively disclose facts that were necessary for the persons and entities to which they were published and uttered, in order to prevent said statements from being misleading and detrimental to the interests of the aforesaid developers and Plaintiffs.

236.    Defendants' aforesaid untrue statements and failures to disclose material facts related to matters of importance or significance to the decisions of the developers as to whether to enter into the said loan transactions with Defendants, and caused them to accept Defendants' proffered loan agreements, which in turn caused harm and substantial economic damages to the developers and Plaintiffs.

237.    The acts, omissions and conduct aforesaid of Defendants and each them amounted to the commission of gross negligence.

238.    The Plaintiffs herein did not know that the aforementioned representations and promises of Defendants were false, and they justifiably relied to their detriment on said representations, believing them to be true.

239.    As a direct and proximate result of the Defendants' misrepresentations, Plaintiffs were caused, and continue to suffer, economic damages in an amount to be determined at trial.

Fourth Amended Complaint - 94

## CONSPIRACY
### (Applicable to Non-Negligence Claims Against All Defendants)

240.    Defendants, and each of them, combined and conspired with each other and aided and abetted each other in the furtherance of a conspiracy to wrongfully harm Plaintiffs by means of the deceptive and illegal conduct specified herein above.

241.    Defendants and each of them agreed to participate in combination with one another, and with third parties or persons not herein named, in a scheme and civil conspiracy to engage in said deceptive and illegal conduct to the detriment of Plaintiffs.

242.    Defendants' aforesaid wrongful acts and conduct was committed by them with wrongful intent pursuant to Defendants' plan and scheme and in furtherance of their unlawful and tortious intent to benefit themselves financially to the detriment of Plaintiffs.

243.    Defendants' conspiracy to commit, and commission of, wrongful acts and conduct in furtherance of their illegal *Loan to Own* scheme caused substantial economic harm and damage to Plaintiffs in a cumulative amount exceeding $86 Million.  Each Defendant is jointly and severally liable to Plaintiffs for said damages.

### DEMAND FOR JURY TRIAL

Pursuant to F.R.C.P. 38(b), Plaintiffs hereby demand a jury trial on all issues in the Complaint and Counterclaim so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment on behalf of Plaintiffs and against Defendants and each of them as follows:

A.    Economic damages in a just and reasonable amount as determined by proof at trial; (The damages to the named Plaintiffs are estimated to be approximately $86 Million.)

B.      Plaintiffs' costs and expenses incurred in this action, including reasonable attorneys' and experts' fees;

C.      For an order that Defendants are estopped from asserting or attempting to enforce the contractual jury waiver clause, and/or other clauses in its loan agreements, or in the alternative for an Order that said clause, or clauses is/are not applicable and void in its/their entirety due to illegality or in the alternative that said clause, or clauses is/are not applicable with regard to Defendants' international torts; and

D.      For such other and further relief as to the Court seems meet and equitable in the premises.

Dated this 2nd day of October, 2014.

/s/ Michael J. Flynn                              /s/ Philip H. Stillman
Michael J. Flynn                                  Philip H. Stillman

/s/ Christopher J. Conant                         /s/ Robert C. Huntley
Christopher J. Conant                             Robert C. Huntley
Attorneys for all Plaintiffs Except Gibson, Koenig, Mushkin, Lafluer and Griffen Development

/s/ James C. Sabalos                              /s/ William L. Smith
James C. Sabalos                                  William L. Smith

Attorneys for Plaintiffs Gibson, Koenig, Mushkin, Lafluer and Griffen Development

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of October, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system which sent a Notice of Electronic Filing to the following persons:

Donald L. Morrow (donaldmorrow@paulhastings.com)

Panteha Abdollahi (pantehaabdollahi@paulhastings.com)
Barry G. Sher (barrysher@paulhastings.com)
Richard C. Boardman (RBoardman@perkinscoie.com)
Thomas Ray Guy (ray.guy@weil.com)
James L. Martin (jlm@moffatt.com)
David Lender (david.lender@weil.com)

/s/  Robert C. Huntley
Robert C. Huntley

## APPENDIX A to FOURTH AMENDED COMPLAINT

|  | NAME & RESIDENCY | Date of Purchase (DOP)<br>Lot No. (LN) | MPC | Estimated Damages |
|---|---|---|---|---|
| 1. | **20 Montova #310, LLC**<br>John Passariello & William Moskowitz<br>2953 W Cypress Creek Road, Suite 101<br>Fort Lauderdale, FL 33309 | DOP: 4/20/2006<br>LN:   20 Via Mantova Unit 310 | LLV | 580,0000 |
| 2. | **Balabis, Rogelio A. & Salvacion S.**<br>3577 Mallard Way<br>Antioch, CA 94509 | DOP:  11/14/2003<br>LN:    20 Pyrenees Ct. | LLV | 280,000 |
| 3. | **Barker, Charles and Susan L.**<br>2330 Seven Oaks Lane<br>Palm Beach Gardens, FL 33410 | DOP:  10/10/2006<br>LN:    245 and 246 | GSM | 920,905 |
| 4. | **Beck, Buddy**<br>11601 Shadow Lane<br>Fairfax Station, VA 22039 | DOP:  2/2004 – 3/2005<br>LN:    15, 29 | TAM | 920,000 |
| 5. | **BFG Kool-Aid LLC**<br>**Garlich, Chris**<br>7953 Park Drive<br>St. Louis, MO 63117 | DOP: 1/26/2006<br>LN:   428, 433, 434 | YC | 830,465<br>1,415,465<br>1,055,465<br>750,000<br>**4,051,395** |
| 6. | **Bianchi, Rudy A.**<br>Bianchi Presta LLP<br>Barristers & Solicitors<br>9100 Jane Street, Building A, 3rd Floor<br>Vaughan, Ontario<br>4K0A4 | DOP:  4/6/2006<br>LN:    25 Monte Lago Unit 205 | LLV | 259,900 |

| 7. | Boespflug, Dan R and Kathy O.<br>10416 W. Rockwood Street<br>Boise, Idaho 83704-1900 | DOP: 5/04/2007<br>LN: Lot 29 Block 18 | TAM | 1,185,000 |
|---|---|---|---|---|
| 8. | Burgee, Lawrence E. and Sloat, Mary<br>205 Brightdale Road<br>Timonium, MD 21093 (Lawrence)<br>1138 Concordia Drive, Towson, MD | DOP: 12/22/2006<br>LN: 455, West End Plat No. 3 | GSM | $412,900 |
| 9. | Cattaneo, William and Erica<br>27846 Country Lane Road<br>Laguna Niguel, CA 92677-3768 | DOP: 11/ 2003<br>LN: 30 Strada Di Villagio #415 | LLV | 214,900 |
| 10. | Chitty, Louis A and Nancy<br>P.O. Box 21680<br>Long Beach, CA 90801 | DOP: 6/ 2006<br>LN: 20 Via Mantova #302 | LLV | 800,000 |
| 11. | Damon, Renard | DOP:<br>LN: | GSM | To be Supplied |
| 12.<br>13. | Dolan, James J.<br>CFO Voyager Properties<br>90 Beta Drive<br>Pittsburgh, PA 15238 | DOP: 4/2007<br>LN: 96, 97 (Dolan)<br>12 Lots (Voyager Properties) | YC | 17,213,000<br>18,000,000 |
| 14. | Ellenz, Jeffrey S.<br>40667 Paxton Drive<br>Rancho Mirage, CA 92270 | DOP: 5/20/2005<br>LN: Condo 220 | TAM | 572,000 |
| 15. | Ellenz, LeeAnn and Hollerich, Tim<br>36395 Artisan Way<br>Cathedral City, CA 92234 | DOP: 2004<br>LN: 25 | TAM | 450,000 |
| 16. | Fouts, Debra N.<br>7627 E. Mercer Way<br>Mercer Island, WA 98040 | DOP: 6/ 2006<br>LN: 29 Montelago Blvd. #336 | LLV | 380,000 |

| 17. | Gioia, Angelo J. and Carole L.<br>21 Caminito Amore<br>Henderson, NV 89011 | DOP: 10/24/2003<br>LN:   21 Caminito Amore | LLV | 175,000 |
|---|---|---|---|---|
| 18. | Grant, Philip D and Virginia N<br>3 Pond Ridge Lane<br>Norwalk, CT 06853-1541 | DOP: 10/07/2006<br>LN:   36 | GSM | To Be Supplied |
| 19. | Heger, Scott D. and Deborah A.<br>4701 Royal Birkdale Way<br>Wesley Chapel, FL 33543 | DOP: 8/30/2006<br>LN:   6 Via Vasari #1206 | LLV | 870,000 |
| 20. | Herzog, Joseph M. C.P.A., P.C.<br>1000 Woodbury Rad, Ste 206<br>Woodbury, New York 11797 | DOP:   2/2008<br>LN:   160-14-815-007 | LLV | 688,000 |
| 21. | Hoch, Scott<br>8800 Lake Sheen Ct.<br>Orlando FL 32836 | DOP:   9/15/2006<br>LN:   West End Plot No. 1; Lot 120 | GSM | To be determined by Expert |
| 22. | Hopewell, James and Heidi<br>3 Grand Anacapri Drive<br>Henderson, NV 89011 | DOP: 8/1993<br>LN:   160-22-810-010 | LLV | 235,000 |
| 23. | Hoyle, Richard W.<br>1180 W. Ashboourne Drive<br>Eagle, Idaho 83616 | DOP:   1/22/2005<br>LN:   Lot 34 Block 2 (plus deposit on 2 condos in the Village – Lot # 220, 050) | TAM | 517,050 |

| 24. | HS & WT LLC (Lots 35 and 76) and Tamarack Tee LLC (Lot 93) - Tillman, Warner on behalf of | DOP: 12/01/2004<br>LN: Lot 79 Block 5, Lot 35 Block 13, Lot 76 Block 5,  Lot 93 Block 5 | TAM | 5,386,096 |
| 25. | AND<br>Degen HS&WT JV by and through Warner Tillman and Alan Degen (Lot #79) | | TAM | |
| 26. | Huerd, Scott and Nowbar, Sogol<br>1414 N. 18th Street<br>Boise, Idaho 83702-2525 | DOP: 2/04/2004<br>LN: Lot 47 Block 13 | TAM | 2,031,500 |
| 27. | Jacoby, Linda Powell<br>322 Chopin Way<br>Cardiff, CA 92007-2300 | DOP: 10/2007<br>LN: Lot 31  Block 15 | TAM | 340,000 |
| 28. | James, Michael J.<br>1983 Belwood Drive<br>Okemos, MI 48864 | DOP: 5/2004<br>LN: 22 Via Siena Place | LLV | 535,000 |
| 29. | Koznick, Jeffrey<br>18 Grand Miramer Drive<br>Henderson, NV 89011 | DOP: 1998<br>LN: 18 Grand Miroama Drive | LLV | 898,000 |
| 30. | Lamming, Scott and Katie<br>31511 Via Santa Maria<br>San Juan Capistrano, CA 92675 | DOP: 1/2004<br>LN: Lot 18 Block 18 | TAM | 312,000 |
| 31. | Lau, Johnnie F. and Gay<br>P.O. Box 90850<br>Henderson NV 89009<br>10 Greenside Drive<br>Las Vegas NV 89141 | DOP: 3/08/2007<br>LN: 160-23-513-008 | LLV | 470,000 |

| | | | | |
|---|---|---|---|---|
| 32. | Lesh, Newton D. II<br>420 Reed Way<br>Port Hueneme, CA 93041 | DOP:  6/10/04<br>LN:     Lot xx Block 15 | TAM | 1,008,361 |
| 33. | Locke, Shane and Jessica<br>11209 Macaw CT<br>Windermere, FL 34786-5635 | DOP:  1/26/2007<br>LN:     Lot 136 | GSM | To be Supplied |
| 34. | Marangi, Kent<br>3813 Vista Blanca<br>San Clemente, CA 92672 | DOP:  5/28/2005<br>LN:     Lot 61 Block 19 | TAM | 620,475 |
| 35. | Martello, Art<br>20 Benevolo Drive<br>Henderson, NV 89011 | DOP:  11/13/2006<br>LN:     25 Bella Fiore | LLV | 1,096,480 |
| 36. | McWilliams, Dennis<br>6311 Benzo Drive<br>San Jose, CA 95123 | DOP:  5/19/2006<br>LN:     29 Montelago Blvd. Unit 408 | LLV | 467,900 |
| 37. | Mellor, Nancy K.<br>8 Brayton Meadow<br>East Greenwich, RI 02818-1334 | DOP:  4/13/2007<br>LN:     Land | GSM | To be Supplied |
| 38. | McGEE-SCOTT (CHILDS), Maisha<br>1045 Bedford Gardens Drive<br>Alpharetta, GA 30022 | DOP:  3/09/2006<br>LN:     Luna di Lusso Unit 316 | LLV | 341,753 |
| 39. | Mikulka, John M. and Sharon L.<br>1120 White Sails Way<br>Corona Del Mar, CA 92625 | DOP:  5/06/2006<br>LN:     160-22-317-079 | LLV | 268,750 |
| 40. | Minas, Randall K. and Nancy M.<br>P.O. Box 191<br>Culver, IN 46571 | DOP:  2/2007; 7/2006;<br>LN:     25 Via Visione 13204<br>          29 Montelago Village # 252 | LLV | 1,459,900 |

| 41. | Mitchell, Robert W. III<br>Robert W. Mitchell III CPA PC<br>124 Park Street SE<br>Suite 201<br>Vienna, VA 22180 | DOP: 4/19/2006<br>LN: 8 Via Vasari #2204 | LLV | 790,167 |
|---|---|---|---|---|
| 42. | Morabito, Carol A.<br>32 Benevolo Drive<br>Henderson, NV 98011 | DOP: 11/01/2007<br>LN: 32 Benevolo Drive | LLV | 646,000 |
| 43. | Nelson, Richard R. and Sandra L.<br>105 Calwell Ct.<br>Folsom, CA 95630 | DOP: 3/24/2006<br>LN: Members Lodge #213 | TAM | 350,000 |
| 44. | Neuman, Howard Heshy & Judah<br>144-31 – 69th Road<br>Flushing, NY 11367-1424 | DOP: 11/27/2006<br>LN: 451 | GSM | 500,000 |
| 45. | Palmer, David and Julie<br>2607 W. Fountain Blvd.<br>Tampa, FL 33609 | DOP: 2/11/2004; 10/21/2003;<br>LN: 160-14-813-030; 160-22-817-083; | LLV | 1,000,000 |
| 46. | Patel, Hemant & Vijyantika<br>Vijhem Properties LLC<br>5 McGlashen Ct<br>South Barrington, Illinois 60010 | DOP: 12/28/2007<br>LN: Home/residence | LLV | 850,000 |
| 47. | Price, Sheelagh and Kanigowski, Garth<br>P.O. Box 462<br>McCall, Idaho 83638 | DOP: 2008<br>LN: Lot 63A | TAM | 1,680,569 |
| 48. | Purwin, Alan and Kathryn<br>Contact: Jack Snyder<br>16644 Roscoe Blvd.<br>Van Nuys, CA 91406 | DOP: 5/05/2006<br>LN: Lot 41 Block 13 | TAM | 2,045,000 |

| 49. | Raskin, Leonard, MSFS, CFP, CHFC, CLU, CAP, CASL, AEP * GSMBite/GSMBugs President, CEO Raskin Global 225 International Circle, Suite 101 Hunt Valley, Md. 21030 4010 Bland Road Phoenix, AZ 21131 | DOP: 6/2007 LN: 389, 390 | GSM | 1,581,806 |
| 50. | Rebmann, Ronald M. 1401 Minard Lane Green Oaks, IL 60048 | DOP: 3/15/2007 LN: P 59 | GSM | 695,000 |
| 51. | Seascape Ventures, Inc. Sean Ladson 4612 Crossfield Circle Louisville, KY 40241 | DOP: 3/19/2007 LN: Lot 202 West End Plat No. 2 | GSM | 369,900 |
| 52. | Segarra, Luis Crescent Realty Properties LLC 2 Stowe Road, Suite 3A Peekskill, NY10566 | DOP: 4/2007 LN: P26 Lot 218 | GSM | 1,000,000 |
| 53. | Simone, Thomas and Conti, Joanne 5471 Grand Park Place Boca Raton, FL 33486 | DOP: 3/29/2007 LN: 40 | GSM | 744,205 |
| 54. | Steele, Kent and Charlotte 335 Brianne Ct. Pleasanton, CA 94566 | DOP: October 2006 LN: Golden Bar Lot #20 | TAM | 443,900 |
| 55. | Thain, Steven 1706 205th Pl N.E. Sammamish, WA 98074 | DOP: LN: | TAM | To be Supplied |

| 56. | Tufano, Phillip<br>Madure, Mathew<br>Stuckey, Scott | DOP: 12/22/2006<br>LN:    Coquille Lot 93 | GSM | 818,748 |
|---|---|---|---|---|
| 57. | Wall, George and Pamela J.<br>11600 SW Bull Mt. Road<br>Tigard, OR 97224 | DOP: 8/04/2006<br>LN:   Lot 50 Block 13 | TAM | 1,137,500 |
| 58. | Walz, Rod<br>Rod and Jeri Walz<br>6959 Via Mariposa Norte<br>Bonsall, CA 92003 | DOP:   3/22/2004<br>LN:      Lot 48 Block 13 | TAM | 1,945,000 |
| 59. | Zavell, A. Stephen<br>5911 Ostrander Road<br>Oakland, CA 94618-2000 | DOP:      Deposit 2004; Land purchased 2005;<br>Building 2006-07<br>LN:      Lot 44 Block 2, Phase 2.1 | TAM | 383,000 |